# U. S. TERM LIMITS, INC., ET AL. *v.* THORNTON ET AL.

No. 93–1456. Argued November 29, 1994—Decided May 22, 1995*

---

*Together with No. 93–1828, *Bryant, Attorney General of Arkansas* v. *Hill et al.,* also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, p. 838. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., joined, *post*, p. 845.

*J. Winston Bryant*, Attorney General of Arkansas, *pro se*, argued the cause for petitioner in No. 93–1828. With him on the briefs were *Jeffrey A. Bell*, Deputy Attorney General, *Ann Purvis* and *David R. Raupp*, Assistant Attorneys General, *Griffin B. Bell, Paul J. Larkin, Jr., Richard F. Hatfield*, and *Cleta Deatherage Mitchell*. *John G. Kester* argued the cause for petitioners in No. 93–1456. With him on the briefs was *H. William Allen*. *Robert H. Bork, Theodore B. Olson*, and *Thomas G. Hungar* filed briefs for Representative Jay Dickey et al., and *Edward W. Warren* filed briefs for the Republican Party of Arkansas et al., as respondents under this Court's Rule 12.4.

*Louis R. Cohen* argued the cause for respondents in both cases. With him on the brief for respondents in No. 93–1828 were *W. Hardy Callcott, Peter B. Hutt II*, and *Elizabeth J. Robben*. *Henry Maurice Mitchell, Sherry P. Bartley, Rex E. Lee, Carter G. Phillips, Ronald S. Flagg, Mark D. Hopson, Joseph R. Guerra*, and *Jeffrey T. Green* filed a brief for respondent Thornton in No. 93–1456.

*Solicitor General Days* argued the cause for the United States as *amicus curiae* urging affirmance. With him on

the brief were *Assistant Attorneys General Dellinger* and *Hunger, Deputy Solicitor General Bender, Paul R. Q. Wolfson,* and *Douglas N. Letter.*†

Justice Stevens delivered the opinion of the Court.

The Constitution sets forth qualifications for membership in the Congress of the United States. Article I, § 2, cl. 2, which applies to the House of Representatives, provides:

†Briefs of *amici curiae* urging reversal in both cases were filed for the State of Nebraska et al. by *Don Stenberg,* Attorney General of Nebraska, and *L. Steven Grasz,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Robert A. Marks* of Hawaii, *Robert T. Stephan* of Kansas, *Chris Gorman* of Kentucky, *Scott Harshbarger* of Massachusetts, *Joseph P. Mazurek* of Montana, *Jeffrey R. Howard* of New Hampshire, *Lee Fisher* of Ohio, *Mark Barnett* of South Dakota, *Charles W. Burson* of Tennessee, and *Joseph B. Meyer* of Wyoming; for the State of Washington by *Christine O. Gregoire,* Attorney General, *James K. Pharris* and *William B. Collins,* Senior Assistant Attorneys General, and *Jeffrey T. Even,* Assistant Attorney General; for Citizens for Term Limits et al. by *Ronald A. Zumbrun, Anthony T. Caso, Deborah J. La Fetra,* and *John M. Groen;* for the Citizens United Foundation by *William J. Olson* and *John S. Miles;* for Congressional Term Limits Coalition, Inc., by *John C. Armor* and *Lowell D. Weeks;* for the Mountain States Legal Foundation et al. by *William Perry Pendley;* for People's Advocate, Inc., et al. by *Jayna P. Karpinski;* for the United States Justice Foundation by *James V. Lacy;* for Virginians for Term Limits et al. by *Charles A. Shanor, Zachary D. Fasman, Margaret H. Spurlin,* and *G. Stephen Parker;* and for the Washington Legal Foundation et al. by *Timothy E. Flanigan, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging reversal in No. 93–1456 were filed for the Alaska Committee for a Citizen Congress et al. by *Jeanette R. Burrage;* for the Allied Educational Foundation by *Bertram R. Gelfand* and *Jeffrey C. Dannenberg;* and for Governor John Engler by *Stephen J. Safranek.*

Briefs of *amici curiae* urging affirmance in both cases were filed for the American Civil Liberties Union et al. by *Kevin J. Hamilton* and *Steven R. Shapiro;* for the California Democratic Party by *Daniel H. Lowenstein* and *Jonathan H. Steinberg;* for the League of Women Voters of the United States et al. by *Frederic C. Tausend* and *Herbert E. Wilgis III;* and for Henry J. Hyde by *Charles A. Rothfeld.*

"No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."

Article I, § 3, cl. 3, which applies to the Senate, similarly provides:

"No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen."

Today's cases present a challenge to an amendment to the Arkansas State Constitution that prohibits the name of an otherwise-eligible candidate for Congress from appearing on the general election ballot if that candidate has already served three terms in the House of Representatives or two terms in the Senate. The Arkansas Supreme Court held that the amendment violates the Federal Constitution. We agree with that holding. Such a state-imposed restriction is contrary to the "fundamental principle of our representative democracy," embodied in the Constitution, that "the people should choose whom they please to govern them." *Powell* v. *McCormack*, 395 U. S. 486, 547 (1969) (internal quotation marks omitted). Allowing individual States to adopt their own qualifications for congressional service would be inconsistent with the Framers' vision of a uniform National Legislature representing the people of the United States. If the qualifications set forth in the text of the Constitution are to be changed, that text must be amended.

I

At the general election on November 3, 1992, the voters of Arkansas adopted Amendment 73 to their State Constitution. Proposed as a "Term Limitation Amendment," its preamble stated:

"The people of Arkansas find and declare that elected officials who remain in office too long become preoccupied with reelection and ignore their duties as representatives of the people. Entrenched incumbency has reduced voter participation and has led to an electoral system that is less free, less competitive, and less representative than the system established by the Founding Fathers. Therefore, the people of Arkansas, exercising their reserved powers, herein limit the terms of elected officials."

The limitations in Amendment 73 apply to three categories of elected officials. Section 1 provides that no elected official in the executive branch of the state government may serve more than two 4-year terms. Section 2 applies to the legislative branch of the state government; it provides that no member of the Arkansas House of Representatives may serve more than three 2-year terms and no member of the Arkansas Senate may serve more than two 4-year terms. Section 3, the provision at issue in these cases, applies to the Arkansas Congressional Delegation. It provides:

"(a) Any person having been elected to three or more terms as a member of the United States House of Representatives from Arkansas shall not be certified as a candidate and shall not be eligible to have his/her name placed on the ballot for election to the United States House of Representatives from Arkansas.

"(b) Any person having been elected to two or more terms as a member of the United States Senate from Arkansas shall not be certified as a candidate and shall not be eligible to have his/her name placed on the ballot for election to the United States Senate from Arkansas."

Amendment 73 states that it is self-executing and shall apply to all persons seeking election after January 1, 1993.

On November 13, 1992, respondent Bobbie Hill, on behalf of herself, similarly situated Arkansas "citizens, residents,

taxpayers and registered voters," and the League of Women Voters of Arkansas, filed a complaint in the Circuit Court for Pulaski County, Arkansas, seeking a declaratory judgment that § 3 of Amendment 73 is "unconstitutional and void." Her complaint named as defendants then-Governor Clinton, other state officers, the Republican Party of Arkansas, and the Democratic Party of Arkansas. The State of Arkansas, through its Attorney General, petitioner Winston Bryant, intervened as a party defendant in support of the amendment. Several proponents of the amendment also intervened, including petitioner U. S. Term Limits, Inc.

On cross-motions for summary judgment, the Circuit Court held that § 3 of Amendment 73 violated Article I of the Federal Constitution.[1]

With respect to that holding, in a 5-to-2 decision, the Arkansas Supreme Court affirmed. *U. S. Term Limits, Inc.* v. *Hill*, 316 Ark. 251, 872 S. W. 2d 349, 351 (1994). Writing for a plurality of three justices, Justice Robert L. Brown concluded that the congressional restrictions in Amendment 73 are unconstitutional because the States have no authority "to change, add to, or diminish" the requirements for congressional service enumerated in the Qualifications Clauses. *Id.*, at 265, 872 S. W. 2d, at 356. He noted:

> "If there is one watchword for representation of the various states in Congress, it is uniformity. Federal legislators speak to national issues that affect the citizens of every state. . . . The uniformity in qualifications man-

---

[1] The Circuit Court also held that § 3 was severable from the other provisions of the amendment, but that the entire amendment was void under state law for lack of an enacting clause. App. to Pet. for Cert. in No. 93–1456, p. 60a. The Arkansas Supreme Court affirmed the Circuit Court's decision regarding severability, *U. S. Term Limits, Inc.* v. *Hill*, 316 Ark. 251, 270, 872 S. W. 2d 349, 359 (1994), and reversed its decision regarding the enacting clause, *id.*, at 263, 872 S. W. 2d, at 355. The decision of the Arkansas Supreme Court with respect to those issues of state law is not before us.

dated in Article 1 provides the tenor and the fabric for representation in the Congress. Piecemeal restrictions by State would fly in the face of that order." *Ibid.*

Justice Brown's plurality opinion also rejected the argument that Amendment 73 is "merely a ballot access amendment," concluding that "[t]he intent and the effect of Amendment 73 are to disqualify congressional incumbents from further service." *Id.*, at 265–266, 872 S. W. 2d, at 356–357. Justice Brown considered the possibilities that an excluded candidate might run for Congress as a write-in candidate or be appointed to fill a vacancy to be "glimmers of opportunity . . . [that] are faint indeed—so faint in our judgment that they cannot salvage Amendment 73 from constitutional attack." *Id.*, at 266, 872 S. W. 2d, at 357. In separate opinions, Justice Dudley and Justice Gerald P. Brown agreed that Amendment 73 violates the Federal Constitution.

Two justices dissented from the federal constitutional holding. Justice Hays started from "the premise that all political authority resides in the people, limited only by those provisions of the federal or state constitutions specifically to the contrary." *Id.*, at 281, 872 S. W. 2d, at 367. Because his examination of the text and history of the Qualifications Clauses convinced him that the Constitution contains no express or implicit restriction on the States' ability to impose additional qualifications on candidates for Congress, Justice Hays concluded that § 3 is constitutional. Special Chief Justice Cracraft, drawing a distinction between a measure that "impose[s] an absolute bar on incumbent succession" and a measure that "merely makes it more difficult for an incumbent to be elected," *id.*, at 284, 872 S. W. 2d, at 368, concluded that Amendment 73 does not even implicate the Qualifications Clauses, and instead is merely a permissible ballot access restriction.

The State of Arkansas, by its Attorney General, and the intervenors petitioned for writs of certiorari. Because of the importance of the issues, we granted both petitions and

consolidated the cases for argument. See 512 U. S. 1218 (1994). We now affirm.

## II

As the opinions of the Arkansas Supreme Court suggest, the constitutionality of Amendment 73 depends critically on the resolution of two distinct issues. The first is whether the Constitution forbids States to add to or alter the qualifications specifically enumerated in the Constitution. The second is, if the Constitution does so forbid, whether the fact that Amendment 73 is formulated as a ballot access restriction rather than as an outright disqualification is of constitutional significance. Our resolution of these issues draws upon our prior resolution of a related but distinct issue: whether Congress has the power to add to or alter the qualifications of its Members.

Twenty-six years ago, in *Powell* v. *McCormack,* 395 U. S. 486 (1969), we reviewed the history and text of the Qualifications Clauses[2] in a case involving an attempted exclusion

---

[2] As we explained, that term may describe more than the provisions quoted, *supra,* at 783:

"In addition to the three qualifications set forth in Art. I, §2, Art. I, §3, cl. 7, authorizes the disqualification of any person convicted in an impeachment proceeding from 'any Office of honor, Trust or Profit under the United States'; Art. I, §6, cl. 2, provides that 'no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office'; and §3 of the 14th Amendment disqualifies any person 'who, having previously taken an oath . . . to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof.' It has been argued that each of these provisions, as well as the Guarantee Clause of Article IV and the oath requirement of Art. VI, cl. 3, is no less a 'qualification' within the meaning of Art. I, §5, than those set forth in Art. I, §2." *Powell* v. *McCormack,* 395 U. S. 486, 520, n. 41 (1969).

In *Powell,* we saw no need to resolve the question whether those additional provisions constitute "qualifications," because "both sides agree that Powell was not ineligible under any of these provisions." *Ibid.* We similarly have no need to resolve that question today: Because those additional provisions are part of the text of the Constitution, they have little bearing

of a duly elected Member of Congress. The principal issue was whether the power granted to each House in Art. I, § 5, cl. 1, to judge the "Qualifications of its own Members"[3] includes the power to impose qualifications other than those set forth in the text of the Constitution. In an opinion by Chief Justice Warren for eight Members of the Court,[4] we held that it does not. Because of the obvious importance of the issue, the Court's review of the history and meaning of the relevant constitutional text was especially thorough. We therefore begin our analysis today with a full statement of what we decided in that case.

### The Issue in Powell

In November 1966, Adam Clayton Powell, Jr., was elected from a District in New York to serve in the United States House of Representatives for the 90th Congress. Allegations that he had engaged in serious misconduct while serving as a committee chairman during the 89th Congress led to the appointment of a Select Committee to determine his eligibility to take his seat. That committee found that Powell met the age, citizenship, and residency requirements set forth in Art. I, § 2, cl. 2. The committee also found, however, that Powell had wrongfully diverted House funds for the use of others and himself and had made false reports on expenditures of foreign currency. Based on those findings, the House after debate adopted House Resolution 278, excluding

---

on whether Congress and the States may add qualifications to those that appear in the Constitution.

[3] Art. I, § 5, cl. 1, provides in part: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do business . . . ."

[4] Justice Stewart dissented on procedural grounds, arguing that the case should have been dismissed as moot. See 395 U. S., at 559–561. Other than expressing agreement with the characterization of the case as raising constitutional issues which " 'touch the bedrock of our political system [and] strike at the very heart of representative government,' " id., at 573, Justice Stewart did not comment on the merits.

Powell from membership in the House, and declared his seat vacant. See 395 U. S., at 489–493.

Powell and several voters of the district from which he had been elected filed suit seeking a declaratory judgment that the House Resolution was invalid because Art. I, §2, cl. 2, sets forth the exclusive qualifications for House membership. We ultimately accepted that contention, concluding that the House of Representatives has no "authority to *exclude*[5] any person, duly elected by his constituents, who meets all the requirements for membership expressly prescribed in the Constitution." 395 U. S., at 522 (emphasis in original); see also *id.*, at 547.[6] In reaching that conclusion, we undertook a detailed historical review to determine the intent of the Framers. Though recognizing that the Constitutional Convention debates themselves were inconclusive, see *id.*, at 532, we determined that the "relevant historical materials" reveal that Congress has no power to alter the qualifications in the text of the Constitution, *id.*, at 522.

## *Powell's Reliance on History*

We started our analysis in *Powell* by examining the British experience with qualifications for membership in Parliament, focusing in particular on the experience of John Wilkes. While serving as a member of Parliament, Wilkes had published an attack on a peace treaty with France. This

---

[5] The *Powell* Court emphasized the word "exclude" because it had been argued that the House Resolution depriving Powell of his seat should be viewed as an expulsion rather than an exclusion. Having rejected that submission, the Court expressed no opinion on issues related to the House's power to expel a Member who has been sworn in and seated.

[6] Though *Powell* addressed only the power of the House, the Court pointed out that its rationale was equally applicable to the Senate: "Since Art. I, §5, cl. 1, applies to both Houses of Congress, the scope of the Senate's power to judge the qualification of its members necessarily is identical to the scope of the House's power, with the exception, of course, that Art. I, §3, cl. 3, establishes different age and citizenship requirements for membership in the Senate." *Id.*, at 522, n. 44.

literary endeavor earned Wilkes a conviction for seditious libel and a 22-month prison sentence. In addition, Parliament declared Wilkes ineligible for membership and ordered him expelled. Despite (or perhaps because of) these difficulties, Wilkes was reelected several times. Parliament, however, persisted in its refusal to seat him. After several years of Wilkes' efforts, the House of Commons voted to expunge the resolutions that had expelled Wilkes and had declared him ineligible, labeling those prior actions "'subversive of the rights of the whole body of electors of this kingdom.'" *Id.*, at 528, quoting 22 Parliamentary History of England 1411 (1782) (Parl. Hist. Eng.). After reviewing Wilkes' "long and bitter struggle for the right of the British electorate to be represented by men of their own choice," 395 U. S., at 528, we concluded in *Powell* that "on the eve of the Constitutional Convention, English precedent stood for the proposition that 'the law of the land had regulated the qualifications of members to serve in parliament' and those qualifications were 'not occasional but fixed.'" *Ibid.*, quoting 16 Parl. Hist. Eng. 589, 590 (1769).

Against this historical background, we viewed the Convention debates as manifesting the Framers' intent that the qualifications in the Constitution be fixed and exclusive. We found particularly revealing the debate concerning a proposal made by the Committee of Detail that would have given Congress the power to add property qualifications. James Madison argued that such a power would vest "'an improper & dangerous power in the Legislature,'" by which the Legislature "'can by degrees subvert the Constitution.'" 395 U. S., at 533–534, quoting 2 Records of the Federal Convention of 1787, pp. 249–250 (M. Farrand ed. 1911) (hereinafter Farrand).[7] Madison continued: "'A Republic may be

---

[7] Though we recognized that Madison was responding to a proposal that would have allowed Congress to impose property restrictions, we noted that "Madison's argument was not aimed at the imposition of a property

converted into an aristocracy or oligarchy as well by limiting the number capable of being elected, as the number authorised to elect.'" 395 U. S., at 534, quoting 2 Farrand 250. We expressly noted that the "parallel between Madison's arguments and those made in Wilkes' behalf is striking." 395 U. S., at 534.

The Framers further revealed their concerns about congressional abuse of power when Gouverneur Morris suggested modifying the proposal of the Committee of Detail to grant Congress unfettered power to add qualifications. We noted that Hugh Williamson "expressed concern that if a majority of the legislature should happen to be 'composed of any particular description of men, of lawyers for example, . . . the future elections might be secured to their own body.'" *Id.*, at 535, quoting 2 Farrand 250. We noted, too, that Madison emphasized the British Parliament's attempts to regulate qualifications, and that he observed: "'[T]he abuse they had made of it was a lesson worthy of our attention.'" 395 U. S., at 535, quoting 2 Farrand 250. We found significant that the Convention rejected both Morris' modification and the Committee's proposal.

We also recognized in *Powell* that the post-Convention ratification debates confirmed that the Framers understood the qualifications in the Constitution to be fixed and unalterable by Congress. For example, we noted that in response to the antifederalist charge that the new Constitution favored the wealthy and well born, Alexander Hamilton wrote:

> "'The truth is that there is no method of securing to the rich the preference apprehended but by prescribing qualifications of property either for those who may elect or be elected. But this forms no part of the power to be conferred upon the national government. . . . *The*

---

qualification as such, but rather at the delegation to the Congress of the discretionary power to establish any qualifications." *Id.*, at 534.

*qualifications of the persons who may choose or be cho-
sen, as has been remarked upon other occasions, are
defined and fixed in the Constitution, and are unalter-
able by the legislature.'"* 395 U. S., at 539, quoting The
Federalist No. 60, p. 371 (C. Rossiter ed. 1961) (emphasis
added) (hereinafter The Federalist).

We thus attached special significance to "Hamilton's express
reliance on the immutability of the qualifications set forth in
the Constitution." 395 U. S., at 540. Moreover, we re-
viewed the debates at the state conventions and found that
they "also demonstrate the Framers' understanding that the
qualifications for members of Congress had been fixed in the
Constitution." *Ibid.;* see, *e. g., id.,* at 541, citing 3 Debates
on the Adoption of the Federal Constitution 8 (J. Elliot ed.
1863) (hereinafter Elliot's Debates) (Wilson Carey Nicholas,
Virginia).[8]

The exercise by Congress of its power to judge the quali-
fications of its Members further confirmed this understand-
ing. We concluded that, during the first 100 years of its
existence, "Congress strictly limited its power to judge the
qualifications of its members to those enumerated in the
Constitution." 395 U. S., at 542.

As this elaborate summary reveals, our historical analysis
in *Powell* was both detailed and persuasive. We thus con-
clude now, as we did in *Powell,* that history shows that, with

---

[8] Our examination of the history also caused us to reject the argument
that the negative phrasing of the Clauses indicated that the Framers did
not limit the power of the House to impose additional qualifications for
membership. *Id.,* at 537 (noting that the Committee of Style, which
edited the Qualifications Clauses to incorporate "their present negative
form," had "'no authority from the Convention to make alterations of sub-
stance in the Constitution as voted by the Convention, nor did it purport
to do so'"); *id.,* at 539, quoting C. Warren, The Making of the Constitution
422, n. 1 (1947) (hereinafter Warren); see also 2 Farrand 553 (the Commit-
tee of Style was appointed "to revise the stile and arrange the articles
which had been agreed to").

respect to Congress, the Framers intended the Constitution to establish fixed qualifications.[9]

### Powell's Reliance on Democratic Principles

In *Powell*, of course, we did not rely solely on an analysis of the historical evidence, but instead complemented that analysis with "an examination of the basic principles of our democratic system." *Id.*, at 548. We noted that allowing Congress to impose additional qualifications would violate that "fundamental principle of our representative democracy . . . 'that the people should choose whom they please to govern them.'" *Id.*, at 547, quoting 2 Elliot's Debates 257 (A. Hamilton, New York).

Our opinion made clear that this broad principle incorporated at least two fundamental ideas.[10] First, we empha-

---

[9] The text of the Qualifications Clauses also supports the result we reached in *Powell*. John Dickinson of Delaware observed that the enumeration of a few qualifications "would by implication tie up the hands of the Legislature from supplying omissions." 2 Farrand 123. Justice Story made the same point:

"It would seem but fair reasoning upon the plainest principles of interpretation, that when the constitution established certain qualifications, as necessary for office, it meant to exclude all others, as prerequisites. From the very nature of such a provision, the affirmation of these qualifications would seem to imply a negative of all others." 1 J. Story, Commentaries on the Constitution of the United States § 625 (3d ed. 1858) (hereinafter Story). See also Warren 421 ("As the Constitution . . . expressly set forth the qualifications of age, citizenship, and residence, and as the Convention refused to grant to Congress power to establish qualifications in general, the maxim *expressio unius exclusio alterius* would seem to apply").

As Dickinson's comment demonstrates, the Framers were well aware of the *expressio unius* argument that would result from their wording of the Qualifications Clauses; they adopted that wording nonetheless. There thus is no merit either to the dissent's suggestion that Story was the first to articulate the *expressio unius* argument, see *post*, at 868–869, or to the dissent's assertion that that argument is completely without merit.

[10] The principle also incorporated the more practical concern that reposing the power to adopt qualifications in Congress would lead to a self-perpetuating body to the detriment of the new Republic. See, *e. g.,*

sized the egalitarian concept that the opportunity to be elected was open to all.[11] We noted in particular Madison's statement in The Federalist that " '[u]nder these reasonable limitations [enumerated in the Constitution], the door of this part of the federal government is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession of religious faith.' " *Powell,* 395 U. S., at 540, n. 74, quoting The Federalist No. 52, at 326. Similarly, we noted that Wilson Carey Nicholas defended the Constitution against the charge that it "violated democratic principles" by arguing: " 'It has ever been considered a great security to liberty, that very few should be excluded from the right of being chosen to the legislature. This Constitution has amply attended to this idea. We find no qualifications required except those of age and residence.' " 395 U. S., at 541, quoting 3 Elliot's Debates 8.

Second, we recognized the critical postulate that sovereignty is vested in the people, and that sovereignty confers on the people the right to choose freely their representatives to the National Government. For example, we noted that "Robert Livingston . . . endorsed this same fundamental principle: 'The people are the best judges who ought to represent .them. To dictate and control them, to tell them whom they shall not elect, is to abridge their natural

---

*Powell,* 395 U. S., at 533–534, quoting 2 Farrand 250 (Madison) (" 'If the Legislature could regulate [the qualification of electors or elected], it can by degrees subvert the Constitution. A Republic may be converted into an aristocracy or oligarchy as well by limiting the number capable of being elected, as the number authorised to elect' "); 395 U. S., at 535–536 (citing statements of Williamson and Madison emphasizing the potential for legislative abuse).

[11] Contrary to the dissent's suggestion, *post,* at 879, we do not understand *Powell* as reading the Qualifications Clauses "to create a personal right to be a candidate for Congress." The Clauses did, however, further the interest of the people of the entire Nation in keeping the door to the National Legislature open to merit of every description.

rights.'" 395 U. S., at 541, n. 76, quoting 2 Elliot's Debates 292–293. Similarly, we observed that "[b]efore the New York convention . . . , Hamilton emphasized: 'The true principle of a republic is, that the people should choose whom they please to govern them. Representation is imperfect in proportion as the current of popular favor is checked. This great source of free government, popular election, should be perfectly pure, and the most unbounded liberty allowed.'" 395 U. S., at 540–541, quoting 2 Elliot's Debates 257. Quoting from the statement made in 1807 by the Chairman of the House Committee on Elections, we noted that "restrictions upon the people to choose their own representatives must be limited to those 'absolutely necessary for the safety of the society.'" 395 U. S., at 543, quoting 17 Annals of Cong. 874 (1807). Thus, in *Powell*, we agreed with the sentiment expressed on behalf of Wilkes' admission to Parliament: "'That the right of the electors to be represented by men of their own choice, was so essential for the preservation of all their other rights, that it ought to be considered as one of the most sacred parts of our constitution.'" 395 U. S., at 534, n. 65, quoting 16 Parl. Hist. Eng. 589–590 (1769).

*Powell* thus establishes two important propositions: first, that the "relevant historical materials" compel the conclusion that, at least with respect to qualifications imposed by Congress, the Framers intended the qualifications listed in the Constitution to be exclusive; and second, that that conclusion is equally compelled by an understanding of the "fundamental principle of our representative democracy . . . 'that the people should choose whom they please to govern them.'" 395 U. S., at 547.

### *Powell's Holding*

Petitioners argue somewhat half-heartedly that the narrow holding in *Powell*, which involved the power of the House to exclude a Member pursuant to Art. I, § 5, does not control the more general question whether Congress has the

power to add qualifications. *Powell*, however, is not susceptible to such a narrow reading. Our conclusion that Congress may not alter or add to the qualifications in the Constitution was integral to our analysis and outcome. See, *e. g.*, *id.*, at 540 (noting "Framers' understanding that the qualifications for members of Congress had been fixed in the Constitution"). Only two Terms ago we confirmed this understanding of *Powell* in *Nixon* v. *United States*, 506 U. S. 224 (1993). After noting that the three qualifications for membership specified in Art. I, § 2, are of "a precise, limited nature" and *"unalterable by the legislature,"* we explained:

> "Our conclusion in *Powell* was based on the fixed meaning of '[q]ualifications' set forth in Art. I, § 2. The claim by the House that its power to 'be the Judge of the Elections, Returns and Qualifications of its own Members' was a textual commitment of unreviewable authority was defeated by the existence of this separate provision specifying the only qualifications which might be imposed for House membership." *Id.*, at 237.[12]

---

[12] JUSTICE THOMAS' dissent purports to agree with the outcome of *Powell*, but rejects the reasoning in the opinion. The dissent treats *Powell* as simply an application of the "default rule" that if "the Constitution is silent about the exercise of a particular power—that is, where the Constitution does not speak either expressly or by necessary implication—the Federal Government lacks that power and the States enjoy it." *Post*, at 848, 876, 885–886. However, there is not a word in the Court's opinion in *Powell* suggesting that the decision rested on the "default rule" that undergirds the dissent's entire analysis. On the contrary, as the excerpt from *Nixon* quoted in the text plainly states, our conclusion in *Powell* was based on our understanding of the "fixed meaning of '[q]ualifications' set forth in Art. I, § 2." We concluded that the Framers affirmatively intended the qualifications set forth in the text of the Constitution to be exclusive in order to effectuate the principle that in a representative democracy the people should choose whom they please to govern them.

Moreover, the Court has never treated the dissent's "default rule" as absolute. In *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), for example, Chief Justice Marshall rejected the argument that the Constitution's silence on state power to tax federal instrumentalities requires that States

Unsurprisingly, the state courts and lower federal courts have similarly concluded that *Powell* conclusively resolved the issue whether Congress has the power to impose additional qualifications. See, *e. g., Joyner* v. *Mofford,* 706 F. 2d 1523, 1528 (CA9 1983) ("In *Powell* . . . , the Supreme Court accepted this restrictive view of the Qualifications Clause— at least as applied to Congress"); *Michel* v. *Anderson,* 14 F. 3d 623 (CADC 1994) (citing *Nixon's* description of *Powell's* holding); *Stumpf* v. *Lau,* 108 Nev. 826, 830, 839 P. 2d 120, 122 (1992) (citing *Powell* for the proposition that "[n]ot even Congress has the power to alter qualifications for these constitutional federal officers").[13]

---

have the power to do so. Under the dissent's unyielding approach, it would seem that *McCulloch* was wrongly decided. Similarly, the dissent's approach would invalidate our dormant Commerce Clause jurisprudence, because the Constitution is clearly silent on the subject of state legislation that discriminates against interstate commerce. However, though JUSTICE THOMAS has endorsed just that argument, see, *e. g., Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc., ante,* p. 175 (SCALIA, J., concurring in judgment, joined by THOMAS, J.), the Court has consistently rejected that argument and has continued to apply the dormant Commerce Clause, see, *e. g., ante,* at 179–180; *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.,* 486 U. S. 888 (1988).

[13] Our decision in *Powell* and its historical analysis were consistent with prior decisions from state courts. For example, in *State ex rel. Johnson* v. *Crane,* 65 Wyo. 189, 197 P. 2d 864 (1948), the Wyoming Supreme Court undertook a detailed historical analysis and concluded that the Qualifications Clauses were exclusive. Several other courts reached the same result, though without performing the same detailed historical analysis. See, *e. g., Hellmann* v. *Collier,* 217 Md. 93, 141 A. 2d 908 (1958); *State ex rel. Chandler* v. *Howell,* 104 Wash. 99, 175 P. 569 (1918); *State ex rel. Eaton* v. *Schmahl,* 140 Minn. 219, 167 N. W. 481 (1918); see generally *State ex rel. Johnson* v. *Crane,* 65 Wyo., at 204–213, 197 P. 2d, at 869–874 (citing cases).

The conclusion and analysis were also consistent with the positions taken by commentators and scholars. See, *e. g.,* n. 9, *supra;* see also Warren 412–422 (discussing history and concluding that "[t]he elimination of all power in Congress to fix qualifications clearly left the provisions of the Constitution itself as the sole source of qualifications").

In sum, after examining *Powell's* historical analysis and its articulation of the "basic principles of our democratic system," we reaffirm that the qualifications for service in Congress set forth in the text of the Constitution are "fixed," at least in the sense that they may not be supplemented by Congress.

## III

Our reaffirmation of *Powell* does not necessarily resolve the specific questions presented in these cases. For petitioners argue that whatever the constitutionality of additional qualifications for membership imposed by Congress, the historical and textual materials discussed in *Powell* do not support the conclusion that the Constitution prohibits additional qualifications imposed by States. In the absence of such a constitutional prohibition, petitioners argue, the Tenth Amendment and the principle of reserved powers require that States be allowed to add such qualifications.

Before addressing these arguments, we find it appropriate to take note of the striking unanimity among the courts that have considered the issue. None of the overwhelming array of briefs submitted by the parties and *amici* has called to our attention even a single case in which a state court or federal court has approved of a State's addition of qualifications for a Member of Congress. To the contrary, an impressive number of courts have determined that States lack the authority to add qualifications. See, *e. g., Chandler* v. *Howell,* 104 Wash. 99, 175 P. 569 (1918); *Eckwall* v. *Stadelman,* 146 Ore. 439, 446, 30 P. 2d 1037, 1040 (1934); *Stockton* v. *McFarland,* 56 Ariz. 138, 144, 106 P. 2d 328, 330 (1940); *State ex rel. Johnson* v. *Crane,* 65 Wyo. 189, 197 P. 2d 864 (1948); *Dillon* v. *Fiorina,* 340 F. Supp. 729, 731 (N. M. 1972); *Stack* v. *Adams,* 315 F. Supp. 1295, 1297–1298 (ND Fla. 1970); *Buckingham* v. *State,* 42 Del. 405, 35 A. 2d 903, 905 (1944); *Stumpf* v. *Lau,* 108 Nev. 826, 830, 839 P. 2d 120, 123 (1992); *Danielson* v. *Fitzsimmons,* 232 Minn. 149, 151, 44 N. W. 2d 484, 486 (1950); *In re Opinion of Judges,* 79 S. D. 585, 587,

116 N. W. 2d 233, 234 (1962). Courts have struck down state-imposed qualifications in the form of term limits, see, e. g., *Thorsted* v. *Gregoire*, 841 F. Supp. 1068, 1081 (WD Wash. 1994); *Stumpf* v. *Lau*, 108 Nev., at 830, 839 P. 2d, at 123, district residency requirements, see, e. g., *Hellmann* v. *Collier*, 217 Md. 93, 100, 141 A. 2d 908, 911 (1958); *Dillon* v. *Fiorina*, 340 F. Supp., at 731; *Exon* v. *Tiemann*, 279 F. Supp. 609, 613 (Neb. 1968); *State ex rel. Chavez* v. *Evans*, 79 N. M. 578, 581, 446 P. 2d 445, 448 (1968) *(per curiam)*, loyalty oath requirements, see, e. g., *Shub* v. *Simpson*, 196 Md. 177, 199, 76 A. 2d 332, 341, appeal dism'd, 340 U. S. 881 (1950); *In re O'Connor*, 173 Misc. 419, 421, 17 N. Y. S. 2d 758, 760 (Super. Ct. 1940), and restrictions on those convicted of felonies, see, e. g., *Application of Ferguson*, 57 Misc. 2d 1041, 1043, 294 N. Y. S. 2d 174, 176 (Super. Ct. 1968); *Danielson* v. *Fitzsimmons*, 232 Minn., at 151, 44 N. W. 2d, at 486; *State ex rel. Eaton* v. *Schmahl*, 140 Minn. 219, 220, 167 N. W. 481 (1918) *(per curiam)*. Prior to *Powell*, the commentators were similarly unanimous. See, e. g., 1 W. Blackstone, Commentaries, Appendix 213 (S. Tucker ed. 1803) ("[T]hese provisions, as they require qualifications which the constitution does not, may possibly be found to be nugatory"); 1 Story §627 (each Member of Congress is "an officer of the union, deriving his powers and qualifications from the constitution, and neither created by, dependent upon, nor controllable by, the states"); 1 J. Kent, Commentaries on American Law 228, n. a (3d ed. 1836) ("[T]he objections to the existence of any such power [on the part of the States to add qualifications are] . . . too palpable and weighty to admit of any discussion"); G. McCrary, American Law of Elections §322 (4th ed. 1897) ("It is not competent for any State to add to or in any manner change the qualifications for a Federal office, as prescribed by the Constitution or laws of the United States"); T. Cooley, General Principles of Constitutional Law 268 (2d ed. 1891) ("The Constitution and laws of the United States determine what shall be the qualifications for federal offices, and state

constitutions and laws can neither add to nor take away from them"); C. Burdick, Law of the American Constitution 160 (1922) ("It is clearly the intention of the Constitution that all persons not disqualified by the terms of that instrument should be eligible to the federal office of Representative"); *id.*, at 165 ("It is as clear that States have no more right to add to the constitutional qualifications of Senators than they have to add to those for Representatives"); Warren 422 ("The elimination of all power in Congress to fix qualifications clearly left the provisions of the Constitution itself as the sole source of qualifications").[14] This impressive and uniform body of judicial decisions and learned commentary indicates that the obstacles confronting petitioners are formidable indeed.

Petitioners argue that the Constitution contains no express prohibition against state-added qualifications, and that Amendment 73 is therefore an appropriate exercise of a State's reserved power to place additional restrictions on the choices that its own voters may make. We disagree for two independent reasons. First, we conclude that the power to add qualifications is not within the "original powers" of the States, and thus is not reserved to the States by the Tenth Amendment. Second, even if States possessed some original power in this area, we conclude that the Framers in-

---

[14] More recently, the commentators have split, with some arguing that state-imposed term limits are constitutional, see, *e. g.*, Gorsuch & Guzman, Will the Gentlemen Please Yield? A Defense of the Constitutionality of State-Imposed Term Limitation, 20 Hofstra L. Rev. 341 (1991); Hills, A Defense of State Constitutional Limits on Federal Congressional Terms, 53 U. Pitt. L. Rev. 97 (1991); Safranek, Term Limitations: Do the Winds of Change Blow Unconstitutional?, 26 Creighton L. Rev. 321 (1993), and others arguing that they are not, see, *e. g.*, Lowenstein, Are Congressional Term Limits Constitutional?, 18 Harv. J. L. & Pub. Policy 1 (1994); Eid & Kolbe, The New Anti-Federalism: The Constitutionality of State-Imposed Limits on Congressional Terms of Office, 69 Denver L. Rev. 1 (1992); Comment, Congressional Term Limits: Unconstitutional by Initiative, 67 Wash. L. Rev. 415 (1992).

tended the Constitution to be the exclusive source of qualifications for Members of Congress, and that the Framers thereby "divested" States of any power to add qualifications.

The "plan of the convention" as illuminated by the historical materials, our opinions, and the text of the Tenth Amendment draws a basic distinction between the powers of the newly created Federal Government and the powers retained by the pre-existing sovereign States. As Chief Justice Marshall explained, "it was neither necessary nor proper to define the powers retained by the States. These powers proceed, not from the people of America, but from the people of the several States; and remain, after the adoption of the constitution, what they were before, except so far as they may be abridged by that instrument." *Sturges* v. *Crowninshield*, 4 Wheat. 122, 193 (1819).

This classic statement by the Chief Justice endorsed Hamilton's reasoning in The Federalist No. 32 that the plan of the Constitutional Convention did not contemplate "[a]n entire consolidation of the States into one complete national sovereignty," but only a partial consolidation in which "the State governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, *exclusively* delegated to the United States." The Federalist No. 32, at 198. The text of the Tenth Amendment unambiguously confirms this principle:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

As we have frequently noted, "[t]he States unquestionably do retain a significant measure of sovereign authority. They do so, however, *only to the extent that the Constitution has not divested them of their original powers* and transferred those powers to the Federal Government." *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 549 (1985) (internal quotation marks and citation omitted) (em-

phasis added); see also *New York* v. *United States*, 505 U. S. 144, 155–156 (1992).

## Source of the Power

Contrary to petitioners' assertions, the power to add qualifications is not part of the original powers of sovereignty that the Tenth Amendment reserved to the States. Petitioners' Tenth Amendment argument misconceives the nature of the right at issue because that Amendment could only "reserve" that which existed before. As Justice Story recognized, "the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them. . . . No state can say, that it has reserved, what it never possessed." 1 Story § 627.

Justice Story's position thus echoes that of Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819). In *McCulloch,* the Court rejected the argument that the Constitution's silence on the subject of state power to tax corporations chartered by Congress implies that the States have "reserved" power to tax such federal instrumentalities. As Chief Justice Marshall pointed out, an "original right to tax" such federal entities "never existed, and the question whether it has been surrendered, cannot arise." *Id.,* at 430. See also *Crandall* v. *Nevada,* 6 Wall. 35, 46 (1868). In language that presaged Justice Story's argument, Chief Justice Marshall concluded: "This opinion does not deprive the States of any resources which they originally possessed." 4 Wheat., at 436.[15]

---

[15] Thus, contrary to the dissent's suggestion, *post,* at 856–857, Justice Story was not the first, only, or even most influential proponent of the principle that certain powers are not reserved to the States despite constitutional silence. Instead, as Chief Justice Marshall's opinion in *McCulloch* reveals, that principle has been a part of our jurisprudence for over 175 years.

With respect to setting qualifications for service in Congress, no such right existed before the Constitution was ratified. The contrary argument overlooks the revolutionary character of the Government that the Framers conceived. Prior to the adoption of the Constitution, the States had joined together under the Articles of Confederation. In that system, "the States retained most of their sovereignty, like independent nations bound together only by treaties." *Wesberry* v. *Sanders*, 376 U. S. 1, 9 (1964). After the Constitutional Convention convened, the Framers were presented with, and eventually adopted a variation of, "a plan not merely to amend the Articles of Confederation but to create an entirely new National Government with a National Executive, National Judiciary, and a National Legislature." *Id.*, at 10. In adopting that plan, the Framers envisioned a uniform national system, rejecting the notion that the Nation was a collection of States, and instead creating a direct link between the National Government and the people of the United States. See, *e. g., FERC* v. *Mississippi*, 456 U. S. 742, 791 (1982) (O'CONNOR, J., concurring in judgment in part and dissenting in part) ("The Constitution . . . permitt[ed] direct contact between the National Government and the individual citizen"). In that National Government, representatives owe primary allegiance not to the people of a State, but to the people of the Nation. As Justice Story observed, each Member of Congress is "an officer of the union, deriving his powers and qualifications from the constitution, and neither created by, dependent upon, nor controllable by, the states. . . . Those officers owe their existence and functions to the united voice of the whole, not of a portion, of the people." 1 Story § 627. Representatives and Senators are as much officers of the entire Union as is the President. States thus "have just as much right, and no more, to prescribe new qualifications for a representative, as they have for a president. . . . It is no original prerogative of state

power to appoint a representative, a senator, or president for the union." *Ibid.*[16]

We believe that the Constitution reflects the Framers' general agreement with the approach later articulated by Justice Story. For example, Art. I, § 5, cl. 1, provides: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." The text of the Constitution thus gives the representatives of all the people the final say in judging the qualifications of the representatives of any one State. For this reason, the dissent falters when it states that "the people of Georgia have no say over whom the people of Massachusetts select to represent them in Congress." *Post,* at 859.

Two other sections of the Constitution further support our view of the Framers' vision. First, consistent with Story's view, the Constitution provides that the salaries of representatives should "be ascertained by Law, and paid out of the Treasury of the United States," Art. I, § 6, rather than by individual States. The salary provisions reflect the view that representatives owe their allegiance to the people, and not to the States. Second, the provisions governing elections reveal the Framers' understanding that powers over the election of federal officers had to be delegated to, rather than reserved by, the States. It is surely no coincidence that the context of federal elections provides one of the few areas in which the Constitution expressly requires action by the States, namely that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be

---

[16] The Constitution's provision for election of Senators by the state legislatures, see Art. I, § 3, cl. 1, is entirely consistent with this view. The power of state legislatures to elect Senators comes from an express delegation of power from the Constitution, and thus was not at all based on some aspect of original state power. Of course, with the adoption of the Seventeenth Amendment, state power over the election of Senators was eliminated, and Senators, like Representatives, were elected directly by the people.

prescribed in each State by the Legislature thereof." Art. I, § 4, cl. 1. This duty parallels the duty under Article II that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors." Art. II, § 1, cl. 2. These Clauses are express delegations of power to the States to act with respect to federal elections.[17]

This conclusion is consistent with our previous recognition that, in certain limited contexts, the power to regulate the incidents of the federal system is not a reserved power of the States, but rather is delegated by the Constitution. Thus, we have noted that "[w]hile, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, . . . this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I." *United States* v. *Classic*, 313 U. S. 299, 315 (1941). Cf. *Hawke* v. *Smith, No. 1*, 253 U. S. 221, 230 (1920) ("[T]he power to ratify a proposed amendment to the Federal Constitution has its source in the Federal Constitution. The act of ratification by the State derives its authority from the Federal Constitution to which the State and its people have alike assented").

In short, as the Framers recognized, electing representatives to the National Legislature was a new right, arising from the Constitution itself. The Tenth Amendment thus provides no basis for concluding that the States possess reserved power to add qualifications to those that are fixed in the Constitution. Instead, any state power to set the qualifications for membership in Congress must derive not from the reserved powers of state sovereignty, but rather from the delegated powers of national sovereignty. In the absence of any constitutional delegation to the States of power to add qualifications to those enumerated in the Constitution, such a power does not exist.

---

[17] The Clauses also reflect the idea that the Constitution treats both the President and Members of Congress as federal officers.

### The Preclusion of State Power

Even if we believed that States possessed as part of their original powers some control over congressional qualifications, the text and structure of the Constitution, the relevant historical materials, and, most importantly, the "basic principles of our democratic system" all demonstrate that the Qualifications Clauses were intended to preclude the States from exercising any such power and to fix as exclusive the qualifications in the Constitution.

Much of the historical analysis was undertaken by the Court in *Powell*. See *supra*, at 789–793. There is, however, additional historical evidence that pertains directly to the power of the States. That evidence, though perhaps not as extensive as that reviewed in *Powell*, leads unavoidably to the conclusion that the States lack the power to add qualifications.

### The Convention and Ratification Debates

The available affirmative evidence indicates the Framers' intent that States have no role in the setting of qualifications. In Federalist Paper No. 52, dealing with the House of Representatives, Madison addressed the "qualifications of the electors and the elected." The Federalist No. 52, at 325. Madison first noted the difficulty in achieving uniformity in the qualifications for electors, which resulted in the Framers' decision to require only that the qualifications for federal electors be the same as those for state electors. Madison argued that such a decision "must be satisfactory to every State, because it is comfortable to the standard already established, or which may be established, by the State itself." *Id.*, at 326. Madison then explicitly contrasted the state control over the qualifications of electors with the lack of state control over the qualifications of the elected:

> "The qualifications of the elected, being less carefully and properly defined by the State constitutions, and being at the same time more susceptible of uniformity,

have been very properly considered and regulated by the convention. A representative of the United States must be of the age of twenty-five years; must have been seven years a citizen of the United States; must, at the time of his election be an inhabitant of the State he is to represent; and, during the time of his service must be in no office under the United States. Under these reasonable limitations, the door of this part of the federal government is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession of religious faith." *Ibid.*[18]

---

[18] The dissent places a novel and implausible interpretation on this paragraph. Consistent with its entire analysis, the dissent reads Madison as saying that the sole purpose of the Qualifications Clauses was to set minimum qualifications that would prevent the States from sending incompetent representatives to Congress; in other words, Madison viewed the Clauses as preventing the States from opening the door to this part of the federal service too widely. See *post,* at 900–902.

The text of The Federalist No. 52 belies the dissent's reading. First, Madison emphasized that "[t]he qualifications of the elected . . . [were] more susceptible of uniformity." His emphasis on uniformity would be quite anomalous if he envisioned that States would create for their representatives a patchwork of qualifications. Second, the idea that Madison was in fact concerned that States would open the doors to national service too widely is entirely inconsistent with Madison's emphasizing that the Constitution kept "the door . . . open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession of religious faith." The Federalist No. 52, at 326.

Finally the dissent argues that "Madison could not possibly have been rebuking the States for setting unduly high qualifications for their representatives in Congress," *post,* at 901, and suggests that Madison's comments do not reflect "an implicit criticism of the States for setting unduly high entrance barriers," *post,* at 902. We disagree. Though the dissent attempts to minimize the extensiveness of state-imposed qualifications by focusing on the qualifications that States imposed on delegates to Congress and the age restrictions that they imposed on state legislators, the dissent neglects to give appropriate attention to the abundance of property, religious, and other qualifications that States imposed on state

Madison emphasized this same idea in The Federalist No. 57:

> "Who are to be the objects of popular choice? Every citizen whose merit may recommend him to the esteem and confidence of his country. *No qualification of wealth, of birth, of religious faith, or of civil profession is permitted to fetter the judgment or disappoint the inclination of the people.*" The Federalist No. 57, at 351 (emphasis added).

The provisions in the Constitution governing federal elections confirm the Framers' intent that States lack power to add qualifications. The Framers feared that the diverse interests of the States would undermine the National Legislature, and thus they adopted provisions intended to minimize the possibility of state interference with federal elections. For example, to prevent discrimination against federal electors, the Framers required in Art. I, § 2, cl. 1, that the qualifications for federal electors be the same as those for state electors. As Madison noted, allowing States to differentiate between the qualifications for state and federal electors "would have rendered too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone." The Federalist No. 52, at 326. Similarly, in Art. I, § 4, cl. 1, though giving the States the freedom to regulate the "Times, Places and Manner of holding Elections," the Framers created a safeguard against state abuse by giving Congress the power to "by Law make or alter such Regulations." The Convention debates make clear that the Framers' overriding concern was the potential for States' abuse of the power to set the

---

elected officials. As we describe in some detail, *infra*, at 823–826, nearly every State had property qualifications, and many States had religious qualifications, term limits, or other qualifications. As Madison surely recognized, without a constitutional prohibition, these qualifications could be applied to federal representatives. We cannot read Madison's comments on the "open door" of the Federal Government as anything but a rejection of the "unduly high" barriers imposed by States.

"Times, Places and Manner" of elections. Madison noted that "[i]t was impossible to foresee all the abuses that might be made of the discretionary power." 2 Farrand 240. Gouverneur Morris feared that "the States might make false returns and then make no provisions for new elections." *Id.*, at 241. When Charles Pinckney and John Rutledge moved to strike the congressional safeguard, the motion was soundly defeated. *Id.*, at 240–241. As Hamilton later noted: "Nothing can be more evident than that an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy." The Federalist No. 59, at 363. See also *ibid.* (one justification for Times, Places and Manner Clause is that "[i]f we are in a humor to presume abuses of power, it is as fair to presume them on the part of the State governments as on the part of the general government").[19]

The Framers' discussion of the salary of representatives reveals similar concerns. When the issue was first raised, Madison argued that congressional compensation should be fixed in the Constitution, rather than left to state legislatures, because otherwise "it would create an improper dependence." 1 Farrand 216. George Mason agreed, noting

---

[19] The dissent attacks our holding today by arguing that the Framers' distrust of the States extended only to measures adopted by "state legislatures," and not to measures adopted by "the people themselves." *Post*, at 889. See also *post*, at 889–890 ("These delegates presumably did not want *state legislatures* to be able to tell Members of Congress from their State" how to vote) (emphasis added). The novelty and expansiveness of the dissent's attack is quite astonishing. We are aware of no case that would even suggest that the validity of a state law under the Federal Constitution would depend at all on whether the state law was passed by the state legislature or by the people directly through amendment of the state constitution. Indeed, no party has so argued. Quite simply, in our view, the dissent's distinction between state legislation passed by the state legislature and legislation passed by state constitutional amendment is untenable. The qualifications in the Constitution are fixed, and may not be altered by either States or their legislatures.

that "the parsimony of the States might reduce the provision so low that . . . the question would be not who were most fit to be chosen, but who were most willing to serve." *Ibid.*

When the issue was later reopened, Nathaniel Gorham stated that he "wished not to refer the matter to the State Legislatures who were always paring down salaries in such a manner as to keep out of offices men most capable of executing the functions of them." *Id.*, at 372. Edmund Randolph agreed that "[i]f the States were to pay the members of the Nat[ional] Legislature, a dependence would be created that would vitiate the whole System." *Ibid.* Rufus King "urged the danger of creating a dependence on the States," *ibid.*, and Hamilton noted that "[t]hose who pay are the masters of those who are paid," *id.*, at 373. The Convention ultimately agreed to vest in Congress the power to set its own compensation. See Art. I, § 6.[20]

In light of the Framers' evident concern that States would try to undermine the National Government, they could not have intended States to have the power to set qualifications. Indeed, one of the more anomalous consequences of petitioners' argument is that it accepts federal supremacy over the procedural aspects of determining the times, places, and manner of elections while allowing the States *carte blanche* with respect to the substantive qualifications for membership in Congress.

The dissent nevertheless contends that the Framers' distrust of the States with respect to elections does not preclude the people of the States from adopting eligibility requirements to help narrow their own choices. See *post*, at 888–889. As the dissent concedes, *post*, at 893, however, the Framers were unquestionably concerned that the States would simply not hold elections for federal officers, and therefore the Framers gave Congress the power to "make

---

[20] The Framers' decision to reject a proposal allowing for States to recall their own representatives, see 1 Farrand 20, 217, reflects these same concerns.

or alter" state election regulations. Yet under the dissent's approach, the States could achieve exactly the same result by simply setting qualifications for federal office sufficiently high that no one could meet those qualifications. In our view, it is inconceivable that the Framers would provide a specific constitutional provision to ensure that federal elections would be held while at the same time allowing States to render those elections meaningless by simply ensuring that no candidate could be qualified for office. Given the Framers' wariness over the potential for state abuse, we must conclude that the specification of fixed qualifications in the constitutional text was intended to prescribe uniform rules that would preclude modification by either Congress or the States.[21]

We find further evidence of the Framers' intent in Art. I, § 5, cl. 1, which provides: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." That Art. I, § 5, vests a federal tribunal with ultimate authority to judge a Member's qualifications is fully consistent with the understanding that those qualifications are fixed in the Federal Constitution, but not with the understanding that they can be altered by the States. If the States had the right to prescribe additional qualifications—

---

[21] The dissent's arguments concerning these provisions of the Constitution, see *post*, at 889–895, simply reinforce our argument that the constitutional provisions surrounding elections all reveal the Framers' basic fear that the States might act to undermine the National Legislature. For example, as the dissent concedes, the Framers feared that States would use the control over salaries to influence the votes of their representative. See *post*, at 889–890. Similarly, the dissent concedes that the Times, Places and Manner Clause reflects the Framers' fear that States would not conduct federal elections at all. See *post*, at 894. We believe that the dissent's reading of the provisions at issue understates considerably the extent of the Framers' distrust. However, even under the dissent's reading of the provisions, the text of the Constitution unquestionably reveals the Framers' distrust of the States regarding elections, and thus provides powerful evidence supporting our view that the qualifications established in the Constitution are exclusive.

such as property, educational, or professional qualifications—for their own representatives, state law would provide the standard for judging a Member's eligibility. As we concluded in *Murdock* v. *Memphis*, 20 Wall. 590 (1875), federal questions are generally answered finally by federal tribunals because rights which depend on federal law "should be the same everywhere" and "their construction should be uniform." *Id.*, at 632. The judging of questions concerning rights which depend on state law is not, however, normally assigned to federal tribunals. See *id.*, at 636. The Constitution's provision for each House to be the judge of its own qualifications thus provides further evidence that the Framers believed that the primary source of those qualifications would be federal law.

We also find compelling the complete absence in the ratification debates of any assertion that States had the power to add qualifications. In those debates, the question whether to require term limits, or "rotation," was a major source of controversy. The draft of the Constitution that was submitted for ratification contained no provision for rotation.[22] In arguments that echo in the preamble to Arkansas' Amendment 73, opponents of ratification condemned the absence of a rotation requirement, noting that "there is no doubt that senators will hold their office perpetually; and in this situation, they must of necessity lose their dependence, and their attachments to the people."[23] Even proponents of ratifica-

---

[22] A proposal requiring rotation for Members of the House was proposed at the Convention, see 1 Farrand 20, but was defeated unanimously, see *id.*, at 217. There is no record of any debate on either occasion.

[23] 2 Elliot's Debates 309–310 (N. Y., Smith). See also *id.*, at 287–288 (N. Y., G. Livingston) (Senators will enjoy "a security of their re-election, as long as they please. . . . In such a situation, men are apt to forget their dependence, lose their sympathy, and contract selfish habits. . . . The senators will associate only with men of their own class, and thus become strangers to the condition of the common people"); *id.*, at 30–31 (Mass., Turner) ("Knowing the numerous arts that designing men are prone to, to secure their election, and perpetuate themselves, it is my hearty wish that

tion expressed concern about the "abandonment in every instance of the necessity of rotation in office."[24] At several ratification conventions, participants proposed amendments that would have required rotation.[25]

The Federalists' responses to those criticisms and proposals addressed the merits of the issue, arguing that rotation was incompatible with the people's right to choose. As we noted above, Robert Livingston argued:

---

a rotation may be provided for"); *id.*, at 62 (Mass., Kingsley) ("[W]e are deprived of annual elections, have no rotation, and cannot recall our members; therefore our federal rulers will be masters, and not servants"); Samuel Bryan, "Centinel I," Independent Gazetteer (Phil., Oct. 5, 1787), 1 Debate on the Constitution 52, 61 (B. Bailyn ed. 1990) (hereinafter Bailyn) ("[A]s there is no exclusion by rotation, [Senators] may be continued for life, which, from their extensive means of influence, would follow of course"); Letter from George Lee Turberville to Madison (Dec. 11, 1787), 1 Bailyn 477, 479 ("Why was not that truely republican mode of forcing the Rulers or sovereigns of the states to mix after stated Periods with the people again—observed"); Mercy Otis Warren, "A Columbian Patriot" (Boston, Feb. 1788), 2 Bailyn 284, 292 ("There is no provision for a rotation, nor any thing to prevent the perpetuity of office in the same hands for life. . . . By this neglect we lose the advantages of that check to the overbearing insolence of office, which by rendering him ineligible at certain periods, keeps the mind of man in equilibrio, and teaches him the feelings of the governed").

[24] Letter of Dec. 20, 1787, from Thomas Jefferson to James Madison. 1 *id.*, at 209, 211. In 1814, in another private letter, Jefferson expressed the opinion that the States had not abandoned the power to impose term limits. See Letter of Jan. 31, 1814, to Joseph C. Cabell, in 14 Writings of Thomas Jefferson 82 (A. Lipscomb ed. 1904). Though he noted that his reasoning on the matter "appears to me to be sound," he went on to note:

"but, on so recent a change of view, caution requires us not to be too confident, and that we admit this to be one of the doubtful questions on which honest men may differ with the purest of motives; and the more readily, as we find we have differed from ourselves on it." *Id.*, at 83.

The text of Jefferson's response clearly belies the dissent's suggestion that Jefferson "himself did not entertain serious doubts of its correctness." *Post*, at 874, n. 14.

[25] See n. 40, *infra*.

> "The people are the best judges who ought to represent them. To dictate and control them, to tell them whom they shall not elect, is to abridge their natural rights. This rotation is an absurd species of ostracism." 2 Elliot's Debates 292–293.

Similarly, Hamilton argued that the representatives' need for reelection rather than mandatory rotation was the more effective way to keep representatives responsive to the people, because "[w]hen a man knows he must quit his station, let his merit be what it may, he will turn his attention chiefly to his own emolument." *Id.*, at 320.[26]

Regardless of which side has the better of the debate over rotation, it is most striking that nowhere in the extensive ratification debates have we found any statement by either a proponent or an opponent of rotation that the draft constitution would permit States to require rotation for the representatives of their own citizens. If the participants in the debate had believed that the States retained the authority to impose term limits, it is inconceivable that the Federalists would not have made this obvious response to the arguments of the pro-rotation forces. The absence in an otherwise freewheeling debate of any suggestion that States had the power to impose additional qualifications unquestionably reflects the Framers' common understanding that States lacked that power.

In short, if it had been assumed that States could add additional qualifications, that assumption would have provided the basis for a powerful rebuttal to the arguments being advanced. The failure of intelligent and experienced advocates to utilize this argument must reflect a general agree-

---

[26] George Washington made a similar argument:

"The power under the Constitution will always be in the People. It is entrusted for certain defined purposes, and for a certain limited period, to representatives of their own chusing; and whenever it is executed contrary to their Interest, or not agreeable to their wishes, their Servants can, and undoubtedly will be, recalled." 1 Bailyn 305, 306–307.

ment that its premise was unsound, and that the power to add qualifications was one that the Constitution denied the States.[27]

---

[27] Petitioners set forth several other arguments to support their contention that the Convention and ratification debates reveal that the qualifications in the Qualifications Clauses were not intended to be exclusive. We find none of these persuasive.

Petitioners first observe that the notes of Edmund Randolph, who was a member of the Committee of Detail, reveal that an early draft of the Qualifications Clause provided:

"The qualifications of (a) delegates shall be the age of twenty-five years at least. and citizenship: (and any person possessing these qualifications may be elected except)." 2 Farrand 139 (footnote omitted).

Petitioners suggest that the deletion of the parenthetical material from the Clause suggests that the Framers did not intend the Qualifications Clause to be exclusive. We reject this argument. First, there is no evidence that the draft in Randolph's notes was ever presented to the Convention, and thus the deletion of the Clause tells us little about the views of the Convention as a whole. Moreover, even assuming that the Convention had seen the draft, the deletion of the language without comment is at least as consistent with a belief—as suggested by Dickinson, see n. 9, supra—that the language was superfluous as with a concern that the language was inappropriate. Finally, contrary to the rather ingenious argument advanced in the dissent, see post, at 887–888, it seems to us irrelevant that the draft in question did not include a comparable parenthetical clause referring to "elected" Senators because the draft contemplated that Senators, unlike Representatives, would not be chosen by popular election.

Nor is there merit to the argument that the inclusion in the Committee's final draft of a provision allowing each House to add property qualifications, see 2 Farrand 179, is somehow inconsistent with our holding today. First, there is no conflict between our holding that the qualifications for Congress are fixed in the Constitution and a provision in the Constitution itself providing for property qualifications. Indeed, that is why our analysis is consistent with the other disqualifications contained in the Constitution itself. See n. 2, supra. The Constitution simply prohibits the imposition by either States or Congress of additional qualifications that are not contained in the text of the Constitution. Second, of course, the property provision was deleted, thus providing further evidence that the Framers wanted to minimize the barriers that would exclude the most able citizens from service in the National Government.

Respondent Republican Party of Arkansas also argues that the negative phrasing of the Qualifications Clauses suggests that they were not meant

*Congressional Experience*

Congress' subsequent experience with state-imposed qualifications provides further evidence of the general consensus on the lack of state power in this area. In *Powell,* we examined that experience and noted that during the first 100 years of its existence, "Congress strictly limited its power to judge the qualifications of its members to those enumerated in the Constitution." 395 U. S., at 542. Congress first confronted the issue in 1807 when it faced a challenge to the qualifications of William McCreery, a Representative from Maryland who allegedly did not satisfy a residency requirement imposed by that State. In recommending that McCreery be seated, the Report of the House Committee on Elections noted:

> "'The committee proceeded to examine the Constitution, with relation to the case submitted to them, and find that *qualifications of members are therein determined, without reserving any authority to the State Legislatures to change, add to, or diminish those qualifications;* and that, by that instrument, Congress is constituted the sole judge of the qualifications prescribed by it, and are obliged to decide agreeably to the Constitutional rules . . . .'" *Powell,* 395 U. S., at 542, quoting 17 Annals of Cong. 871 (1807) (emphasis added).[28]

The Chairman of the House Committee on Elections elaborated during debate:

---

to be exclusive. Brief for Respondents Republican Party of Arkansas et al. 5–6. This argument was firmly rejected in *Powell,* see 395 U. S., at 537–539, and n. 73; see also Warren 422, n. 1, and we see no need to revisit it now.

[28] We recognize that the "Committee of Elections were not unanimous in these sentiments," and that a "minority advocated the right of the State Legislature to prescribe additional qualifications to the members from the respective States." 17 Annals of Cong. 873 (1807).

" 'The Committee of Elections considered the qualifications of members to have been unalterably determined by the Federal Convention, unless changed by an authority equal to that which framed the Constitution at first; that neither the State nor the Federal Legislatures are vested with authority to add to those qualifications, so as to change them.' " *Powell*, 395 U. S., at 542–543, quoting from 17 Annals of Cong. 872 (1807).

As we noted in *Powell*, the congressional debate over the committee's recommendation tended to focus on the "narrow issue of the power of the States to add to the standing qualifications set forth in the Constitution," 395 U. S., at 543. The whole House, however, did not vote on the committee's Report, and instead voted only on a simple resolution: *"Resolved*, That William McCreery is entitled to his seat in this House." 17 Annals of Cong. 1238 (1807). That resolution passed by a vote of 89 to 18. *Ibid.*

Though the House Debate may be inconclusive, commentators at the time apparently viewed the seating of McCreery as confirmation of the States' lack of power to add qualifications. For example, in a letter to Joseph Cabell, Thomas Jefferson noted the argument that "to add new qualifications to those of the Constitution would be as much an alteration as to detract from them"; he then added: "And so I think the House of Representatives of Congress decided in some case; I believe that of a member from Baltimore." Letter of Jan. 31, 1814, to Joseph C. Cabell, in 14 Writings of Thomas Jefferson 82 (A. Lipscomb ed. 1904).

Similarly, for over 150 years prior to *Powell*, commentators viewed the seating of McCreery as an expression of the view of the House that States could not add to the qualifications established in the Constitution. Thus, for example, referring to the McCreery debates, one commentator noted, "By the decision in this case, [and that in another contested election], *it seems to have been settled* that the States have not a right to require qualifications from members, different

from, or in addition to, those prescribed by the constitution." Cases of Contested Elections in Congress 171 (M. Clarke & D. Hall eds. 1834) (emphasis in original). Other commentators viewed the incident similarly. See, *e. g.*, G. Paschal, The Constitution of the United States 66 (1876) (citing McCreery to support the proposition that "[t]he Constitution having fixed the qualifications of members, no *additional* qualifications can rightfully be required by the States") (emphasis in original); G. McCrary, American Law of Elections § 323 (4th ed. 1897) (citing McCreery and stating "A state law requiring that a Representative in Congress shall reside in a particular town and country within the district from which he is chosen is unconstitutional and void"); W. Sutherland, Notes on the Constitution of the United States 40 (1904) (citing McCreery to support statement that "[t]his clause fixes the qualifications of members so far as state action is concerned, and no additional qualifications can be required by the state"); C. Burdick, Law of the American Constitution 160 (1922) (citing McCreery to support the proposition that state-imposed "limitations have been held . . . not to be effective"). Finally, it is clear that in *Powell* we viewed the seating of McCreery as the House's acknowledgment that the qualifications in the Constitution were fixed. See 395 U. S., at 542–543.

The Senate experience with state-imposed qualifications further supports our conclusions. In 1887, for example, the Senate seated Charles Faulkner of West Virginia, despite the fact that a provision of the West Virginia Constitution purported to render him ineligible to serve. The Senate Committee on Privileges and Elections unanimously concluded that "no State can prescribe any qualification to the office of United States Senator in addition to those declared in the Constitution of the United States." S. Rep. No. 1, 50th Cong., 1st Sess., 4 (1887). The Senate Committee on Rules and Administration reached the same conclusion in 1964 when faced with a challenge to Pierre Salinger, who had

been appointed to serve as Senator from California. See S. Rep. No. 1381, 88th Cong., 2d Sess., 5 ("It is well settled that the qualifications established by the U. S. Constitution for the office of U. S. Senator are exclusive, and a State cannot, by constitutional or statutory provisions, add to or enlarge upon those qualifications").

We recognize, as we did in *Powell*, that "congressional practice has been erratic"[29] and that the precedential value of congressional exclusion cases is "quite limited." *Powell*, 395 U. S., at 545–546. Nevertheless, those incidents lend support to the result we reach today.

*Democratic Principles*

Our conclusion that States lack the power to impose qualifications vindicates the same "fundamental principle of our representative democracy" that we recognized in *Powell*, namely, that "the people should choose whom they please to govern them." *Id.*, at 547 (internal quotation marks omitted).

As we noted earlier, the *Powell* Court recognized that an egalitarian ideal—that election to the National Legislature should be open to all people of merit—provided a critical foundation for the constitutional structure. This egalitarian theme echoes throughout the constitutional debates. In The Federalist No. 57, for example, Madison wrote:

> "Who are to be the objects of popular choice? Every citizen whose merit may recommend him to the esteem and confidence of his country. No qualification of wealth, of birth, of religious faith, or of civil profession is permitted to fetter the judgment or disappoint the inclination of the people." The Federalist No. 57, at 351.

Similarly, hoping to persuade voters in New York that the Constitution should be ratified, John Stevens, Jr., wrote:

---

[29] See, *e. g.*, *Powell*, 395 U. S., at 544–546 (noting examples).

"[N]o Government, that has ever yet existed in the world, affords so ample a field, to individuals of all ranks, for the display of political talents and abilities. . . . No man who has real merit, let his situation be what it will, need despair." 1 Bailyn 487, 492. And Timothy Pickering noted that, "while several of the state constitutions prescribe certain degrees of property as indispensable qualifications for offices, this which is proposed for the U. S. throws the door wide open for the entrance of *every man* who enjoys the confidence of his fellow citizens." Letter from T. Pickering to C. Tillinghast (Dec. 24, 1787), 1 Bailyn 289, 290 (emphasis in original).[30] Additional qualifications pose the same obstacle to open elections whatever their source. The egalitarian ideal, so valued by the Framers, is thus compromised to the same degree by additional qualifications imposed by States as by those imposed by Congress.

Similarly, we believe that state-imposed qualifications, as much as congressionally imposed qualifications, would undermine the second critical idea recognized in *Powell:* that an aspect of sovereignty is the right of the people to vote for whom they wish. Again, the source of the qualification is of little moment in assessing the qualification's restrictive impact.

Finally, state-imposed restrictions, unlike the congressionally imposed restrictions at issue in *Powell,* violate a third idea central to this basic principle: that the right to choose

---

[30] See also 2 Farrand 123 (it is "improper that any man of merit should be subjected to disabilities in a Republic where merit was understood to form the great title to public trust, honors & rewards") (Dickinson); The Federalist No. 36, at 217 ("There are strong minds in every walk of life that will rise superior to the disadvantages of situation and will command the tribute due to their merit, not only from the classes to which they particularly belong, but from the society in general. The door ought to be equally open to all") (Hamilton); N. Webster, "A Citizen of America," (Phil., Oct. 17, 1787), 1 Bailyn 129, 142 ("[M]oney is not made a requisite— the places of senators are wisely left open to all persons of suitable age and merit").

representatives belongs not to the States, but to the people. From the start, the Framers recognized that the "great and radical vice" of the Articles of Confederation was "the principle of LEGISLATION for STATES or GOVERNMENTS, in their CORPORATE or COLLECTIVE CAPACITIES, and as contradistinguished from the INDIVIDUALS of whom they consist." The Federalist No. 15, at 108 (Hamilton). Thus the Framers, in perhaps their most important contribution, conceived of a Federal Government directly responsible to the people, possessed of direct power over the people, and chosen directly, not by States, but by the people. See, e. g., supra, at 802–804. The Framers implemented this ideal most clearly in the provision, extant from the beginning of the Republic, that calls for the Members of the House of Representatives to be "chosen every second Year by the People of the several States." Art. I, §2, cl. 1. Following the adoption of the Seventeenth Amendment in 1913, this ideal was extended to elections for the Senate. The Congress of the United States, therefore, is not a confederation of nations in which separate sovereigns are represented by appointed delegates, but is instead a body composed of representatives of the people. As Chief Justice John Marshall observed: "The government of the Union, then, . . . is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit." *McCulloch* v. *Maryland*, 4 Wheat., at 404–405.[31] Ours is a "government of the people, by the people, for the people." A. Lincoln, Gettysburg Address (1863).

---

[31] Cf. *Hawke* v. *Smith (No. 1)*, 253 U. S. 221, 226 (1920) ("The Constitution of the United States was ordained by the people, and, when duly ratified, it became the Constitution of the people of the United States"). Compare U. S. Const., Preamble ("We the People"), with The Articles of Confederation, reprinted in 2 Bailyn 926 ("we the under signed Delegates of the States").

The Framers deemed this principle critical when they discussed qualifications. For example, during the debates on residency requirements, Morris noted that in the House, *"the people at large,* not the *States,* are represented." 2 Farrand 217 (emphasis in original) (footnote omitted). Similarly, George Read noted that the Framers "were forming a *Nati[ona]l* Gov[ernmen]t and such a regulation would correspond little with the idea that we were one people." *Ibid.* (emphasis in original). James Wilson "enforced the same consideration." *Ibid.*

Consistent with these views, the constitutional structure provides for a uniform salary to be paid from the national treasury, allows the States but a limited role in federal elections, and maintains strict checks on state interference with the federal election process. The Constitution also provides that the qualifications of the representatives of each State will be judged by the representatives of the entire Nation. The Constitution thus creates a uniform national body representing the interests of a single people.

Permitting individual States to formulate diverse qualifications for their representatives would result in a patchwork of state qualifications, undermining the uniformity and the national character that the Framers envisioned and sought to ensure. Cf. *McCulloch* v. *Maryland,* 4 Wheat., at 428–429 ("Those means are not given by the people of a particular State, not given by the constituents of the legislature, . . . but by the people of all the States. They are given by all, for the benefit of all—and upon theory, should be subjected to that government only which belongs to all"). Such a patchwork would also sever the direct link that the Framers found so critical between the National Government and the people of the United States.[32]

---

[32] There is little significance to the fact that Amendment 73 was adopted by a popular vote, rather than as an Act of the state legislature. See n. 19, *supra.* In fact, none of the petitioners argues that the constitutionality of a state law would depend on the method of its adoption. This is proper,

*State Practice*

Petitioners attempt to overcome this formidable array of evidence against the States' power to impose qualifications by arguing that the practice of the States immediately after the adoption of the Constitution demonstrates their understanding that they possessed such power. One may properly question the extent to which the States' own practice is a reliable indicator of the contours of restrictions that the Constitution imposed on States, especially when no court has ever upheld a state-imposed qualification of any sort. See *supra*, at 798–799. But petitioners' argument is unpersuasive even on its own terms. At the time of the Convention, "[a]lmost all the State Constitutions required members of their Legislatures to possess considerable property." See Warren 416–417.[33] Despite this near uniformity, only one

because the voters of Arkansas, in adopting Amendment 73, were acting as citizens of the State of Arkansas, and not as citizens of the National Government. The people of the State of Arkansas have no more power than does the Arkansas Legislature to supplement the qualifications for service in Congress. As Chief Justice Marshall emphasized in *McCulloch*, "Those means are not given by the people of a particular State, not given by the constituents of the legislature, . . . but by the people of all the States." 4 Wheat., at 428–429.

The dissent concedes that the people of the Nation have an interest in preventing any State from sending "immature, disloyal, or unknowledgeable representatives to Congress," *post*, at 869, but does not explain why the people of the Nation lack a comparable interest in allowing every State to send mature, loyal, and knowledgeable representatives to Congress. In our view, the interest possessed by the people of the Nation and identified by the dissent is the same as the people's interest in making sure that, within "reasonable limitations, the door to this part of the federal government is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession of religious faith." The Federalist No. 52, at 326.

[33] See, *e. g.*, 7 Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies 3816 (F. Thorpe ed. 1909) (hereinafter Thorpe) (Virginia) (members of state legislature must be freeholders); 4 *id.*, at 2460, 2461 (New Hampshire) (freehold

State, Virginia, placed similar restrictions on Members of Congress, requiring that a representative be, *inter alia,* a "freeholder." See 1788 Va. Acts, ch. 2, §2.[34] Just 15 years after imposing a property qualification, Virginia replaced that requirement with a provision requiring that representatives be only "qualified according to the constitution of the United States." 1813 Va. Acts, ch. 23, §2. Moreover, several States, including New Hampshire, Georgia, Delaware, and South Carolina, revised their Constitutions at around the time of the Federal Constitution. In the revised Constitutions, each State retained property qualifications for its own

estate of 200 pounds for state senators; estate of 100 pounds, at least half of which is freehold, for state representatives); 3 *id.,* at 1691, 1694 (Maryland) (real and personal property of over 500 pounds for House of Delegates; real and personal property of 1,000 pounds for Senate); *id.,* at 1897, 1898 (freehold estate of 300 pounds or personal estate of 600 pounds for state senators; freehold estate of 100 pounds or ratable estate of 200 pounds for state representatives); 1 *id.,* at 562 (Delaware) (state legislators must be freeholders); 5 *id.,* at 2595 (New Jersey) (members of Legislative Council must be freeholders and must have real and personal property of 1,000 pounds; members of Assembly must have real and personal property of 500 pounds); *id.,* at 2631 (New York) (state senators must be freeholders); *id.,* at 2790 (North Carolina) (100 acres of land for House; 300 acres of land in Senate); 2 *id.,* at 779 (Georgia) (150 acres of land or property of 250 pounds); 6 *id.,* at 3251 (South Carolina) (freehold estate of 2,000 pounds for state senate).

[34] Judge Tucker expressed doubt about the constitutionality of the provisions of the Virginia statute, noting that "these provisions, as they require qualifications which the constitution does not, may possibly be found to be nugatory." 1 W. Blackstone, Commentaries Appendix 213 (S. Tucker ed. 1803). Judge Tucker noted the two primary arguments against the power to add such a qualification:

"First, that in a representative government, the people have an undoubted right to judge for themselves of the qualification of their delegate, and if their opinion of the integrity of their representative will supply the want of estate, there can be no reason for the government to interfere, by saying, that the latter must and shall overbalance the former.

"Secondly; by requiring a qualification in estate it may often happen, that men the best qualified in other respects might be incapacitated from serving their country." *Ibid.*

state elected officials yet placed no property qualification on its congressional representatives.[35]

The contemporaneous state practice with respect to term limits is similar. At the time of the Convention, States widely supported term limits in at least some circumstances. The Articles of Confederation contained a provision for term limits.[36] As we have noted, some members of the Convention had sought to impose term limits for Members of Congress.[37] In addition, many States imposed term limits on

[35] See 4 Thorpe 2477, 2479 (New Hampshire) (100 pounds for House; 200 pounds for Senate); 2 *id.*, at 786 (Georgia) (200 acres of land or 150 pounds for House; 250 acres of land or 250 pounds for Senate); 6 *id.*, at 3259 (South Carolina) (500 acres and 10 slaves or 150 pounds sterling for House; 300 pounds sterling for Senate); 1 *id.*, at 570, 571 (Delaware) (freehold for House; freehold estate of 200 acres or real and personal property of 1,000 pounds for Senate). Pennsylvania amended its Constitution in 1790. Neither the old constitution nor the amended one contained property qualifications for state representatives. See 5 *id.*, at 3084; *id.*, at 3092–3093.

Several State Constitutions also imposed religious qualifications on state representatives. For example, New Hampshire's Constitution of 1784 and its Constitution of 1792 provided that members of the State Senate and House of Representatives be "of the protestant religion." 4 *id.*, at 2460, 2461–2462 (1784 Constitution); *id.*, at 2477, 2479 (1792 Constitution). North Carolina's Constitution provided that "no clergyman, or preacher of the gospel, of any denomination, shall be capable of being a member of either the Senate, House of Commons, or Council of State," 5 *id.*, at 2793, and that "no person, who shall deny the being of God or the truth of the Protestant religion . . . shall be capable of holding any office or place of trust or profit in the civil department within this State," *ibid.* Georgia and South Carolina also had religious qualifications in their Constitutions for state legislators, see 2 *id.*, at 779 (Georgia) ("of the Protestant religion"); 6 *id.*, at 3252 (South Carolina) (must be "of the Protestant religion"), but deleted those provisions when they amended their Constitutions, in 1789, see 2 *id.*, at 785, and in 1790, see 6 *id.*, at 3258, respectively. Article VI of the Federal Constitution, however, prohibited States from imposing similar qualifications on federal legislators.

[36] See 2 Bailyn 926, 927 ("[N]o person shall be capable of being a delegate for more than three years in any term of six years").

[37] See 1 Farrand 20 ("Res[olved] that the members of the first branch of the National Legislature ought . . . to be incapable of re-election for the

state officers,[38] four placed limits on delegates to the Continental Congress,[39] and several States voiced support for term limits for Members of Congress.[40] Despite this widespread support, no State sought to impose any term limits on its own federal representatives. Thus, a proper assessment of contemporaneous state practice provides further persuasive evidence of a general understanding that the qualifications in the Constitution were unalterable by the States.[41]

---

space of [blank] after the expiration of their term of service"). See also n. 22, *supra*.

[38] See, *e. g.*, G. Wood, Creation of the American Republic, 1776–1787, p. 140 (1969) (noting that 7 of the 10 State Constitutions drafted in 1776–1777 provided for term limits on their state executives); see also App. to Brief for State Petitioner 1b–34b (describing provisions of State Constitutions).

[39] 3 Thorpe 1695–1697 (Maryland); 4 *id.*, at 2467 (New Hampshire); 5 *id.*, at 3085 ((Pennsylvania); 5 *id.*, at 2793 (North Carolina).

[40] New York attached to its ratification a list of proposed amendments and "enjoin[ed] it upon their representatives in Congress to exert all their influence, and use all reasonable means, to obtain a ratification." 1 Elliot's Debates 329. One of the proposed amendments was "That no person be eligible as a senator for more than six years in any term of twelve years." *Id.*, at 330. In Virginia, the Convention similarly "enjoin[ed] it upon their representatives," 2 Bailyn 564, to adopt "a Declaration or Bill of Rights," *id.*, at 558, which would include the statement that members of the Executive and Legislative Branches "should at fixed periods be reduced to a private station, return into the mass of the people; and the vacancies be supplied by certain and regular elections; in which all or any part of the former members to be eligible or ineligible, as the rules of the Constitution of Government, and the laws shall direct," *id.*, at 559. The North Carolina Convention proposed nearly identical language, see *id.*, at 566, though that Convention ultimately did not ratify the Constitution, see 4 Elliot's Debates 250–251. Thus, at least three States proposed some form of constitutional amendment supporting term limits for Members of Congress.

[41] Petitioners and the dissent also point out that Georgia, Maryland, Massachusetts, Virginia, and North Carolina added district residency requirements, and petitioners note that New Jersey and Connecticut established nominating processes for congressional candidates. They rely on

In sum, the available historical and textual evidence, read in light of the basic principles of democracy underlying the Constitution and recognized by this Court in *Powell*, reveal the Framers' intent that neither Congress nor the States should possess the power to supplement the exclusive qualifications set forth in the text of the Constitution.

these facts to show that the States believed they had the power to add qualifications. We again are unpersuaded. First, establishing a nominating process is no more setting a qualification for office than is creating a primary. Second, it seems to us that States may simply have viewed district residency requirements as the necessary analog to state residency requirements. Thus, state practice with respect to residency requirements does not necessarily indicate that States believed that they had a broad power to add restrictions. Finally, we consider the number of state-imposed qualifications to be remarkably small. Despite the array of property, religious, and other qualifications that were contained in State Constitutions, petitioners and the dissent can point to only one instance of a state-imposed property qualification on candidates for Congress, and five instances of district residency requirements. The state practice seems to us notable for its restraint, and thus supports the conclusion that States did not believe that they generally had the power to add qualifications.

Nor are we persuaded by the more recent state practice involving qualifications such as those that bar felons from being elected. As we have noted, the practice of States is a poor indicator of the effect of restraints on the States, and no court has ever upheld one of these restrictions. Moreover, as one moves away from 1789, it seems to us that state practice is even less indicative of the Framers' understanding of state power.

Finally, it is important to reemphasize that the dissent simply has no credible explanation as to why almost every State imposed property qualifications on state representatives but not on federal representatives. The dissent relies first on the obvious but seemingly irrelevant proposition that the state legislatures were larger than state congressional delegations. *Post*, at 913–914, n. 37. If anything, the smaller size of the congressional delegation would have made States *more* likely to put qualifications on federal representatives since the election of any "pauper" would have had proportionally greater significance. The dissent also suggests that States failed to add qualifications out of fear that others, *e. g.*, Congress, believed that States lacked the power to add such qualifications. Of course, this rationale is perfectly consistent with our view that the general understanding at the time was that States lacked the power to add qualifications.

## IV

Petitioners argue that, even if States may not add qualifications, Amendment 73 is constitutional because it is not such a qualification, and because Amendment 73 is a permissible exercise of state power to regulate the "Times, Places and Manner of holding Elections." We reject these contentions.

Unlike §§ 1 and 2 of Amendment 73, which create absolute bars to service for long-term incumbents running for state office, § 3 merely provides that certain Senators and Representatives shall not be certified as candidates and shall not have their names appear on the ballot. They may run as write-in candidates and, if elected, they may serve. Petitioners contend that only a legal bar to service creates an impermissible qualification, and that Amendment 73 is therefore consistent with the Constitution.

Petitioners support their restrictive definition of qualifications with language from *Storer* v. *Brown,* 415 U. S. 724 (1974), in which we faced a constitutional challenge to provisions of the California Elections Code that regulated the procedures by which both independent candidates and candidates affiliated with qualified political parties could obtain ballot position in general elections. The code required candidates affiliated with a qualified party to win a primary election, and required independents to make timely filing of nomination papers signed by at least 5% of the entire vote cast in the last general election. The code also denied ballot position to independents who had voted in the most recent primary election or who had registered their affiliation with a qualified party during the previous year.

In *Storer,* we rejected the argument that the challenged procedures created additional qualifications as "wholly without merit." *Id.,* at 746, n. 16. We noted that petitioners "would not have been disqualified had they been nominated at a party primary or by an adequately supported independent petition and then elected at the general election." *Ibid.*

We concluded that the California Code "no more establishes an additional requirement for the office of Representative than the requirement that the candidate win the primary to secure a place on the general ballot or otherwise demonstrate substantial community support." *Ibid.* See also *Joyner* v. *Mofford*, 706 F. 2d, at 1531; *Hopfmann* v. *Connolly*, 746 F. 2d 97, 103 (CA1 1984), vacated in part on other grounds, 471 U. S. 459 (1985). Petitioners maintain that, under *Storer*, Amendment 73 is not a qualification.

We need not decide whether petitioners' narrow understanding of qualifications is correct because, even if it is, Amendment 73 may not stand. As we have often noted, " '[c]onstitutional rights would be of little value if they could be . . . indirectly denied.' " *Harman* v. *Forssenius*, 380 U. S. 528, 540 (1965), quoting *Smith* v. *Allwright*, 321 U. S. 649, 664 (1944). The Constitution "nullifies sophisticated as well as simple-minded modes" of infringing on constitutional protections. *Lane* v. *Wilson*, 307 U. S. 268, 275 (1939); *Harman* v. *Forssenius*, 380 U. S., at 540–541.

In our view, Amendment 73 is an indirect attempt to accomplish what the Constitution prohibits Arkansas from accomplishing directly. As the plurality opinion of the Arkansas Supreme Court recognized, Amendment 73 is an "effort to dress eligibility to stand for Congress in ballot access clothing," because the "intent and the effect of Amendment 73 are to disqualify congressional incumbents from further service." 316 Ark., at 266, 872 S. W. 2d, at 357.[42] We must, of course, accept the state court's view of the purpose of its own law: We are thus authoritatively informed that the sole purpose of §3 of Amendment 73 was to attempt to achieve a result that is forbidden by the Federal Constitution. In-

---

[42] Justice Dudley noted in his concurrence: "I am reassured by the style of this case, U. S. Term Limits, Inc. That name implies just what this amendment is: A practical limit on the terms of the members of the Congress." 316 Ark., at 276, 872 S. W. 2d, at 364 (opinion concurring in part and dissenting in part).

deed, it cannot be seriously contended that the intent behind
Amendment 73 is other than to prevent the election of in-
cumbents. The preamble of Amendment 73 states explic-
itly: "[T]he people of Arkansas . . . herein limit the terms of
elected officials." Sections 1 and 2 create absolute limits on
the number of terms that may be served. There is no hint
that § 3 was intended to have any other purpose.

Petitioners do, however, contest the Arkansas Supreme
Court's conclusion that the amendment has the same practi-
cal effect as an absolute bar. They argue that the possibility
of a write-in campaign creates a real possibility for victory,
especially for an entrenched incumbent. One may reason-
ably question the merits of that contention.[43] Indeed, we
are advised by the state court that there is nothing more
than a faint glimmer of possibility that the excluded candi-
date will win.[44] Our prior cases, too, have suggested that

---

[43] The uncontested data submitted to the Arkansas Supreme Court indi-
cate that, in over 1,300 Senate elections since the passage of the Seven-
teenth Amendment in 1913, only 1 has been won by a write-in candidate.
In over 20,000 House elections since the turn of the century, only 5 have
been won by write-in candidates. App. 201–202. Indeed, it is for this
reason that the Arkansas Supreme Court found the possibility of a
write-in victory to be a mere "glimme[r] of opportunity for those disquali-
fied." 316 Ark., at 266, 872 S. W. 2d, at 357; see also id., at 276, 872
S. W. 2d, at 364 (Dudley, J., concurring in part and dissenting in part) ("as
a practical matter, the amendment would place term limits on service in
the Congress").

[44] Contrary to the dissent, post, at 919–920, we read a majority of the
Arkansas Supreme Court as holding that Amendment 73 has the same
practical effect as an absolute bar. See 316 Ark., at 266, 872 S. W. 2d, at
357 (plurality opinion) (the "intent and the effect of Amendment 73 are to
disqualify congressional incumbents from further service"); id., at 276, 872
S. W. 2d, at 364 (Dudley, J., concurring in part and dissenting in part)
("That name implies just what this amendment is: A practical limit on the
terms of the members of the Congress"). However, as we note in the
text, infra, at 831, we do not rely on the state court's finding on this point.
See also infra, at 836.

write-in candidates have only a slight chance of victory.[45] But even if petitioners are correct that incumbents may occasionally win reelection as write-in candidates, there is no denying that the ballot restrictions will make it significantly more difficult for the barred candidate to win the election. In our view, an amendment with the avowed purpose and obvious effect of evading the requirements of the Qualifications Clauses by handicapping a class of candidates cannot stand. To argue otherwise is to suggest that the Framers spent significant time and energy in debating and crafting Clauses that could be easily evaded. More importantly, allowing States to evade the Qualifications Clauses by "dress[ing] eligibility to stand for Congress in ballot access clothing" trivializes the basic principles of our democracy that underlie those Clauses. Petitioners' argument treats the Qualifications Clauses not as the embodiment of a grand principle, but rather as empty formalism. " 'It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.'" *Gomillion* v. *Lightfoot*, 364 U. S. 339, 345 (1960), quoting *Frost & Frost Trucking Co.* v. *Railroad Comm'n of Cal.*, 271 U. S. 583, 594 (1926).

---

[45] We noted in *Lubin* v. *Panish*, 415 U. S. 709 (1974), that "[t]he realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot." *Id.*, at 719, n. 5; see also *Anderson* v. *Celebrezze*, 460 U. S. 780, 799, n. 26 (1983) ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidates name appear on the printed ballot"); *United States* v. *Classic*, 313 U. S. 299, 313 (1941) ("Even if . . . voters may lawfully write into their ballots, cast at the general election, the name of a candidate rejected at the primary and have their ballots counted, the practical operation of the primary law . . . is such as to impose serious restrictions upon the choice of candidates by the voters"); *Burdick* v. *Takushi*, 504 U. S. 428, 437, n. 7 (1992) ("If the dissent were correct in suggesting that requiring primary voters to select a specific ballot impermissibly burdened the right to vote, it is clear under our decisions that the availability of a write-in option would not provide an adequate remedy").

Petitioners make the related argument that Amendment 73 merely regulates the "Manner" of elections, and that the amendment is therefore a permissible exercise of state power under Article I, §4, cl. 1 (the Elections Clause), to regulate the "Times, Places and Manner" of elections.[46] We cannot agree.

A necessary consequence of petitioners' argument is that Congress itself would have the power to "make or alter" a measure such as Amendment 73. Art. I, §4, cl. 1. See *Smiley* v. *Holm*, 285 U. S. 355, 366–367 (1932) ("[T]he Congress may supplement these state regulations or may substitute its own"). That the Framers would have approved of such a result is unfathomable. As our decision in *Powell* and our discussion above make clear, the Framers were particularly concerned that a grant to Congress of the authority to set its own qualifications would lead inevitably to congressional self-aggrandizement and the upsetting of the delicate constitutional balance. See *supra*, at 790–791, and n. 10, *supra*. Petitioners would have us believe, however, that even as the Framers carefully circumscribed congressional power to set qualifications, they intended to allow Congress to achieve the same result by simply formulating the regulation as a ballot access restriction under the Elections Clause. We refuse to adopt an interpretation of the Elections Clause that would so cavalierly disregard what the Framers intended to be a fundamental constitutional safeguard.

Moreover, petitioners' broad construction of the Elections Clause is fundamentally inconsistent with the Framers' view of that Clause. The Framers intended the Elections Clause to grant States authority to create procedural regulations, not to provide States with license to exclude classes of candi-

---

[46] Article I, §4, cl. 1, provides:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

dates from federal office. During the Convention debates, for example, Madison illustrated the procedural focus of the Elections Clause by noting that it covered "[w]hether the electors should vote by ballot or vivâ voce, should assemble at this place or that place; should be divided into districts or all meet at one place, sh[oul]d all vote for all the representatives; or all in a district vote for a number allotted to the district." 2 Farrand 240. Similarly, during the ratification debates, proponents of the Constitution noted: "[T]he power over the manner only enables them to determine *how* these electors shall elect—whether by ballot, or by vote, or by any other way." 4 Elliot's Debates 71 (Steele statement at North Carolina ratifying convention) (emphasis in original).[47]

Hamilton made a similar point in The Federalist No. 60, in which he defended the Constitution's grant to Congress of the power to override state regulations. Hamilton expressly distinguished the broad power to set qualifications from the limited authority under the Elections Clause, noting that

> "there is no method of securing to the rich the preference apprehended but by prescribing qualifications of property either for those who may elect or be elected. But this forms no part of the power to be conferred upon the national government. Its authority would be expressly restricted to the regulation of the *times*, the *places*, and the *manner* of elections." The Federalist No. 60, at 371 (emphasis in original).

As Hamilton's statement suggests, the Framers understood the Elections Clause as a grant of authority to issue procedural regulations, and not as a source of power to dictate

---

[47] See also "The Republican," Connecticut Courant (Hartford, Jan. 7, 1788), 1 Bailyn 710, 713 ("The constitution expressly provides that the choice shall be by the people, which cuts off both from the general and state Legislatures the power of so regulating the mode of election, as to deprive the people of a fair choice").

electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints.

Our cases interpreting state power under the Elections Clause reflect the same understanding. The Elections Clause gives States authority "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley* v. *Holm,* 285 U. S., at 366. However, "[t]he power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights." *Tashjian* v. *Republican Party of Conn.,* 479 U. S. 208, 217 (1986). States are thus entitled to adopt "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson* v. *Celebrezze,* 460 U. S. 780, 788, n. 9 (1983). For example, in *Storer* v. *Brown,* 415 U. S. 724 (1974), the case on which petitioners place principal reliance, we upheld the validity of certain provisions of the California Elections Code. In so doing, we emphasized the States' interest in having orderly, fair, and honest elections "rather than chaos." *Id.,* at 730. We also recognized the "States' strong interest in maintaining the integrity of the political process by preventing interparty raiding," *id.,* at 731, and explained that the specific requirements applicable to independents were "expressive of a general state policy aimed at maintaining the integrity of the various routes to the ballot," *id.,* at 733. In other cases, we have approved the States' interests in avoiding "voter confusion, ballot overcrowding, or the presence of frivolous candidacies," *Munro* v. *Socialist Workers Party,* 479 U. S. 189, 194–195 (1986), in "seeking to assure that elections are operated equitably and efficiently," *Burdick* v. *Takushi,* 504 U. S., at 433, and in "guard[ing] against irregularity and error in the tabulation of votes," *Roudebush* v. *Hartke,* 405 U. S. 15, 25 (1972). In short, we have approved of state regulations designed to ensure that

elections are " 'fair and honest and . . . [that] some sort of order, rather than chaos, . . . accompan[ies] the democratic processes.' " *Burdick* v. *Takushi*, 504 U. S., at 433, quoting *Storer*, 415 U. S., at 730.

The provisions at issue in *Storer* and our other Elections Clause cases were thus constitutional because they regulated election *procedures* and did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position. They served the state interest in protecting the integrity and regularity of the election process, an interest independent of any attempt to evade the constitutional prohibition against the imposition of additional qualifications for service in Congress. And they did not involve measures that exclude candidates from the ballot without reference to the candidates' support in the electoral process. Our cases upholding state regulations of election procedures thus provide little support for the contention that a state-imposed ballot access restriction is constitutional when it is undertaken for the twin goals of disadvantaging a particular class of candidates and evading the dictates of the Qualifications Clauses.[48]

---

[48] Nor does *Clements* v. *Fashing*, 457 U. S. 957 (1982), support petitioners. In *Clements*, the Court rejected First and Fourteenth Amendment challenges to Texas' so-called "resign-to-run" provision. That provision treated an elected state official's declaration of candidacy for another elected office as an automatic resignation from the office then held. We noted that the regulation was a permissible attempt to regulate state officeholders. See *id.*, at 972 ("Appellees are elected state officeholders who contest restrictions on partisan political activity") (emphasis deleted); *id.*, at 974, n. 1 (STEVENS, J., concurring in part and concurring in judgment) ("The fact that appellees hold state office is sufficient to justify a restriction on their ability to run for other office that is not imposed on the public generally"). As the Ninth Circuit recognized in upholding a similar resign-to-run statute from Arizona: "The burden on candidacy . . . is indirect and attributable to a desire to regulate state officeholders and not to impose additional qualifications to serving in Congress." *Joyner* v. *Mofford*, 706 F. 2d 1523, 1528 (1983); see also *Signorelli* v. *Evans*, 637 F. 2d

We do not understand the dissent to contest our primary thesis, namely, that if the qualifications for Congress are fixed in the Constitution, then a state-passed measure with the avowed purpose of imposing indirectly such an additional qualification violates the Constitution. The dissent, instead, raises two objections, challenging the assertion that the Arkansas amendment has the likely effect of creating a qualification, *post*, at 917–919, and suggesting that the true intent of Amendment 73 was not to evade the Qualifications Clauses but rather to simply "level the playing field," *post*, at 922. Neither of these objections has merit.

As to the first, it is simply irrelevant to our holding today. As we note above in n. 45, our prior cases strongly suggest that write-in candidates will have only a slim chance of success, and the Arkansas plurality agreed. However, we expressly do not rest on this Court's prior observations regarding write-in candidates. Instead, we hold that a state amendment is unconstitutional when it has the likely effect of handicapping a class of candidates and has the sole purpose of creating additional qualifications indirectly. Thus, the dissent's discussion of the evidence concerning the possibility that a popular incumbent will win a write-in election is simply beside the point.

As to the second argument, we find wholly unpersuasive the dissent's suggestion that Amendment 73 was designed merely to "level the playing field." As we have noted, *supra*, at 829–830, it is obvious that the sole purpose of Amendment 73 was to limit the terms of elected officials, both state and federal, and that Amendment 73, therefore, may not stand.

---

853, 859 (CA2 1980) ("New York's purpose is to regulate the judicial office that [the candidate] holds, not the Congressional office he seeks"). Moreover, as now-Chief Judge Newman observed while upholding similar restrictions imposed by New York, such provisions "plac[e] no obstacle between [a candidate] and the ballot or his nomination or his election. He is free to run and the people are free to choose him." *Id.*, at 858.

## V

The merits of term limits, or "rotation," have been the subject of debate since the formation of our Constitution, when the Framers unanimously rejected a proposal to add such limits to the Constitution. The cogent arguments on both sides of the question that were articulated during the process of ratification largely retain their force today. Over half the States have adopted measures that impose such limits on some offices either directly or indirectly, and the Nation as a whole, notably by constitutional amendment, has imposed a limit on the number of terms that the President may serve.[49] Term limits, like any other qualification for office, unquestionably restrict the ability of voters to vote for whom they wish. On the other hand, such limits may provide for the infusion of fresh ideas and new perspectives, and may decrease the likelihood that representatives will lose touch with their constituents. It is not our province to resolve this longstanding debate.

We are, however, firmly convinced that allowing the several States to adopt term limits for congressional service would effect a fundamental change in the constitutional framework. Any such change must come not by legislation adopted either by Congress or by an individual State, but rather—as have other important changes in the electoral process[50]—through the amendment procedures set forth in Article V. The Framers decided that the qualifications for service in the Congress of the United States be fixed in the Constitution and be uniform throughout the Nation. That decision reflects the Framers' understanding that Members of Congress are chosen by separate constituencies, but that

[49] See U. S. Const., Amdt. 22 (1951) (limiting Presidents to two 4-year terms).

[50] See, e. g., Amdt. 17 (1913) (direct elections of Senators); Amdt. 19 (1920) (extending suffrage to women); Amdt. 22 (1951) (Presidential term limits); Amdt. 24 (1964) (prohibition against poll taxes); Amdt. 26 (1971) (lowering age of voter eligibility to 18).

they become, when elected, servants of the people of the United States. They are not merely delegates appointed by separate, sovereign States; they occupy offices that are integral and essential components of a single National Government. In the absence of a properly passed constitutional amendment, allowing individual States to craft their own qualifications for Congress would thus erode the structure envisioned by the Framers, a structure that was designed, in the words of the Preamble to our Constitution, to form a "more perfect Union."

The judgment is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

I join the opinion of the Court.

The majority and dissenting opinions demonstrate the intricacy of the question whether or not the Qualifications Clauses are exclusive. In my view, however, it is well settled that the whole people of the United States asserted their political identity and unity of purpose when they created the federal system. The dissent's course of reasoning suggesting otherwise might be construed to disparage the republican character of the National Government, and it seems appropriate to add these few remarks to explain why that course of argumentation runs counter to fundamental principles of federalism.

Federalism was our Nation's own discovery. The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other. The resulting Constitution created a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it. It is appropriate to recall these origins, which instruct us as to the

nature of the two different governments created and confirmed by the Constitution.

A distinctive character of the National Government, the mark of its legitimacy, is that it owes its existence to the act of the whole people who created it. It must be remembered that the National Government, too, is republican in essence and in theory. John Jay insisted on this point early in The Federalist Papers, in his comments on the government that preceded the one formed by the Constitution.

> "To all general purposes we have uniformly been one people; each individual citizen everywhere enjoying the same national rights, privileges, and protection. . . .
>
> "A strong sense of the value and blessings of union induced the people, at a very early period, to institute a federal government to preserve and perpetuate it. They formed it almost as soon as they had a political existence . . . ." The Federalist No. 2, pp. 38–39 (C. Rossiter ed. 1961) (hereinafter The Federalist).

Once the National Government was formed under our Constitution, the same republican principles continued to guide its operation and practice. As James Madison explained, the House of Representatives "derive[s] its powers from the people of America," and "the operation of the government on the people in their individual capacities" makes it "a national government," not merely a federal one. *Id.*, No. 39, at 244, 245 (emphasis deleted). The Court confirmed this principle in *McCulloch* v. *Maryland,* 4 Wheat. 316, 404–405 (1819), when it said: "The government of the Union, then, . . . is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit." The same theory led us to observe as follows in *Ex parte Yarbrough,* 110 U. S. 651, 666 (1884): "In a republican government, like ours, . . . political

power is reposed in representatives of the entire body of the people."

In one sense it is true that "the people of each State retained their separate political identities," *post*, at 849, for the Constitution takes care both to preserve the States and to make use of their identities and structures at various points in organizing the federal union. It does not at all follow from this that the sole political identity of an American is with the State of his or her residence. It denies the dual character of the Federal Government which is its very foundation to assert that the people of the United States do not have a political identity as well, one independent of, though consistent with, their identity as citizens of the State of their residence. Cf. *post*, at 848–850. It must be recognized that " '[f]or all the great purposes for which the Federal government was formed, we are one people, with one common country.' " *Shapiro* v. *Thompson*, 394 U. S. 618, 630 (1969) (quoting *Passenger Cases*, 7 How. 283, 492 (1849) (Taney, C. J., dissenting); see *Crandall* v. *Nevada*, 6 Wall. 35, 43 (1868) ("The people of these United States constitute one nation" and "have a government in which all of them are deeply interested").

It might be objected that because the States ratified the Constitution, the people can delegate power only through the States or by acting in their capacities as citizens of particular States. See *post*, at 846. But in *McCulloch* v. *Maryland,* the Court set forth its authoritative rejection of this idea:

> "The Convention which framed the constitution was indeed elected by the State legislatures. But the instrument . . . was submitted to the people. . . . It is true, they assembled in their several States—and where else should they have assembled? No political dreamer was ever wild enough to think of breaking down the lines which separate the States, and of compounding the American people into one common mass. Of consequence, when they act, they act in their States. But

the measures they adopt do not, on that account, cease to be the measures of the people themselves, or become the measures of the State governments." 4 Wheat., at 403.

The political identity of the entire people of the Union is reinforced by the proposition, which I take to be beyond dispute, that, though limited as to its objects, the National Government is, and must be, controlled by the people without collateral interference by the States. *McCulloch* affirmed this proposition as well, when the Court rejected the suggestion that States could interfere with federal powers. "This was not intended by the American people. They did not design to make their government dependent on the States." *Id.*, at 432. The States have no power, reserved or otherwise, over the exercise of federal authority within its proper sphere. See *id.*, at 430 (where there is an attempt at "usurpation of a power which the people of a single State cannot give," there can be no question whether the power "has been surrendered" by the people of a single State because "[t]he right never existed"). That the States may not invade the sphere of federal sovereignty is as incontestable, in my view, as the corollary proposition that the Federal Government must be held within the boundaries of its own power when it intrudes upon matters reserved to the States. See *United States* v. *Lopez, ante,* p. 549.

Of course, because the Framers recognized that state power and identity were essential parts of the federal balance, see The Federalist No. 39, the Constitution is solicitous of the prerogatives of the States, even in an otherwise sovereign federal province. The Constitution uses state boundaries to fix the size of congressional delegations, Art. I, § 2, cl. 3, ensures that each State shall have at least one representative, *ibid.,* grants States certain powers over the times, places, and manner of federal elections (subject to congressional revision), Art. I, § 4, cl. 1, requires that when the President is elected by the House of Representatives, the delega-

tions from each State have one vote, Art. II, § 1, cl. 3, and Amdt. 12, and allows States to appoint electors for the President, Art. II, § 1, cl. 2. Nothing in the Constitution or The Federalist Papers, however, supports the idea of state interference with the most basic relation between the National Government and its citizens, the selection of legislative representatives. Indeed, even though the Constitution uses the qualifications for voters of the most numerous branch of the States' own legislatures to set the qualifications of federal electors, Art. I, § 2, cl. 1, when these electors vote, we have recognized that they act in a federal capacity and exercise a federal right. Addressing this principle in *Ex parte Yarbrough* the Court stated as follows: "[T]he right to vote for a member of Congress" is an "office . . . created by that Constitution, and by that alone. . . . It is not true, therefore, that electors for members of Congress owe their right to vote to the State law in any sense which makes the exercise of the right to depend exclusively on the law of the State." 110 U. S., at 663–664. We made the same point in *United States v. Classic,* 313 U. S. 299, 315 (1941), when we said: "[T]he right of qualified voters within a state to cast their ballots and have them counted at Congressional elections . . . is a right secured by the Constitution" and "is secured against the action of individuals as well as of states."

The federal character of congressional elections flows from the political reality that our National Government is republican in form and that national citizenship has privileges and immunities protected from state abridgment by the force of the Constitution itself. Even before the passage of the Fourteenth Amendment, the latter proposition was given expression in *Crandall* v. *Nevada* where the Court recognized the right of the Federal Government to call "any or all of its citizens to aid in its service, as members of the Congress, of the courts, of the executive departments, and to fill all its other offices," and further recognized that "this right cannot be made to depend upon the pleasure of a State over whose

territory they must pass to reach the point where these services must be rendered." 6 Wall., at 43. And without reference to the Privileges and Immunities Clause, the rights of national citizenship were upheld again in *United States* v. *Cruikshank*, 92 U. S. 542, 552 (1876), where the Court said: "The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for any thing else connected with the powers or the duties of the national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." Cf. *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 513 (1939) (opinion of Roberts, J., joined by Black, J., and joined in relevant part by Hughes, C. J.) ("Citizenship of the United States would be little better than a name if it did not carry with it the right to discuss national legislation and the benefits, advantages, and opportunities to accrue to citizens therefrom").

In the *Slaughter-House Cases*, 16 Wall. 36, 78–80 (1873), the Court was careful to hold that federal citizenship in and of itself suffices for the assertion of rights under the Constitution, rights that stem from sources other than the States. Though the *Slaughter-House Cases* interpreted the Privileges and Immunities Clause of the Fourteenth Amendment, its view of the origins of federal citizenship was not confined to that source. Referring to these rights of national dimension and origin the Court observed: "But lest it should be said that no such privileges and immunities are to be found if those we have been considering are excluded, we venture to suggest some which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Id.*, at 79. Later cases only reinforced the idea that there are such incidents of national citizenship. See *Ex*

*parte Yarbrough, supra; Terral* v. *Burke Constr. Co.,* 257 U. S. 529 (1922); *United States* v. *Classic, supra; United States* v. *Guest,* 383 U. S. 745 (1966); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969). Federal privileges and immunities may seem limited in their formulation by comparison with the expansive definition given to the privileges and immunities attributed to state citizenship, see *Slaughter-House Cases, supra,* at 78; *Hague, supra,* at 520 (opinion of Stone, J.), but that federal rights flow to the people of the United States by virtue of national citizenship is beyond dispute.

Not the least of the incongruities in the position advanced by Arkansas is the proposition, necessary to its case, that it can burden the rights of resident voters in federal elections by reason of the manner in which they earlier had exercised it. If the majority of the voters had been successful in selecting a candidate, they would be penalized from exercising that same right in the future. Quite apart from any First Amendment concerns, see *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968); *Anderson* v. *Celebrezze,* 460 U. S. 780, 786–788 (1983), neither the law nor federal theory allows a State to burden the exercise of federal rights in this manner. See *Terral* v. *Burke Constr. Co., supra,* at 532; *Shapiro* v. *Thompson, supra,* at 629–631. Indeed, as one of the "right[s] of the citizen[s] of this great country, protected by implied guarantees of its Constitution," the Court identified the right "'to come to the seat of government . . . to share its offices, to engage in administering its functions.'" *Slaughter-House Cases, supra,* at 79 (quoting *Crandall* v. *Nevada,* 6 Wall., at 44). This observation serves to illustrate the extent of the State's attempted interference with the federal right to vote (and the derivative right to serve if elected by majority vote) in a congressional election, rights that do not derive from the state power in the first instance but that belong to the voter in his or her capacity as a citizen of the United States.

It is maintained by our dissenting colleagues that the State of Arkansas seeks nothing more than to grant its peo-

ple surer control over the National Government, a control, it is said, that will be enhanced by the law at issue here. The arguments for term limitations (or ballot restrictions having the same effect) are not lacking in force; but the issue, as all of us must acknowledge, is not the efficacy of those measures but whether they have a legitimate source, given their origin in the enactments of a single State. There can be no doubt, if we are to respect the republican origins of the Nation and preserve its federal character, that there exists a federal right of citizenship, a relationship between the people of the Nation and their National Government, with which the States may not interfere. Because the Arkansas enactment intrudes upon this federal domain, it exceeds the boundaries of the Constitution.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, dissenting.

It is ironic that the Court bases today's decision on the right of the people to "choose whom they please to govern them." See ante, at 783, 793, 795, 819. Under our Constitution, there is only one State whose people have the right to "choose whom they please" to represent Arkansas in Congress. The Court holds, however, that neither the elected legislature of that State nor the people themselves (acting by ballot initiative) may prescribe any qualifications for those representatives. The majority therefore defends the right of the people of Arkansas to "choose whom they please to govern them" by invalidating a provision that won nearly 60% of the votes cast in a direct election and that carried every congressional district in the State.

I dissent. Nothing in the Constitution deprives the people of each State of the power to prescribe eligibility requirements for the candidates who seek to represent them in Congress. The Constitution is simply silent on this question. And where the Constitution is silent, it raises no bar to action by the States or the people.

## I

Because the majority fundamentally misunderstands the notion of "reserved" powers, I start with some first principles. Contrary to the majority's suggestion, the people of the States need not point to any affirmative grant of power in the Constitution in order to prescribe qualifications for their representatives in Congress, or to authorize their elected state legislators to do so.

## A

Our system of government rests on one overriding principle: All power stems from the consent of the people. To phrase the principle in this way, however, is to be imprecise about something important to the notion of "reserved" powers. The ultimate source of the Constitution's authority is the consent of the people of each individual State, not the consent of the undifferentiated people of the Nation as a whole.

The ratification procedure erected by Article VII makes this point clear. The Constitution took effect once it had been ratified by the people gathered in convention in nine different States. But the Constitution went into effect only "between the States so ratifying the same," Art. VII; it did not bind the people of North Carolina until they had accepted it. In Madison's words, the popular consent upon which the Constitution's authority rests was "given by the people, not as individuals composing one entire nation, but as composing the distinct and independent States to which they respectively belong." The Federalist No. 39, p. 243 (C. Rossiter ed. 1961) (hereinafter The Federalist). Accord, 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 94 (J. Elliot 2d ed. 1876) (hereinafter Elliot) (remarks of James Madison at the Virginia Convention).[1]

---

[1] The ringing initial words of the Constitution—"We the People of the United States"—convey something of the same idea. (In the Constitution, after all, "the United States" is consistently a plural noun. See

When they adopted the Federal Constitution, of course, the people of each State surrendered some of their authority to the United States (and hence to entities accountable to the people of other States as well as to themselves). They affirmatively deprived their States of certain powers, see, *e. g.,* Art. I, §10, and they affirmatively conferred certain powers upon the Federal Government, see, *e. g.,* Art. I, §8. Because the people of the several States are the only true source of power, however, the Federal Government enjoys no authority beyond what the Constitution confers: The Federal Government's powers are limited and enumerated. In the words of Justice Black: "The United States is entirely a creature of the Constitution. Its power and authority have no other source." *Reid* v. *Covert,* 354 U. S. 1, 5–6 (1957) (plurality opinion) (footnote omitted).

In each State, the remainder of the people's powers— "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States," Amdt. 10—are either delegated to the state government or retained by the people. The Federal Constitution does not specify which of these two possibilities obtains; it is up to the various state constitutions to declare which powers the people of each State have delegated to their state government. As far as

---

Art. I, §9, cl. 8; Art. II, §1, cl. 7; Art. III, §2, cl. 1; Art. III, §3, cl. 1; cf. Amar, Of Sovereignty and Federalism, 96 Yale L. J. 1425, 1455 (1987) (noting this fact, though reaching other conclusions).) The Preamble that the Philadelphia Convention approved before sending the Constitution to the Committee of Style is even clearer. It began: "We the people of the States of New-Hampshire, Massachusetts, Rhode-Island and Providence Plantations, Connecticut, New-York, New-Jersey, Pennsylvania, Delaware, Maryland, Virginia, North-Carolina, South-Carolina, and Georgia . . . ." 2 Records of the Federal Convention of 1787, p. 565 (M. Farrand ed. 1911) (hereinafter Farrand). Scholars have suggested that the Committee of Style adopted the current language because it was not clear that all the States would actually ratify the Constitution. M. Farrand, The Framing of the Constitution of the United States 190–191 (1913). In this instance, at least, I agree with the majority that the Committee's edits did not work a substantive change in the Constitution. Cf. *ante,* at 792, n. 8.

the Federal Constitution is concerned, then, the States can exercise all powers that the Constitution does not withhold from them. The Federal Government and the States thus face different default rules: Where the Constitution is silent about the exercise of a particular power—that is, where the Constitution does not speak either expressly or by necessary implication—the Federal Government lacks that power and the States enjoy it.

These basic principles are enshrined in the Tenth Amendment, which declares that all powers neither delegated to the Federal Government nor prohibited to the States "are reserved to the States respectively, or to the people." With this careful last phrase, the Amendment avoids taking any position on the division of power between the state governments and the people of the States: It is up to the people of each State to determine which "reserved" powers their state government may exercise. But the Amendment does make clear that powers reside at the state level except where the Constitution removes them from that level. All powers that the Constitution neither delegates to the Federal Government nor prohibits to the States are controlled by the people of each State.

To be sure, when the Tenth Amendment uses the phrase "the people," it does not specify whether it is referring to the people of each State or the people of the Nation as a whole. But the latter interpretation would make the Amendment pointless: There would have been no reason to provide that where the Constitution is silent about whether a particular power resides at the state level, it might or might not do so. In addition, it would make no sense to speak of powers as being reserved to the undifferentiated people of the Nation as a whole, because the Constitution does not contemplate that those people will either exercise power or delegate it. The Constitution simply does not recognize any mechanism for action by the undifferentiated people of the Nation. Thus, the amendment provision of Article

V calls for amendments to be ratified not by a convention of the national people, but by conventions of the people in each State or by the state legislatures elected by those people. Likewise, the Constitution calls for Members of Congress to be chosen State by State, rather than in nationwide elections. Even the selection of the President—surely the most national of national figures—is accomplished by an electoral college made up of delegates chosen by the various States, and candidates can lose a Presidential election despite winning a majority of the votes cast in the Nation as a whole. See also Art. II, § 1, cl. 3 (providing that when no candidate secures a majority of electoral votes, the election of the President is thrown into the House of Representatives, where "the Votes shall be taken by States, the Representatives from each State having one Vote"); Amdt. 12 (same).

In short, the notion of popular sovereignty that undergirds the Constitution does not erase state boundaries, but rather tracks them. The people of each State obviously did trust their fate to the people of the several States when they consented to the Constitution; not only did they empower the governmental institutions of the United States, but they also agreed to be bound by constitutional amendments that they themselves refused to ratify. See Art. V (providing that proposed amendments shall take effect upon ratification by three-quarters of the States). At the same time, however, the people of each State retained their separate political identities. As Chief Justice Marshall put it, "[n]o political dreamer was ever wild enough to think of breaking down the lines which separate the States, and of compounding the American people into one common mass." *McCulloch* v. *Maryland*, 4 Wheat. 316, 403 (1819).[2]

---

[2] The concurring opinion appears to draw precisely the opposite conclusion from the passage in *McCulloch* that contains this sentence. See *ante*, at 840–841. But while the concurring opinion seizes on Marshall's references to "the people," Marshall was merely using that phrase in contradistinction to "the State governments." Counsel for Maryland had

Any ambiguity in the Tenth Amendment's use of the phrase "the people" is cleared up by the body of the Constitution itself. Article I begins by providing that the Congress of the United States enjoys "[a]ll legislative Powers herein granted," § 1, and goes on to give a careful enumeration of Congress' powers, § 8. It then concludes by enumerating certain powers that are *prohibited* to the States. The import of this structure is the same as the import of the Tenth Amendment: If we are to invalidate Arkansas' Amendment 73, we must point to something in the Federal Constitution that deprives the people of Arkansas of the power to enact such measures.

## B

The majority disagrees that it bears this burden. But its arguments are unpersuasive.

## 1

The majority begins by announcing an enormous and untenable limitation on the principle expressed by the Tenth Amendment. According to the majority, the States possess only those powers that the Constitution affirmatively grants to them or that they enjoyed before the Constitution was adopted; the Tenth Amendment "could only 'reserve' that

---

noted that "the constitution was formed and adopted, not by the people of the United States at large, but by the people of the respective States. To suppose that the mere proposition of this fundamental law threw the American people into one aggregate mass, would be to assume what the instrument itself does not profess to establish." *McCulloch,* 4 Wheat., at 363 (argument of counsel). Marshall's opinion accepted this premise, even borrowing some of counsel's language. See *id.,* at 403. What Marshall rejected was counsel's conclusion that the Constitution therefore was merely "a compact between the States." See *id.,* at 363 (argument of counsel). As Marshall explained, the acts of "the people themselves" in the various ratifying conventions should not be confused with "the measures of the State governments." *Id.,* at 403; see also *id.,* at 404 (noting that no state government could control whether the people of that State decided to adopt the Constitution).

which existed before." *Ante*, at 802. From the fact that the States had not previously enjoyed any powers over the particular institutions of the Federal Government established by the Constitution,[3] the majority derives a rule precisely opposite to the one that the Amendment actually prescribes: " '[T]he states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them.' " *Ibid.* (quoting 1 J. Story, Commentaries on the Constitution of the United States § 627 (3d ed. 1858)).

The majority's essential logic is that the state governments could not "reserve" any powers that they did not control at the time the Constitution was drafted. But it was not the state governments that were doing the reserving. The Constitution derives its authority instead from the consent of *the people* of the States. Given the fundamental principle that all governmental powers stem from the people of the States, it would simply be incoherent to assert that the people of the States could not reserve any powers that they had not previously controlled.

The Tenth Amendment's use of the word "reserved" does not help the majority's position. If someone says that the power to use a particular facility is reserved to some group, he is not saying anything about whether that group has previously used the facility. He is merely saying that the peo-

---

[3] At the time of the framing, of course, a Federal Congress had been operating under the Articles of Confederation for some 10 years. The States unquestionably had enjoyed the power to establish qualifications for their delegates to this body, above and beyond the qualifications created by the Articles themselves. See Brief for Respondents Bobbie E. Hill et al. 39, n. 79 (conceding this point); see also, *e. g.*, Md. Const. of 1776, Art. XXVII (prescribing such qualifications), in 3 Federal and State Constitutions 1695–1696 (F. Thorpe ed. 1909) (hereinafter Thorpe); N. H. Const. of 1784, Pt. II (same), in 4 Thorpe 2467. It is surprising, then, that the concurring opinion seeks to buttress the majority's case by stressing the continuing applicability of "the same republican principles" that had prevailed under the Articles. See *ante*, at 839.

ple who control the facility have designated that group as the entity with authority to use it. The Tenth Amendment is similar: The people of the States, from whom all governmental powers stem, have specified that all powers not prohibited to the States by the Federal Constitution are reserved "to the States respectively, or to the people."

The majority is therefore quite wrong to conclude that the people of the States cannot authorize their state governments to exercise any powers that were unknown to the States when the Federal Constitution was drafted. Indeed, the majority's position frustrates the apparent purpose of the Amendment's final phrase. The Amendment does not preempt any limitations on state power found in the state constitutions, as it might have done if it simply had said that the powers not delegated to the Federal Government are reserved to the States. But the Amendment also does not prevent the people of the States from amending their state constitutions to remove limitations that were in effect when the Federal Constitution and the Bill of Rights were ratified.

In an effort to defend its position, the majority points to language in *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 549 (1985), which it takes to indicate that the Tenth Amendment covers only "the original powers of [state] sovereignty." *Ante,* at 802. But *Garcia* dealt with an entirely different issue: the extent to which principles of state sovereignty implicit in our federal system curtail Congress' authority to exercise its enumerated powers. When we are asked to decide whether a congressional statute that appears to have been authorized by Article I is nonetheless unconstitutional because it invades a protected sphere of state sovereignty, it may well be appropriate for us to inquire into what we have called the "traditional aspects of state sovereignty." See *National League of Cities* v. *Usery,* 426 U. S. 833, 841, 849 (1976); see also *New York* v. *United States,* 505 U. S. 144, 156–157 (1992). The question

raised by the present case, however, is not whether any principle of state sovereignty implicit in the Tenth Amendment bars congressional action that Article I appears to authorize, but rather whether Article I bars state action that it does not appear to forbid. The principle necessary to answer this question is express on the Tenth Amendment's face: Unless the Federal Constitution affirmatively prohibits an action by the States or the people, it raises no bar to such action.

The majority also seeks support for its view of the Tenth Amendment in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). See *ante*, at 802. But this effort is misplaced. *McCulloch* did make clear that a power need not be "expressly" delegated to the United States or prohibited to the States in order to fall outside the Tenth Amendment's reservation; delegations and prohibitions can also arise by necessary implication.[4] True to the text of the Tenth Amendment, however, *McCulloch* indicated that all powers as to which the Constitution does not speak (whether expressly or by necessary implication) are "reserved" to the state level. Thus, in its only discussion of the Tenth Amendment, *McCulloch* observed that the Amendment "leav[es] the question, whether the particular power which may become the subject of contest has been delegated to the one government, or prohibited to the other, to depend on a fair construction of the whole [Constitution]." 4 Wheat., at 406. *McCulloch* did not qualify this observation by indicating that the question also turned on whether the States had enjoyed the power before the framing. To the contrary, *McCulloch* seemed to assume that the people had "conferred on the general government the power contained in the constitution, and on the States the whole residuum of power." *Id.*, at 410.

The structure of *McCulloch*'s analysis also refutes the majority's position. The question before the Court was

---

[4] Despite the majority's odd suggestion to the contrary, see *ante*, at 796–797, n. 12, I fully agree with this sensible position. See *supra*, at 848.

whether the State of Maryland could tax the Bank of the United States, which Congress had created in an effort to accomplish objects entrusted to it by the Constitution. Chief Justice Marshall's opinion began by upholding the federal statute incorporating the bank. *Id.*, at 400–425. It then held that the Constitution affirmatively prohibited Maryland's tax on the bank created by this statute. *Id.*, at 425–437. The Court relied principally on concepts that it deemed inherent in the Supremacy Clause of Article VI, which declares that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, . . . shall be the supreme Law of the Land . . . ." In the Court's view, when a power has been "delegated to the United States by the Constitution," Amdt. 10, the Supremacy Clause forbids a State to "retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry [that power] into execution." *McCulloch*, 4 Wheat., at 436. Thus, the Court concluded that the very nature of state taxation on the bank's operations was "incompatible with, and repugnant to," the federal statute creating the bank. See *id.*, at 425.

For the past 175 years, *McCulloch* has been understood to rest on the proposition that the Constitution affirmatively barred Maryland from imposing its tax on the Bank's operations. See, *e. g.*, *Osborn* v. *Bank of United States*, 9 Wheat. 738, 859–868 (1824) (reaffirming *McCulloch*'s conclusion that by operation of the Supremacy Clause, the federal statute incorporating the bank impliedly pre-empted state laws attempting to tax the bank's operations); *Maryland* v. *Louisiana*, 451 U. S. 725, 746 (1981) (citing *McCulloch* for the proposition that the Supremacy Clause deprives the States of the power to pass laws that conflict with federal statutes); see also *North Dakota* v. *United States*, 495 U. S. 423, 434 (1990) (plurality opinion) (citing *McCulloch* for the proposition that state laws may violate the Supremacy Clause when they "regulate the Government directly or discriminate against

it").[5] For the majority, however, *McCulloch* apparently
turned on the fact that before the Constitution was adopted,
the States had possessed no power to tax the instrumentali-
ties of the governmental institutions that the Constitution
created. This understanding of *McCulloch* makes most of
Chief Justice Marshall's opinion irrelevant; according to the
majority, there was no need to inquire into whether federal
law deprived Maryland of the power in question, because the
power could not fall into the category of "reserved" powers
anyway.[6]

---

[5] Though cited by the majority, see *ante*, at 802, *Crandall* v. *Nevada*, 6
Wall. 35 (1868), did not deviate from this accepted view of *McCulloch*.
See *Crandall*, *supra*, at 48 (observing that *McCulloch* and a number
of other cases "distinctly placed the invalidity of the State taxes on
the ground that they interfered with an authority of the Federal
government").

[6] To support its decision to attribute such surplusage to *McCulloch*, the
majority quotes Marshall's observation that his opinion "'does not deprive
the States of any resources which they originally possessed,'" because the
power to tax federal instrumentalities was not encompassed by the States'
"'original right to tax.'" *Ante*, at 802 (quoting *McCulloch*, 4 Wheat., at
436, 430). In part, Marshall was simply refuting counsel's argument that
it would constitute an "overwhelming invasion of State sovereignty" for
Congress to establish a bank that operated within a State but that none-
theless was exempt from state taxes. See *id.*, at 337–339 (argument of
counsel) (stressing that "the right to raise revenue" is "the highest attri-
bute of sovereignty" and indeed amounts to "the right to exist"). While
Marshall acknowledged that "this original right of taxation" was an "es-
sential" attribute of state sovereignty that Congress could not constitu-
tionally control or invade, he focused more precisely than counsel on "the
nature and extent of this original right," *id.*, at 428, and concluded that it
did not include the right "to tax the means employed by the government
of the Union, for the execution of its powers." *Id.*, at 430. In this re-
spect, then, the Court was referring to the States' "original" powers in
much the same context as *Garcia* v. *San Antonio Metropolitan Transit
Authority*, 469 U. S. 528 (1985): The Court was examining whether Con-
gress' exercise of the "privilege of exempting its own measures from State
taxation," *McCulloch*, *supra*, at 434, had invaded a protected sphere of
state sovereignty.

Marshall did go on to argue that the power to tax the operations of the
Bank of the United States simply was not susceptible to control by the

Despite the majority's citation of *Garcia* and *McCulloch*, the only true support for its view of the Tenth Amendment comes from Joseph Story's 1833 treatise on constitutional law. See 2 J. Story, Commentaries on the Constitution of the United States §§ 623–628. Justice Story was a brilliant and accomplished man, and one cannot casually dismiss his views. On the other hand, he was not a member of the Founding generation, and his Commentaries on the Constitution were written a half century after the framing. Rather than representing the original understanding of the Constitution, they represent only his own understanding. In a range of cases concerning the federal/state relation, moreover, this Court has deemed positions taken in Story's commentaries to be more nationalist than the Constitution warrants. Compare, *e. g., id.,* §§ 1063–1069 (arguing that the Commerce Clause deprives the States of the power to regulate any commerce within Congress' reach), with *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots,* 12 How. 299 (1852) (holding that Congress' Commerce Clause powers are not exclusive). See also 1 Life and Letters of Joseph Story 296 (W. Story ed. 1851) (extract of manuscript written by Story) ("I hold it to be a maxim, which should never be lost sight of by a great statesman, that the Government of the United States is

---

people of a single State. See 4 Wheat., at 430. But that theory is perfectly consistent with my position. Marshall reasoned that the people of a single State may not tax the instrumentalities employed by the people of all the States through the National Government, because such taxation would effectively subject the people of the several States to the taxing power of a single State. See *id.,* at 428. This sort of argument proves that the people of a single State may not prescribe qualifications for the President of the United States; the selection of the President, like the operation of the Bank of the United States, is not up to the people of any single State. See *infra,* at 862. It does not follow, however, that the people of a single State may not prescribe qualifications for their own representatives in Congress.

intrinsically too weak, and the powers of the State Governments too strong"). In this case too, Story's position that the only powers reserved to the States are those that the States enjoyed before the framing conflicts with both the plain language of the Tenth Amendment and the underlying theory of the Constitution.

2

The majority also sketches out what may be an alternative (and narrower) argument. Again citing Story, the majority suggests that it would be inconsistent with the notion of "national sovereignty" for the States or the people of the States to have any reserved powers over the selection of Members of Congress. See *ante*, at 803, 805. The majority apparently reaches this conclusion in two steps. First, it asserts that because Congress as a whole is an institution of the National Government, the individual Members of Congress "owe primary allegiance not to the people of a State, but to the people of the Nation." See *ante*, at 803. Second, it concludes that because each Member of Congress has a nationwide constituency once he takes office, it would be inconsistent with the Framers' scheme to let a single State prescribe qualifications for him. See *ante*, at 803–804, 837–838.

Political scientists can debate about who commands the "primary allegiance" of Members of Congress once they reach Washington. From the framing to the present, however, the *selection* of the Representatives and Senators from each State has been left entirely to the people of that State or to their state legislature. See Art. I, § 2, cl. 1 (providing that Members of the House of Representatives are chosen "by the People of the several States"); Art. I, § 3, cl. 1 (originally providing that the Senators from each State are "chosen by the Legislature thereof"); Amdt. 17 (amending § 3 to provide that the Senators from each State are "elected by the people thereof"). The very name "congress" suggests a

coming together of representatives from distinct entities.[7] In keeping with the complexity of our federal system, once the representatives chosen by the people of each State assemble in Congress, they form a national body and are beyond the control of the individual States until the next election. But the selection of representatives in Congress is indisputably an act of the people of each State, not some abstract people of the Nation as a whole.

The concurring opinion suggests that this cannot be so, because it is the Federal Constitution that guarantees the right of the people of each State (so long as they are qualified electors under state law) to take part in choosing the Members of Congress from that State. See *ante*, at 842. But the presence of a federally guaranteed right hardly means that the selection of those representatives constitutes "the exercise of federal authority." See *ante*, at 841. When the people of Georgia pick their representatives in Congress, they are acting as the people of Georgia, not as the corporate agents for the undifferentiated people of the Nation as a whole. See *In re Green*, 134 U. S. 377, 379 (1890) ("Although [Presidential] electors are appointed and act under and pursuant to the Constitution of the United States, they are no more officers or agents of the United States than are the members of the state legislatures when acting as electors of federal senators, or the people of the States when acting as electors of representatives in Congress"). The concurring opinion protests that the exercise of "reserved" powers in the area of congressional elections would constitute "state interference with the most basic relation between the Na-

---

[7] See 1 S. Johnson, A Dictionary of the English Language 393 (4th ed. 1773) (defining "congress" as "[a]n appointed meeting for settlement of affairs between different nations: as, the *congress* of Cambray"); T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("an appointed meeting for settlement of affairs between different nations; the assembly which governs the United States of America").

tional Government and its citizens, the selection of legislative representatives." See *ante*, at 842. But when one strips away its abstractions, the concurring opinion is simply saying that the people of Arkansas cannot be permitted to inject themselves into the process by which they themselves select Arkansas' representatives in Congress.

The concurring opinion attempts to defend this surprising proposition by pointing out that Americans are "citizens of the United States" as well as "of the State wherein they reside," Amdt. 14, § 1, and that national citizenship (particularly after the ratification of the Fourteenth Amendment) "has privileges and immunities protected from state abridgment by the force of the Constitution itself," *ante*, at 842. These facts are indeed "beyond dispute," *ante*, at 844, but they do not contradict anything that I have said. Although the United States obviously is a Nation, and although it obviously has citizens, the Constitution does not call for Members of Congress to be elected by the undifferentiated national citizenry; indeed, it does not recognize any mechanism at all (such as a national referendum) for action by the undifferentiated people of the Nation as a whole. See *supra*, at 848–849. Even at the level of national politics, then, there always remains a meaningful distinction between someone who is a citizen of the United States and of Georgia and someone who is a citizen of the United States and of Massachusetts. The Georgia citizen who is unaware of this distinction will have it pointed out to him as soon as he tries to vote in a Massachusetts congressional election.

In short, while the majority is correct that the Framers expected the selection process to create a "direct link" between Members of the House of Representatives and the people, *ante*, at 803, the link was between the Representatives from each State and the people of that State; the people of Georgia have no say over whom the people of Massachusetts select to represent them in Congress. This arrange-

ment must baffle the majority,[8] whose understanding of Congress would surely fit more comfortably within a system of nationwide elections. But the fact remains that when it comes to the selection of Members of Congress, the people of each State have retained their independent political identity. As a result, there is absolutely nothing strange about the notion that the people of the States or their state legislatures possess "reserved" powers in this area.

The majority seeks support from the Constitution's specification that Members of Congress "shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States." Art. I, §6, cl. 1; see *ante*, at 804. But the fact that Members of Congress draw a federal salary once they have assembled hardly means that the people of the States lack reserved powers over the selection of their representatives. Indeed, the historical evidence about the compensation provision suggests that the States' reserved powers may even extend beyond the selection stage. The majority itself indicates that if the Constitution had made no provision for congressional compensation, this topic would have been "left to state legislatures." *Ante*, at 809; accord, 1 Farrand 215–216 (remarks of James Madison and George Mason); *id.*, at 219, n. *. Likewise, Madison specifically indicated that even with the compensation provision in place, the individual States still

---

[8] The majority even suggests that congressional elections do not really work in this way, because each House of Congress has the power to judge its Members' qualifications. See *ante*, at 804 (citing Art. I, §5, cl. 1). But the power to act as "Judge" under Art. I, §5, is merely the power to apply pre-existing qualifications to which the people of each State have consented. See *Powell* v. *McCormack*, 395 U. S. 486 (1969). Whether or not §5 directs each House to judge state-law disqualifications as well as those contained in the Constitution, see *infra*, at 895, it is clear that neither House may exclude a representative from Massachusetts for failure to meet a qualification that the people of Massachusetts have not accepted.

enjoyed the reserved power to supplement the federal salary. 3 *id.*, at 315 (remarks at the Virginia ratifying convention).

As for the fact that a State has no reserved power to establish qualifications for the office of President, see *ante*, at 803–804, it surely need not follow that a State has no reserved power to establish qualifications for the Members of Congress who represent the people of that State. Because powers are reserved to the States "respectively," it is clear that no State may legislate for another State: Even though the Arkansas Legislature enjoys the reserved power to pass a minimum-wage law for Arkansas, it has no power to pass a minimum-wage law for Vermont. For the same reason, Arkansas may not decree that only Arkansas citizens are eligible to be President of the United States; the selection of the President is not up to Arkansas alone, and Arkansas can no more prescribe the qualifications for that office than it can set the qualifications for Members of Congress from Florida. But none of this suggests that Arkansas cannot set qualifications for Members of Congress from Arkansas.

In fact, the Constitution's treatment of Presidential elections actively contradicts the majority's position. While the individual States have no "reserved" power to set qualifications for the office of President, we have long understood that they do have the power (as far as the Federal Constitution is concerned) to set qualifications for their Presidential electors—the delegates that each State selects to represent it in the electoral college that actually chooses the Nation's chief executive. Even respondents do not dispute that the States may establish qualifications for their delegates to the electoral college, as long as those qualifications pass muster under other constitutional provisions (primarily the First and Fourteenth Amendments). See *Williams* v. *Rhodes*, 393 U. S. 23, 29 (1968); *McPherson* v. *Blacker*, 146 U. S. 1, 27–36 (1892). As the majority cannot argue that the Consti-

tution affirmatively grants this power,[9] the power must be one that is "reserved" to the States. It necessarily follows that the majority's understanding of the Tenth Amendment is incorrect, for the position of Presidential elector surely " 'spring[s] out of the existence of the national government.' " See *ante*, at 802.

3

In a final effort to deny that the people of the States enjoy "reserved" powers over the selection of their representatives in Congress, the majority suggests that the Constitution expressly delegates to the States certain powers over congressional elections. See *ante*, at 805. Such delegations of power, the majority argues, would be superfluous if the people of the States enjoyed reserved powers in this area.

Only one constitutional provision—the Times, Places and Manner Clause of Article I, § 4—even arguably supports the majority's suggestion. It reads:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

Contrary to the majority's assumption, however, this Clause does not delegate any authority to the States. Instead, it simply imposes a duty upon them. The majority gets it exactly right: By specifying that the state legislatures "shall" prescribe the details necessary to hold congressional elections, the Clause "expressly requires action by the States."

---

[9] The only provision that might conceivably do so is Article II, § 1, which recognizes the authority of state legislatures to specify the "Manner" in which a State appoints its Presidential electors. But if a qualifications law is a "Manner" regulation for purposes of this Clause, then it is also a "Manner" regulation for purposes of Article I, § 4—which would mean that the Constitution specifically recognizes the power of both the States and the Congress to set qualifications for Senators and Representatives.

See *ante*, at 804. This command meshes with one of the principal purposes of Congress' "make or alter" power: to ensure that the States hold congressional elections in the first place, so that Congress continues to exist. As one reporter summarized a speech made by John Jay at the New York ratifying convention:

> "[E]very government was imperfect, unless it had a power of preserving itself. Suppose that, by design or accident, the states should *neglect to appoint representatives;* certainly there should be some constitutional remedy for this evil. The obvious meaning of the paragraph was, that, if this neglect should take place, Congress should have power, by law, to support the government, and prevent the dissolution of the Union. [Jay] believed this was the design of the federal Convention." 2 Elliot 326 (emphasis in original).[10]

Constitutional provisions that impose affirmative duties on the States are hardly inconsistent with the notion of reserved powers.

---

[10] Accord, *e. g.,* 2 Elliot 24 (remarks of Caleb Strong at the Massachusetts ratifying convention) ("[I]f the legislature of a state should refuse to make such regulations, the consequence will be, that the representatives will not be chosen, and the general government will be dissolved. In such case, can gentlemen say that a power to remedy the evil is not necessary to be lodged somewhere? And where can it be lodged but in Congress?"); 2 Documentary History of the Ratification of the Constitution 400 (M. Jensen ed. 1976) (notes of Anthony Wayne at the Pennsylvania ratifying convention) ("4th section occasioned by an eventual *invasion, insurrection, etc."*); The Federalist No. 59, at 363 (Hamilton) (observing that if not subject to any checks, the States "could at any moment annihilate [the Federal Government] by neglecting to provide for the choice of persons to administer its affairs").

These statements about the Clause's purposes also help refute the majority's claim that it was bizarre for the Framers to leave the States relatively free to enact qualifications for congressional office while simultaneously giving Congress "make or alter" power over the States' time, place, and manner regulations. See *infra*, at 896–898.

Of course, the second part of the Times, Places and Manner Clause does grant a power rather than impose a duty. As its contrasting uses of the words "shall" and "may" confirm, however, the Clause grants power exclusively to Congress, not to the States. If the Clause did not exist at all, the States would still be able to prescribe the times, places, and manner of holding congressional elections; the deletion of the provision would simply deprive Congress of the power to override these state regulations.

The majority also mentions Article II, §1, cl. 2: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ." But this Clause has nothing to do with congressional elections, and in any event it, too, imposes an affirmative obligation on the States. In fact, some such barebones provision was essential in order to coordinate the creation of the electoral college. As mentioned above, moreover, it is uncontested that the States enjoy the reserved power to specify qualifications for the Presidential electors who are chosen pursuant to this Clause. See *supra*, at 861–862.

Respondent Thornton seeks to buttress the majority's position with Article I, §2, cl. 1, which provides:

> "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

According to respondent Thornton, this provision "grants States authority to prescribe the qualifications of [voters]" in congressional elections. Brief for Respondent Congressman Ray Thornton 4. If anything, however, the Clause *limits* the power that the States would otherwise enjoy. Though it does leave States with the ability to control who may vote

in congressional elections, it has the effect of restricting their authority to establish special requirements that do not apply in elections for the state legislature.

Our case law interpreting the Clause affirmatively supports the view that the States enjoy reserved powers over congressional elections. We have treated the Clause as a one-way ratchet: While the requirements for voting in congressional elections cannot be more onerous than the requirements for voting in elections for the most numerous branch of the state legislature, they can be less so. See *Tashjian* v. *Republican Party of Conn.*, 479 U. S. 208, 225–229 (1986). If this interpretation of the Clause is correct, it means that even with the Clause in place, States still have partial freedom to set special voting requirements for congressional elections. As this power is not granted in Article I, it must be among the "reserved" powers.

## II

I take it to be established, then, that the people of Arkansas do enjoy "reserved" powers over the selection of their representatives in Congress. Purporting to exercise those reserved powers, they have agreed among themselves that the candidates covered by § 3 of Amendment 73—those whom they have already elected to three or more terms in the House of Representatives or to two or more terms in the Senate—should not be eligible to appear on the ballot for reelection, but should nonetheless be returned to Congress if enough voters are sufficiently enthusiastic about their candidacy to write in their names. Whatever one might think of the wisdom of this arrangement, we may not override the decision of the people of Arkansas unless something in the Federal Constitution deprives them of the power to enact such measures.

The majority settles on "the Qualifications Clauses" as the constitutional provisions that Amendment 73 violates. See *ante,* at 806. Because I do not read those provisions to im-

pose any unstated prohibitions on the States, it is unnecessary for me to decide whether the majority is correct to identify Arkansas' ballot-access restriction with laws fixing true term limits or otherwise prescribing "qualifications" for congressional office. As I discuss in Part A below, the Qualifications Clauses are merely straightforward recitations of the minimum eligibility requirements that the Framers thought it essential for every Member of Congress to meet. They restrict state power only in that they prevent the States from *abolishing* all eligibility requirements for membership in Congress.

Because the text of the Qualifications Clauses does not support its position, the majority turns instead to its vision of the democratic principles that animated the Framers. But the majority's analysis goes to a question that is not before us: whether Congress has the power to prescribe qualifications for its own members. As I discuss in Part B, the democratic principles that contributed to the Framers' decision to withhold this power from Congress do not prove that the Framers also deprived the people of the States of their reserved authority to set eligibility requirements for their own representatives.

In Part C, I review the majority's more specific historical evidence. To the extent that they bear on this case, the records of the Philadelphia Convention affirmatively support my unwillingness to find hidden meaning in the Qualifications Clauses, while the surviving records from the ratification debates help neither side. As for the postratification period, five States supplemented the constitutional disqualifications in their very first election laws. The historical evidence thus refutes any notion that the Qualifications Clauses were generally understood to be exclusive. Yet the majority must establish just such an understanding in order to justify its position that the Clauses impose unstated prohibitions on the States and the people. In my view, the historical evidence is simply inadequate to warrant the majority's

conclusion that the Qualifications Clauses mean anything more than what they say.

### A

The provisions that are generally known as the Qualifications Clauses read as follows:

> "No Person shall be a Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." Art. I, §2, cl. 2.

> "No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen." Art. I, §3, cl. 3.

Later in Article I, the "Ineligibility Clause" imposes another nationwide disqualification from congressional office: "[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." §6, cl. 2.

The majority is quite correct that the "negative phrasing" of these Clauses has little relevance. See *ante*, at 792, n. 8. The Qualifications Clauses would mean the same thing had they been enacted in the form that the Philadelphia Convention referred them to the Committee of Style:

> "Every Member of the House of Representatives shall be of the age of twenty-five years at least; shall have been a citizen of the United States for at least seven years before his election; and shall be, at the time of his election, an inhabitant of the State in which he shall be chosen." 2 Farrand 565.

See also *id.*, at 567 (same phrasing for Senate Qualifications Clause). But these different formulations—whether negative or affirmative—merely establish *minimum* qualifica-

tions. They are quite different from an *exclusive* formulation, such as the following:

> "Every Person who shall have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall, when elected, be an Inhabitant of that State in which he shall be chosen, shall be eligible to be a Representative."

At least on their face, then, the Qualifications Clauses do nothing to prohibit the people of a State from establishing additional eligibility requirements for their own representatives.

Joseph Story thought that such a prohibition was nonetheless implicit in the constitutional list of qualifications, because "[f]rom the very nature of such a provision, the affirmation of these qualifications would seem to imply a negative of all others." 1 Commentaries on the Constitution of the United States § 624 (1833); see also *ante*, at 793, n. 9. This argument rests on the maxim *expressio unius est exclusio alterius*. When the Framers decided which qualifications to include in the Constitution, they also decided not to include any other qualifications in the Constitution. In Story's view, it would conflict with this latter decision for the people of the individual States to decide, as a matter of state law, that they would like their own representatives in Congress to meet additional eligibility requirements.

To spell out the logic underlying this argument is to expose its weakness. Even if one were willing to ignore the distinction between requirements enshrined in the Constitution and other requirements that the Framers were content to leave within the reach of ordinary law, Story's application of the *expressio unius* maxim takes no account of federalism. At most, the specification of certain nationwide disqualifications in the Constitution implies the negation of other *nationwide* disqualifications; it does not imply that individual States or their people are barred from adopting their own

disqualifications on a state-by-state basis. Thus, the one delegate to the Philadelphia Convention who voiced anything approaching Story's argument said only that a recital of qualifications in the Constitution would imply that *Congress* lacked any qualification-setting power. See 2 Farrand 123 (remarks of John Dickinson); cf. *ante,* at 793, n. 9, and 815–816, n. 27.

The Qualifications Clauses do prevent the individual States from abolishing all eligibility requirements for Congress. This restriction on state power reflects the fact that when the people of one State send immature, disloyal, or unknowledgeable representatives to Congress, they jeopardize not only their own interests but also the interests of the people of other States. Because Congress wields power over all the States, the people of each State need some guarantee that the legislators elected by the people of other States will meet minimum standards of competence. The Qualifications Clauses provide that guarantee: They list the requirements that the Framers considered essential to protect the competence of the National Legislature.[11]

If the people of a State decide that they would like their representatives to possess additional qualifications, however, they have done nothing to frustrate the policy behind the Qualifications Clauses. Anyone who possesses all of the constitutional qualifications, plus some qualifications required by state law, still has all of the federal qualifications.

---

[11] Thus, the age requirement was intended to ensure that Members of Congress were people of mature judgment and experience. See, *e. g.,* 1 Farrand 375 (remarks of George Mason at the Philadelphia Convention); 3 *id.,* at 147 (remarks of James McHenry before the Maryland House of Delegates). The citizenship requirement was intended both to ensure that Members of Congress were familiar with the country and that they were not unduly susceptible to foreign influence. See, *e. g.,* 2 *id.,* at 216 (remarks of George Mason). The inhabitancy requirement was intended to produce a National Legislature whose Members, collectively, had a local knowledge of all the States. See, *e. g.,* The Federalist No. 56 (Madison). The Ineligibility Clause was intended to guard against corruption. See, *e. g.,* 1 Farrand 381 (remarks of Alexander Hamilton).

Accordingly, the fact that the Constitution specifies certain qualifications that the Framers deemed necessary to protect the competence of the National Legislature does not imply that it strips the people of the individual States of the power to protect their own interests by adding other requirements for their own representatives.

The people of other States could legitimately complain if the people of Arkansas decide, in a particular election, to send a 6-year-old to Congress. But the Constitution gives the people of other States no basis to complain if the people of Arkansas elect a freshman representative in preference to a long-term incumbent. That being the case, it is hard to see why the rights of the people of other States have been violated when the people of Arkansas decide to enact a more general disqualification of long-term incumbents. Such a disqualification certainly is subject to scrutiny under other constitutional provisions, such as the First and Fourteenth Amendments. But as long as the candidate whom they send to Congress meets the constitutional age, citizenship, and inhabitancy requirements, the people of Arkansas have not violated the Qualifications Clauses.

This conclusion is buttressed by our reluctance to read constitutional provisions to preclude state power by negative implication. The very structure of the Constitution counsels such hesitation. After all, § 10 of Article I contains a brief list of *express* prohibitions on the States. Cf. *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 517–519 (1992) (STEVENS, J.) (applying the *expressio unius* maxim to conclude that Congress' inclusion of an express pre-emption clause in a federal statute implies that state laws beyond the reach of that clause are not pre-empted); *Nevada* v. *Hall*, 440 U. S. 410, 425 (1979) (STEVENS, J.) (suggesting that in light of the Tenth Amendment and the Constitution's express prohibitions on the States, "caution should be exercised before concluding that unstated limitations on state power were intended by the Framers"). Many of the prohibitions listed in

§ 10, moreover, might have been thought to be implicit in other constitutional provisions or in the very nature of our federal system. Compare, *e. g.*, Art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties"), and Art. I, § 8, cl. 5 ("The Congress shall have Power . . . [t]o coin Money"), with Art. I, § 10, cl. 1 ("No State shall enter into any Treaty" and "No State shall . . . coin Money"); see also Art. VI, cl. 2 (explicitly declaring that state law cannot override the Constitution). The fact that the Framers nonetheless made these prohibitions express confirms that one should not lightly read provisions like the Qualifications Clauses as implicit deprivations of state power. See generally *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243, 249 (1833).[12]

The majority responds that "a patchwork of state qualifications" would "undermin[e] the uniformity and the national character that the Framers envisioned and sought to ensure." *Ante*, at 822. Yet the Framers thought it perfectly consistent with the "national character" of Congress for the Senators and Representatives from each State to be chosen by the legislature or the people of that State. The majority never explains why Congress' fundamental character permits this state-centered system, but nonetheless prohibits

---

[12] The principle that the Constitution rests on the consent of the people of the States points in the same direction. Both the process of selecting delegates to the Philadelphia Convention and the ratification procedure erected by Article VII were designed to let the States and the people of the States protect their interests. Lest those protections be evaded, one should not be quick to read the Qualifications Clauses as imposing unstated prohibitions that pre-empt all state qualifications laws. Cf. L. Tribe, American Constitutional Law § 6–25, p. 480 (2d ed. 1988) (arguing that courts should hesitate to read federal statutes to pre-empt state law, because "to give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* [v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985)] relied to protect states' interests"); *Gregory* v. *Ashcroft*, 501 U. S. 452, 464 (1991) (applying this argument).

the people of the States and their state legislatures from setting any eligibility requirements for the candidates who seek to represent them.

As for the majority's related assertion that the Framers intended qualification requirements to be uniform, this is a conclusion, not an argument. Indeed, it is a conclusion that the Qualifications Clauses themselves contradict. At the time of the framing, and for some years thereafter, the Clauses' citizenship requirements incorporated laws that varied from State to State. Thus, the Qualifications Clauses themselves made it possible that a person would be qualified to represent State *A* in Congress even though a similarly situated person would not be qualified to represent State *B*.

To understand this point requires some background. Before the Constitution was adopted, citizenship was controlled entirely by state law, and the different States established different criteria. See J. Kettner, Development of American Citizenship, 1608–1870, pp. 213–218 (1978). Even after the Constitution gave Congress the power to "establish an uniform Rule of Naturalization . . . throughout the United States," Art. I, § 8, cl. 4, Congress was under no obligation to do so, and the Framers surely expected state law to continue in full force unless and until Congress acted. Cf. *Sturges* v. *Crowninshield*, 4 Wheat. 122, 196 (1819) (so interpreting the other part of § 8, cl. 4, which empowers Congress to establish "uniform Laws on the subject of Bankruptcies").[13] Accordingly, the constitutional requirement that

---

[13] Even when Congress enacted the first federal naturalization law in 1790, it left open the possibility that the individual States could establish more lenient standards of their own for admitting people to citizenship. While Hamilton had suggested that Congress' power to "establish an uniform Rule" logically precluded the States from deviating downward from the rule that Congress established, see The Federalist No. 32, at 199, the early cases on this question took the opposite view. See *Collet* v. *Collet*, 2 Dall. 294, 296 (CC Pa. 1792) (Wilson, Blair, and Peters, JJ.). States therefore continued to enact naturalization laws of their own until 1795,

Members of Congress be United States citizens meant different things in different States. The very first contested-election case in the House of Representatives, which involved the citizenship of a would-be Congressman from South Carolina, illustrates this principle. As Representative James Madison told his colleagues, "I take it to be a clear point, that we are to be guided, in our decision, by the laws and constitution of South Carolina, so far as they can guide us; and where the laws do not expressly guide us, we must be guided by principles of a general nature . . . ." Cases of Contested Elections in Congress 32 (M. Clarke & D. Hall eds. 1834) (reporting proceedings from May 22, 1789).

Even after Congress chose to exercise its power to prescribe a uniform route to naturalization, the durational element of the citizenship requirement in the Qualifications Clauses ensured that variances in state law would continue to matter. Thus, in 1794 the Senate refused to seat Albert Gallatin because, owing to the individual peculiarities of the laws of the two relevant States, he had not been a citizen for the required nine years. *Id.,* at 859–862, 867 (reporting proceedings from February 20 and 28, 1794).

Even if the Qualifications Clauses had not themselves incorporated nonuniform requirements, of course, there would still be no basis for the assertion of the plurality below that they mandate "uniformity in qualifications." See 316 Ark. 251, 265, 872 S. W. 2d 349, 356 (1994). The Clauses wholly omit the exclusivity provision that, according to both the plurality below and today's majority, was their central focus. In fact, neither the text nor the apparent purpose of the Qualifications Clauses does anything to refute Thomas Jefferson's elegant legal analysis:

---

when Congress passed an exclusive naturalization law. See J. Kettner, Development of American Citizenship, 1608–1870, pp. 242–243 (1978).

"Had the Constitution been silent, nobody can doubt but that the right to prescribe all the qualifications and disqualifications of those they would send to represent them, would have belonged to the State. So also the Constitution might have prescribed the whole, and excluded all others. It seems to have preferred the middle way. It has exercised the power in part, by declaring some disqualifications .... But it does not declare, itself, that the member shall not be a lunatic, a pauper, a convict of treason, of murder, of felony, or other infamous crime, or a non-resident of his district; nor does it prohibit to the State the power of declaring these, or any other disqualifications which its particular circumstances may call for; and these may be different in different States. Of course, then, by the tenth amendment, the power is reserved to the State." Letter to Joseph C. Cabell (Jan. 31, 1814), in 14 Writings of Thomas Jefferson 82–83 (A. Lipscomb ed. 1904).[14]

## B

Although the Qualifications Clauses neither state nor imply the prohibition that it finds in them, the majority infers from the Framers' "democratic principles" that the Clauses must have been generally understood to preclude the people of the States and their state legislatures from prescribing any additional qualifications for their representatives in Congress. But the majority's evidence on this point establishes only two more modest propositions: (1) the Framers did not want the Federal Constitution itself to impose a

---

[14] The majority notes Jefferson's concession that state power to supplement the Qualifications Clauses was "one of the doubtful questions on which honest men may differ with the purest of motives." See *ante*, at 813, n. 24; 14 Writings of Thomas Jefferson 83 (A. Lipscomb ed. 1904). But while Jefferson cautioned against impugning the motives of people who might disagree with his position, his use of the phrase "[o]f course" suggests that he himself did not entertain serious doubts of its correctness.

broad set of disqualifications for congressional office, and (2) the Framers did not want the Federal Congress to be able to supplement the few disqualifications that the Constitution does set forth. The logical conclusion is simply that the Framers did not want the people of the States and their state legislatures to be constrained by too many qualifications imposed at the national level. The evidence does not support the majority's more sweeping conclusion that the Framers intended to bar the people of the States and their state legislatures from adopting additional eligibility requirements to help narrow their own choices.

I agree with the majority that Congress has no power to prescribe qualifications for its own Members. This fact, however, does not show that the Qualifications Clauses contain a hidden exclusivity provision. The reason for Congress' incapacity is not that the Qualifications Clauses deprive Congress of the authority to set qualifications, but rather that nothing in the Constitution grants Congress this power. In the absence of such a grant, Congress may not act. But deciding whether the Constitution denies the qualification-setting power to the States and the people of the States requires a fundamentally different legal analysis.

Despite the majority's claims to the contrary, see *ante*, at 796–797, n. 12, this explanation for Congress' incapacity to supplement the Qualifications Clauses is perfectly consistent with the reasoning of *Powell* v. *McCormack*, 395 U. S. 486 (1969). *Powell* concerned the scope of Article I, § 5, which provides that "[e]ach House [of Congress] shall be the Judge of the Elections, Returns and Qualifications of its own Members." As the majority itself recognizes, "[t]he principal issue [in *Powell*] was whether the power granted to each House in Art. I, § 5, . . . includes the power to impose qualifications other than those set forth in the text of the Constitution." *Ante*, at 788. Contrary to the majority's suggestion, then, the critical question in *Powell* was whether § 5 conferred a qualification-setting power—not whether the Quali-

fications Clauses took it away. Compare *Powell, supra,* at 519 (describing the question before the Court as "what power the Constitution confers upon the House through Art. I, § 5"), and 536 (describing the Court's task as · "determining the meaning of Art. I, § 5") with *ante,* at 789, and 792, n. 8 (suggesting that *Powell* held that the Qualifications Clauses "limit the power of the House to impose additional qualifications"). See also *Buckley* v. *Valeo,* 424 U. S. 1, 133 (1976) (taking my view of *Powell*).

*Powell*'s analysis confirms this point. After summarizing a large quantity of historical material bearing on the original understanding of what it meant for a legislature to act as "the Judge" of the qualifications of its members, see 395 U. S., at 521–531, *Powell* went on to stress that the Philadelphia Convention specifically rejected proposals to grant Congress the power to pass laws prescribing additional qualifications for its Members, and that the Convention rejected these proposals on the very same day that it approved the precursor of § 5. See *id.,* at 533–536. Given this historical evidence, the *Powell* Court refused to read § 5 as empowering the House to prescribe such additional qualifications in its capacity as "Judge." And if nothing in the Constitution gave the House this power, it inevitably followed that the House could not exercise it. Despite the majority's claims, then, *Powell* itself rested on the proposition that the institutions of the Federal Government enjoy only the powers that are granted to them. See also *ante,* at 793, n. 9 (describing the Qualifications Clauses merely as an independent basis for the result reached in *Powell*).[15]

---

[15] The majority also errs in its interpretation of *Nixon* v. *United States,* 506 U. S. 224 (1993). See *ante,* at 796, n. 12. In dictum, *Nixon* did refer to "the fixed meaning of '[q]ualifications' set forth in Art. I, § 2." 506 U. S., at 237. But as both the surrounding context and the internal punctuation of this passage make clear, *Nixon* was referring to the meaning of the word "Qualifications" in § 5; that term, after all, does not even appear in the House Qualifications Clause of § 2. Thus, *Nixon* merely said that § 5 directs the House to judge the qualifications "set forth in Art. I, § 2," and not qualifications of its own invention. See also *infra,* at 895. There

The fact that the Framers did not grant a qualification-setting power to Congress does not imply that they wanted to bar its exercise at the state level. One reason why the Framers decided not to let Congress prescribe the qualifications of its own Members was that incumbents could have used this power to perpetuate themselves or their ilk in office. As Madison pointed out at the Philadelphia Convention, Members of Congress would have an obvious conflict of interest if they could determine who may run against them. 2 Farrand 250; see also *ante,* at 793–794, n. 10. But neither the people of the States nor the state legislatures would labor under the same conflict of interest when prescribing qualifications for Members of Congress, and so the Framers would have had to use a different calculus in determining whether to deprive them of this power.

As the majority argues, democratic principles also contributed to the Framers' decision to withhold the qualification-setting power from Congress. But the majority is wrong to suggest that the same principles must also have led the Framers to deny this power to the people of the States and the state legislatures. In particular, it simply is not true that "the source of the qualification is of little moment in assessing the qualification's restrictive impact." *Ante,* at 820. There is a world of difference between a self-imposed constraint and a constraint imposed from above.

Congressional power over qualifications would have enabled the representatives from some States, acting collectively in the National Legislature, to prevent the people of another State from electing their preferred candidates. The John Wilkes episode in 18th-century England illustrates the problems that might result. As the majority mentions, Wilkes' district repeatedly elected him to the House of Commons, only to have a majority of the representatives of other

---

would have been no occasion for *Nixon* to extend *Powell:* The only point of its discussion was to explain why the question at issue in *Powell* was justiciable, while the question at issue in *Nixon* (which concerned impeachment) was not.

districts frustrate their will by voting to exclude him. See *ante*, at 790. Americans who remembered these events might well have wanted to prevent the National Legislature from fettering the choices of the people of any individual State (for the House of Representatives) or their state legislators (for the Senate).

Yet this is simply to say that qualifications should not be set at the national level for offices whose occupants are selected at the state level. The majority never identifies the democratic principles that would have been violated if a state legislature, in the days before the Constitution was amended to provide for the direct election of Senators, had imposed some limits of its own on the field of candidates that it would consider for appointment.[16] Likewise, the majority does not explain why democratic principles prohibit the people of a State from adopting additional eligibility requirements to help narrow their choices among candidates seeking to represent them in the House of Representatives. Indeed, the invocation of democratic principles to invalidate Amendment 73 seems particularly difficult in the present case, because Amendment 73 remains fully within the control of the people of Arkansas. If they wanted to repeal it (despite the 20-point margin by which they enacted it less than three years ago), they could do so by a simple majority vote. See Ark. Const., Amdt. 7.

The majority appears to believe that restrictions on eligibility for office are inherently undemocratic. But the Qualifications Clauses themselves prove that the Framers did not share this view; eligibility requirements to which the people of the States consent are perfectly consistent with the Fram-

---

[16] Oregon, for instance, pioneered a system in which the state legislature bound itself to appoint the candidates chosen in a statewide vote of the people. See Hills, A Defense of State Constitutional Limits on Federal Congressional Terms, 53 U. Pitt. L. Rev. 97, 108 (1991). The majority is in the uncomfortable position of suggesting that this system violated "democratic principles."

ers' scheme. In fact, we have described "the authority of the people of the States to determine the qualifications of their most important government officials" as "an authority that lies at the heart of representative government." *Gregory* v. *Ashcroft*, 501 U. S. 452, 463 (1991) (internal quotation marks omitted) (refusing to read federal law to preclude States from imposing a mandatory retirement age on state judges who are subject to periodic retention elections). When the people of a State themselves decide to restrict the field of candidates whom they are willing to send to Washington as their representatives, they simply have not violated the principle that "the people should choose whom they please to govern them." See 2 Elliot 257 (remarks of Alexander Hamilton at the New York Convention).

At one point, the majority suggests that the principle identified by Hamilton encompasses not only the electorate's right to choose, but also "the egalitarian concept that the opportunity to be elected [is] open to all." See *ante*, at 794; see also *ante*, at 819–820. To the extent that the second idea has any content independent of the first, the majority apparently would read the Qualifications Clauses to create a personal right to be a candidate for Congress, and then to set that right above the authority of the people of the States to prescribe eligibility requirements for public office. But we have never suggested that "the opportunity to be elected" is open even to those whom the voters have decided not to elect. On that rationale, a candidate might have a right to appear on the ballot in the general election even though he lost in the primary. But see *Storer* v. *Brown*, 415 U. S. 724, 726, n. 16 (1974); see also *Bullock* v. *Carter*, 405 U. S. 134, 142–143 (1972) (rejecting the proposition that there is any fundamental right to be a candidate, separate and apart from the electorate's right to vote). Thus, the majority ultimately concedes that its "egalitarian concept" derives entirely from the electorate's right to choose. See *ante*, at 794, n. 11; see also *ante*, at 819 (deriving the "egalitarian

ideal" from the proposition that the Qualifications Clauses do not unduly "'fetter the judgment . . . of the people'" (quoting The Federalist No. 57, at 351)). If the latter is not violated, then neither is the former.

In seeking ratification of the Constitution, James Madison did assert that "[u]nder these reasonable limitations [set out in the House Qualifications Clause], the door of this part of the federal government is open to merit of every description . . . ." The Federalist No. 52, at 326. The majority stresses this assertion, and others to the same effect, in support of its "egalitarian concept." See *ante,* at 794, 819–820, and n. 30. But there is no reason to interpret these statements as anything more than claims that the Constitution itself imposes relatively few disqualifications for congressional office.[17] One should not lightly assume that Madi-

---

[17] For instance, the majority quotes Noah Webster's observation that under the Constitution, "the places of senators are wisely left open to all persons of suitable age and merit, and who have been citizens of the United States for nine years." See *ante,* at 820, n. 30 (citing "A Citizen of America" (Oct. 17, 1787), in 1 Debate on the Constitution 129, 142 (B. Bailyn ed. 1993) (hereinafter Bailyn)). But there is no reason to read Webster as denying the power of state legislatures to pass resolutions limiting the field of potential candidates that they would consider for appointment to the Senate. Indeed, it seems implausible that Webster would have been invoking the majority's vision of "democratic principles" in support of the constitutional provisions calling for Senators to be appointed by the various state legislatures rather than being elected directly by the people of the States.

Similarly, the majority quotes a newspaper piece written by John Stevens, Jr., to the people of New York. See *ante,* at 819–820. But Stevens gave the following explanation for his assertion that "[n]o man who has real merit . . . need despair" under the system erected by the Constitution: "He first distinguishes himself amongst his neighbours at township and county meeting; he is next sent to the State Legislature. In this theatre his abilities . . . are . . . displayed to the views of every man in the State: from hence his ascent to a seat in Congress becomes easy and sure." "Americanus," Daily Advertiser, Dec. 12, 1787, in 1 Bailyn 487, 492. As the States indisputably controlled eligibility requirements for membership in the various state legislatures, and indeed had established some disquali-

son and his colleagues, who were attempting to win support at the state level for the new Constitution, were proclaiming the inability of the people of the States or their state legislatures to prescribe any eligibility requirements for their own Representatives or Senators. Instead, they were merely responding to the charge that the Constitution was undemocratic and would lead to aristocracies in office. Cf. *ante*, at 791 (referring to "the antifederalist charge that the new Constitution favored the wealthy and well born"). The statement that the qualifications imposed in the Constitution are not unduly restrictive hardly implies that the Constitution withdrew the power of the people of each State to prescribe additional eligibility requirements for their own Representatives if they so desired.

In fact, the authority to narrow the field of candidates in this way may be part and parcel of the right to elect Members of Congress. That is, the right to choose may include the right to winnow. See Hills, A Defense of State Constitutional Limits on Federal Congressional Terms, 53 U. Pitt. L. Rev. 97, 107–109 (1991).

To appreciate this point, it is useful to consider the Constitution as it existed before the Seventeenth Amendment was adopted in 1913. The Framers' scheme called for the legislature of each State to choose the Senators from that State. Art. I, § 3, cl. 1. The majority offers no reason to believe that state legislatures could not adopt prospective rules to guide themselves in carrying out this responsibility; not only is there no express language in the Constitution barring legislatures from passing laws to narrow their choices, but there also is absolutely no basis for inferring such a prohibition. Imagine the worst-case scenario: a state legislature, wishing

---

fications, I do not read Stevens to be saying that they were barred from doing the same thing with respect to Congress. Without addressing whether the people of the States may supplement the Qualifications Clauses, Stevens was merely praising the Constitution for imposing few such requirements of its own.

to punish one of the Senators from its State for his vote on some bill, enacts a qualifications law that the Senator does not satisfy. The Senator would still be able to serve out his term; the Constitution provides for Senators to be chosen for 6-year terms, Art. I, § 3, cl. 1, and a person who has been seated in Congress can be removed only if two-thirds of the Members of his House vote to expel him, § 5, cl. 2. While the Senator would be disqualified from seeking reappointment, under the Framers' Constitution the state legislature already enjoyed unfettered discretion to deny him reappointment anyway. Instead of passing a qualifications law, the legislature could simply have passed a resolution declaring its intention to appoint someone else the next time around. Thus, the legislature's power to adopt laws to narrow its own choices added nothing to its general appointment power.

While it is easier to coordinate a majority of state legislators than to coordinate a majority of qualified voters, the basic principle should be the same in both contexts. Just as the state legislature enjoyed virtually unfettered discretion over whom to appoint to the Senate under Art. I, § 3, so the qualified voters of the State enjoyed virtually unfettered discretion over whom to elect to the House of Representatives under Art. I, § 2. If there is no reason to believe that the Framers' Constitution barred state legislatures from adopting prospective rules to narrow their choices for Senator, then there is also no reason to believe that it barred the people of the States from adopting prospective rules to narrow their choices for Representative. In addition, there surely is no reason to believe that the Senate Qualifications Clause suddenly acquired an exclusivity provision in 1913, when the Seventeenth Amendment was adopted. Now that the people of the States are charged with choosing both Senators and Representatives, it follows that they may adopt eligibility requirements for Senators as well as for Representatives.

I would go further, for I see nothing in the Constitution that precludes the people of each State (if they so desire) from authorizing their elected state legislators to prescribe qualifications on their behalf. If the people of a State decide that they do not trust their state legislature with this power, they are free to amend their state constitution to withdraw it. This arrangement seems perfectly consistent with the Framers' scheme. From the time of the framing until after the Civil War, for example, the Federal Constitution did not bar state governments from abridging the freedom of speech or the freedom of the press, even when those freedoms were being exercised in connection with congressional elections. It was the state constitutions that determined whether state governments could silence the supporters of disfavored congressional candidates, just as it was the state constitutions that determined whether the States could persecute people who held disfavored religious beliefs or could expropriate property without providing just compensation. It would not be at all odd if the state constitutions also determined whether the state legislature could pass qualifications statutes.

But one need not agree with me that the people of each State may delegate their qualification-setting power in order to uphold Arkansas' Amendment 73. Amendment 73 is not the act of a state legislature; it is the act of the people of Arkansas, adopted at a direct election and inserted into the State Constitution. The majority never explains why giving effect to the people's decision would violate the "democratic principles" that undergird the Constitution. Instead, the majority's discussion of democratic principles is directed entirely to attacking eligibility requirements imposed on the people of a State by an entity other than themselves.

The majority protests that any distinction between the people of the States and the state legislatures is "untenable" and "astonishing." See *ante*, at 809, n. 19. In the limited area of congressional elections, however, the Framers them-

selves drew this distinction: They specifically provided for Senators to be chosen by the state legislatures and for Representatives to be chosen by the people. In the context of congressional elections, the Framers obviously saw a meaningful difference between direct action by the people of each State and action by their state legislatures.

Thus, even if one believed that the Framers intended to bar state legislatures from adopting qualifications laws that restrict the people's choices, it would not follow that the people themselves are precluded from agreeing upon eligibility requirements to help narrow their own choices. To be sure, if the Qualifications Clauses were exclusive, they would bar all additional qualifications, whether adopted by popular initiative or by statute. But the majority simply assumes that if state legislatures are barred from prescribing qualifications, it must be because the Qualifications Clauses are exclusive. It would strain the text of the Constitution far less to locate the bar in Article I, § 2, and the Seventeenth Amendment instead: One could plausibly maintain that qualification requirements imposed by state legislatures violate the constitutional provisions entrusting the selection of Members of Congress to the people of the States, even while one acknowledges that qualification requirements imposed by the people themselves are perfectly constitutional. The majority never justifies its conclusion that "democratic principles" require it to reject even this intermediate position.

## C

In addition to its arguments about democratic principles, the majority asserts that more specific historical evidence supports its view that the Framers did not intend to permit supplementation of the Qualifications Clauses. But when one focuses on the distinction between congressional power to add qualifications for congressional office and the power of the people or their state legislatures to add such qualifications, one realizes that this assertion has little basis.

In particular, the detail with which the majority recites the historical evidence set forth in *Powell* v. *McCormack*, 395 U. S. 486 (1969), should not obscure the fact that this evidence has no bearing on the question now before the Court. As the majority ultimately concedes, see *ante*, at 792–793, 796, 798, it does not establish "the Framers' intent that the qualifications in the Constitution be fixed and exclusive," *ante*, at 790; it shows only that the Framers did not intend Congress to be able to enact qualifications laws.[18] If any-

---

[18] For instance, the majority quotes at length from the debate that arose in the Philadelphia Convention when the Committee of Detail proposed the following clause: "The Legislature of the United States shall have authority to establish such uniform qualifications of the members of each House, with regard to property, as to the said Legislature shall seem expedient." See 2 Farrand 179, 248–251; *ante*, at 790–791. The defeat of this proposal—like the defeat of Gouverneur Morris' motion to drop the words "with regard to property" from the clause, so as to empower Congress to enact qualifications of any sort—simply reflects the Framers' decision not to grant *Congress* the power to supplement the constitutional qualifications. Considered out of context, some of James Madison's comments during the debate might be thought to go farther. See *ibid.* But the majority itself properly dispels this false impression. See *ante*, at 793, n. 10; see also *Powell* v. *McCormack*, 395 U. S., at 534.

Likewise, *Powell* drew support from Alexander Hamilton's comments in The Federalist No. 60, which the majority also quotes. See *ante*, at 791. But as the majority concedes, when Hamilton wrote that "[t]he qualifications of the persons who may choose or be chosen [for Congress] . . . are defined and fixed in the Constitution, and are unalterable by the legislature," he was merely restating his prior observation that the power to set qualifications "forms no part of the power to be conferred upon the *national* government." See The Federalist No. 60, at 371 (emphasis added). Indeed, only if "the legislature" to which Hamilton was referring is Congress can one make sense of his remark that the qualifications of voters as well as Congressmen are "fixed in the Constitution" and "unalterable by the legislature." Hamilton surely knew that the States or the people of the States control eligibility for the franchise. See Art. I, §2, cl. 1.

The majority does omit the context necessary to understand one aspect of the historical evidence presented in *Powell.* The majority quotes *Powell*'s observation that "on the eve of the Constitutional Convention, English precedent stood for the proposition that 'the law of the land had regulated

thing, the solidity of the evidence supporting *Powell's* view that Congress lacks the power to supplement the constitutional disqualifications merely highlights the weakness of the majority's evidence that the States and the people of the States also lack this power.

1

To the extent that the records from the Philadelphia Convention itself shed light on this case, they tend to hurt the majority's case. The only evidence that directly bears on the question now before the Court comes from the Committee of Detail, a five-member body that the Convention charged with the crucial task of drafting a Constitution to reflect the decisions that the Convention had reached during its first two months of work. A document that Max Farrand described as "[a]n early, perhaps the first, draft of the committee's work" survived among the papers of George Mason. 1 Farrand xxiii, n. 36. The draft is in the handwriting of

---

the qualifications of members to serve in parliament' and those qualifications were 'not occasional but fixed.'" 395 U. S., at 528 (quoting 16 Parliamentary History of England 589, 590 (1769)); see *ante*, at 790. The English rule seems of only marginal relevance: The pre-existing rule in America—that States could add qualifications for their representatives in Congress, see n. 3, *supra*, while Congress itself could not—is surely more important. But in any event, *Powell* did not claim that the English rule deemed parliamentary qualifications to be fixed in the country's (unwritten) constitution, beyond the reach of a properly enacted law. Instead, qualifications were "fixed" rather than "occasional" only in the sense that neither House of Parliament could "exclude members-elect for general misconduct not within standing qualifications." *Powell*, 395 U. S., at 528. The English rule, in other words, was simply that when sitting as the judge of its members' qualifications, each House of Parliament could do no more than administer the pre-existing laws that defined those qualifications, see *id.*, at 529, for "one House of Parliament cannot create a disability unknown to the law." T. Plucknett, Taswell-Langmead's English Constitutional History 585 (11th ed. 1960); cf. *INS* v. *Chadha*, 462 U. S. 919 (1983). This history was relevant to *Powell* (which dealt with the grounds on which one House of Congress could exclude a Member-elect), but it is not relevant to this case.

Edmund Randolph, the chairman of the Committee, with emendations in the hand of John Rutledge, another member of the Committee. As Professor Farrand noted, "[e]ach item in this document . . . is either checked off or crossed out, showing that it was used in the preparation of subsequent drafts." 2 *id.*, at 137, n. 6; see also W. Meigs, The Growth of the Constitution in the Federal Convention of 1787, pp. I–IX (1900) (providing a facsimile of the document).

The document is an extensive outline of the Constitution. Its treatment of the National Legislature is divided into two parts, one for the "House of Delegates" and one for the Senate. The Qualifications Clause for the House of Delegates originally read as follows: "The qualifications of a delegate shall be the age of twenty five years at least. and citizenship: *and any person possessing these qualifications may be elected except* [blank space]." *Id.*, at II (emphasis added). The drafter(s) of this language apparently contemplated that the Committee might want to insert some exceptions to the exclusivity provision. But rather than simply deleting the word "except"—as it might have done if it had decided to have no exceptions at all to the exclusivity provision—the Committee deleted the exclusivity provision itself. In the document that has come down to us, all the words after the colon are crossed out. *Ibid.*

The majority speculates that the exclusivity provision may have been deleted as superfluous. See *ante,* at 815–816, n. 27.[19] But the same draft that contained the exclusivity language in the House Qualifications Clause contained no

---

[19] The majority also argues that in any event, the views of the members of the Committee "tel[l] us little about the views of the Convention as a whole." *Ante,* at 815, n. 27. But our task is simply to determine whether at the time of the framing, the language of the Qualifications Clauses would have been commonly understood to contain an exclusivity provision. The surviving records suggest that the members of the Committee of Detail did not understand the final Qualifications Clauses to be exclusive, and the majority offers no reason to think that their understanding of the language was unusual for their time.

such language in the Senate Qualifications Clause. See 2 Farrand 141. Thus, the draft appears to reflect a deliberate judgment to distinguish between the House qualifications and the Senate qualifications, and to make only the former exclusive. If so, then the deletion of the exclusivity provision indicates that the Committee expected neither list of qualifications to be exclusive.

The majority responds that the absence of any exclusivity provision in the Committee's draft of the Senate Qualifications Clause merely reflected the fact that "senators, unlike Representatives, would not be chosen by popular election." *Ante,* at 815, n. 27. I am perfectly prepared to accept this explanation: The drafter(s) may well have thought that state legislatures should be prohibited from constricting the people's choices for the House of Representatives, but that no exclusivity provision was necessary on the Senate side because state legislatures would already have unfettered control over the appointment of Senators. To accept this explanation, however, is to acknowledge that the exclusivity provision in the Committee's draft of the House Qualifications Clause was not thought to be mere surplusage. It is also to acknowledge that the Senate Qualifications Clause in the Committee's draft—"the qualification of a senator shall be the age of 25 years at least: citizenship in the united states: and property to the amount of [blank space]," 2 Farrand 141—did not carry any implicit connotation of exclusivity. In short, the majority's own explanation for the difference between the two Qualifications Clauses in the Committee's draft is fundamentally at odds with the *expressio unius* argument on which the majority rests its holding.

2

Unable to glean from the Philadelphia Convention any direct evidence that helps its position, the majority seeks signs of the Framers' unstated intent in the Framers' comments about four *other* constitutional provisions. See *ante,* at 808–

811 (citing Art. I, § 2, cl. 1; § 4, cl. 1; § 5, cl. 1; and § 6, cl. 1). The majority infers from these provisions that the Framers wanted "to minimize the possibility of state interference with federal elections." *Ante*, at 808. But even if the majority's reading of its evidence were correct, the most that one could infer is that the Framers did not want state legislatures to be able to prescribe qualifications that would narrow the people's choices. See *supra*, at 883–888. However wary the Framers might have been of permitting state legislatures to exercise such power, there is absolutely no reason to believe that the Framers feared letting the people themselves exercise this power. Cf. The Federalist No. 52, at 326 (Madison) ("It cannot be feared that the people of the States will alter this [electoral-qualification] part of their constitutions in such a manner as to abridge the rights secured to them by the federal Constitution").

In any event, none of the provisions cited by the majority is inconsistent with state power to add qualifications for congressional office. First, the majority cites the constitutional requirement that congressional salaries be "ascertained by Law, and paid out of the Treasury of the United States." Art. I, § 6, cl. 1. Like the Qualifications Clauses themselves, however, the salary provision can be seen as simply another means of protecting the competence of the National Legislature. As reflected in the majority's own evidence, see *ante*, at 809–810; see also 1 Farrand 373 (remarks of James Madison), one of the recurring themes of the debate over this provision was that if congressional compensation were left up to the States, parsimonious States might reduce salaries so low that only incapable people would be willing to serve in Congress.

As the majority stresses, some delegates to the Philadelphia Convention did argue that leaving congressional compensation up to the various States would give Members of Congress "an improper dependence" upon the States. *Id.*, at 216 (remarks of James Madison); *ante*, at 809–810. These

delegates presumably did not want state legislatures to be able to tell the Members of Congress from their State, "Vote against Bill *A* or we will slash your salary"; such a power would approximate a power of recall, which the Framers denied to the States when they specified the terms of Members of Congress. The Framers may well have thought that state power over salary, like state power to recall, would be inconsistent with the notion that Congress was a national legislature once it assembled. But state power over initial eligibility requirements does not raise the same concerns: It was perfectly coherent for the Framers to leave selection matters to the state level while providing for Members of Congress to draw a federal salary once they took office. Thus, the Compensation Clause seems wholly irrelevant; contrary to the majority's suggestion, see *ante*, at 811, n. 21, it does not address elections at all.

Second, the majority gives passing mention to the Elector-Qualifications Clause of Article I, § 2, which specifies that in each State, the voters in House elections "shall have the qualifications requisite for Electors of the most numerous Branch of the State Legislature." But the records of the Philadelphia Convention provide no evidence for the majority's assertion that the purpose of this Clause was "to prevent discrimination against federal electors." See *ante*, at 808.[20]

---

[20] The majority inaccurately reports James Madison's explanation of the Elector-Qualifications Clause in The Federalist No. 52. Madison neither mentioned nor addressed the consequences of "allowing States to differentiate between the qualifications for state and federal electors." See *ante*, at 808. Instead, he addressed the problems that would have arisen if the Constitution had assigned control over the qualifications of voters in House elections to the state legislatures rather than to the people of each State. It was such an arrangement that, in Madison's view, "would have rendered too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone." The Federalist No. 52, at 326; cf. *ante*, at 808. The Elector-Qualifications Clause avoided this problem because the various state constitutions con-

In fact, the Clause may simply have been a natural concomitant of one of the Framers' most famous decisions. At the Convention, there was considerable debate about whether Members of the House of Representatives should be selected by the state legislatures or directly by the voters of each State. Taken as a whole, the first Clause of Article I, §2—including the elector-qualifications provision—implements the Framers' decision. It specifies that the Representatives from each State are to be chosen by the State's voters (that is, the people eligible to participate in elections for the most numerous branch of the state legislature).

Third, the majority emphasizes that under Article I, §5, "[e]ach House [of Congress] shall be the Judge of the Elections, Returns and Qualifications of its own Members." See *ante*, at 804, 811, 822. There was no recorded discussion of this provision in the Philadelphia Convention, and it appears simply to adopt the practice of England's Parliament. See n. 18, *supra*. According to the majority, however, §5 implies

---

trolled who could vote in elections for the most numerous branch of the state legislature, and no state government could alter these requirements unless the people of the State (through the state constitution) decided to let it do so. See The Federalist No. 52, at 326.

Though one obviously could uphold the action of the people of Arkansas without reaching this issue, Madison's comments should not be read to suggest that the Elector-Qualifications Clause bars the people of a State from delegating their control over voter qualifications to the state legislature. The Clause itself refutes this reading; if a state constitution permits the state legislature to set voter qualifications, and if eligibility for the franchise in the State therefore turns on statutory rather than constitutional law, federal electors in the State still must meet the same qualifications as electors for the most numerous branch of the state legislature. Madison could not possibly have disagreed with this understanding of the Clause. Instead, he was simply explaining why, when it came to voter qualifications for House elections, the Framers had not followed the model of Article I, §3, cl. 1, and vested ultimate control with the state legislatures (regardless of what the people of a State might provide in their state constitutions).

that the Framers could not have intended state law ever to "provide the standard for judging a Member's eligibility." *Ante*, at 812.

My conclusion that States may prescribe eligibility requirements for their Members of Congress does not necessarily mean that the term "Qualifications," as used in Article I, § 5, includes such state-imposed requirements. One surely could read the term simply to refer back to the requirements that the Framers had just listed in the Qualifications Clauses, and not to encompass whatever requirements States might add on their own. See *Nixon v. United States*, 506 U. S. 224, 237 (1993) (dictum) (asserting that the context of § 5 demonstrates that "the word '[q]ualifications' . . . was of a precise, limited nature" and referred only to the qualifications previously "set forth in Art. I, § 2"). The Framers had deemed the constitutional qualifications essential to protect the competence of Congress, and hence the national interest. It is quite plausible that the Framers would have wanted each House to make sure that its Members possessed these qualifications, but would have left it to the States to enforce whatever qualifications were imposed at the state level to protect state interests.

But even if this understanding of § 5 is incorrect, I see nothing odd in the notion that a House of Congress might have to consider state law in judging the "Qualifications" of its Members. In fact, § 5 itself refutes the majority's argument. Because it generally is state law that determines what is necessary to win an election and whether any particular ballot is valid, each House of Congress clearly must look to state law in judging the "Elections" and "Returns" of its Members. It would hardly be strange if each House had to do precisely the same thing in judging "Qualifications." Indeed, even on the majority's understanding of the Constitution, at the time of the framing all "Qualifications" questions that turned on issues of citizenship would have been governed by state law. See *supra*, at 872–873.

More generally, there is no basis for the majority's assertion that the Framers would not have charged "federal tribunals" with the task of "judging . . . questions concerning rights which depend on state law." See *ante*, at 812. Cases involving questions of federal law hardly exhaust the categories of cases that the Framers authorized the federal courts to decide. See Art. III, § 2, cl. 1. The founding generation, moreover, seemed to assign relatively little importance to the constitutional grant of jurisdiction over "all Cases . . . arising under this Constitution, the Laws of the United States, and Treaties made . . . under their Authority." *Ibid.* The First Congress never even implemented this jurisdictional grant at the trial level; it was not until 1875 that Congress "revolutionized the concept of the federal judiciary" by giving federal courts broad jurisdiction over suits arising under federal law. See P. Bator, D. Meltzer, P. Mishkin, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 962 (3d ed. 1988). By contrast, the founding generation thought it important to implement immediately the constitutional grant of diversity jurisdiction, in which the rules of decision generally come entirely from state law. See Judiciary Act of 1789, 1 Stat. 73, 78, 92; *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 77–80 (1938).

The fourth and final provision relied upon by the majority is the Clause giving Congress the power to override state regulations of "[t]he Times, Places and Manner of holding [congressional] Elections." Art. I, § 4, cl. 1. From the fact that the Framers gave Congress the power to "make or alter" these state rules of election procedure, the majority infers that the Framers would also have wanted Congress to enjoy override authority with respect to any matters of substance that were left to the States. See *ante*, at 810–811. As Congress enjoys no "make or alter" powers in this area, the majority concludes that the Framers must not have thought that state legislatures would be able to enact qualifications laws.

But the Framers provided for congressional override only where they trusted Congress more than the States. Even respondents acknowledge that "the primary reason" for the "make or alter" power was to enable Congress to ensure that States held elections in the first place. See Tr. of Oral Arg. 51; see also *supra*, at 863, and n. 10. The Framers did trust Congress more than the States when it came to preserving the Federal Government's own existence; to advance this interest, they had to give Congress the capacity to prescribe both the date and the mechanics of congressional elections. As discussed above, however, the Framers trusted the States more than Congress when it came to setting qualifications for Members of Congress. See *supra*, at 877. Indeed, the majority itself accepts this proposition. See *ante*, at 832 (acknowledging that the Framers were "particularly concerned" about congressional power to set qualifications).

To judge from comments made at the state ratifying conventions, Congress' "make or alter" power was designed to serve a coordination function in addition to ensuring that the States had at least rudimentary election laws. For instance, George Nicholas argued at the Virginia Convention that if regulation of the time of congressional elections had been left exclusively to the States, "there might have been as many times of choosing as there are States," and "such intervals might elapse between the first and last election, as to prevent there being a sufficient number to form a House." 9 Documentary History of the Ratification of the Constitution 920 (J. Kaminski and G. Saladino eds. 1990). For this reason too, if the National Legislature lacked the "make or alter" power, "it might happen that there should be no Congress[,] . . . and this might happen at a time when the most urgent business rendered their session necessary." *Ibid.;* cf. 2 Elliot 535 (remarks of Thomas McKean at the Pennsylvania ratifying convention) (defending § 4 on the ground that congressional elections should be "held on the same day throughout the United States, to prevent corruption or

undue influence"). Again, however, the desire to coordinate state election procedures did not require giving Congress power over qualifications laws.

The structure of the Constitution also undermines the majority's suggestion that it would have been bizarre for the Framers to give Congress supervisory authority over state time, place, and manner regulations but not over state qualifications laws. Although the Constitution does set forth a few nationwide disqualifications for the office of Presidential elector, see Art. II, § 1, cl. 2 ("no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector"), no one contends that these disqualifications implicitly prohibit the States from adding any other eligibility requirements; instead, Article II leaves the States free to establish qualifications for their delegates to the electoral college. See *supra*, at 861–862. Nothing in the Constitution, moreover, gives Congress any say over the additional eligibility requirements that the people of the States or their state legislatures may choose to set. Yet under Article II, "[t]he Congress may determine the Time of chusing the Electors . . . ." Art. II, § 1, cl. 4.

The majority thus creates an unwarranted divergence between Article I's provisions for the selection of Members of Congress and Article II's provisions for the selection of members of the electoral college. Properly understood, the treatment of congressional elections in Article I parallels the treatment of Presidential elections in Article II. Under Article I as under Article II, the States and the people of the States do enjoy the reserved power to establish substantive eligibility requirements for candidates, and Congress has no power to override these requirements. But just as Article II authorizes Congress to prescribe when the States must select their Presidential electors, so Article I gives Congress the ultimate authority over the times, places, and manner of holding congressional elections.

896

The majority's only response is that my reading of the Constitution would permit States to use their qualification-setting power to achieve the very result that Congress' "make or alter" power was designed to avoid. According to the majority, States could set qualifications so high that no candidate could meet them, and Congress would be powerless to do anything about it. *Ante*, at 811.

Even if the majority were correct that Congress could not nullify impossible qualifications, however, the Constitution itself proscribes such state laws. The majority surely would concede that under the Framers' Constitution, each state legislature had an affirmative duty to appoint two people to the Senate. See Art. I, § 3, cl. 1 ("The Senate of the United States *shall* be composed of two Senators from each State, chosen by the Legislature thereof . . ." (emphasis added)); cf. Art. I, § 3, cl. 2 ("if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies"). In exactly the same way that § 3 requires the States to send people to the Senate, § 2 also requires the States to send people to the House. See Art. I, § 2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . ."); cf. Art. I, § 2, cl. 4 ("When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies").

The majority apparently is concerned that (on its reading of the "make or alter" power) Congress would not be able to enforce the constitutional proscription on impossible qualifications; enforcement would instead be relegated to the courts, the Executive Branch, or the political process. But this concern is equally applicable whether one adopts my view of the Qualifications Clauses or the majority's view. Both the majority and I agree that it is unconstitutional for

States to establish impossible qualifications for congressional office. Both the majority and I also agree that it is theoretically conceivable that a State might defy this proscription by erecting an impossible qualification. Whether Congress may use its "make or alter" power to override such laws turns entirely on how one reads the "make or alter" power; it has nothing to do with whether one believes that the Qualifications Clauses are exclusive.

It would not necessarily be unusual if the Framers had decided against using Congress' "make or alter" power to guard against state laws that disqualify everyone from service in the House. After all, although this power extended to the times and manner of selecting Senators as well as Representatives, it did not authorize Congress to pick the Senators from a State whose legislature defied its constitutional obligations and refused to appoint anyone. This does not mean that the States had no duty to appoint Senators, or that the States retained the power to destroy the Federal Government by the simple expedient of refusing to meet this duty. It merely means that the Framers did not place the remedy with Congress.[21]

But the flaws in the majority's argument go deeper. Contrary to the majority's basic premise, Congress *can* nullify state laws that establish impossible qualifications. If a State actually holds an election and only afterwards purports to disqualify the winner for failure to meet an impossible condition, Congress certainly would not be bound by the purported disqualification. It is up to each House of Congress to judge the "[q]ualifications" of its Members for itself. See Art. I, § 5, cl. 1. Even if this task includes the responsibility of judging qualifications imposed by state law, see *supra*, at 892–893, Congress obviously would have not only

---

[21] Likewise, the Constitution requires the States to appoint Presidential electors, Art. II, § 1, cl. 2, but it does not provide for any congressional override if the States refuse to do so (or if the States set impossibly high qualifications and then announce that no one meets them).

the power but the duty to treat the unconstitutional state law as a nullity. Thus, Congress could provide the appropriate remedy for the State's defiance, simply by seating the winner of the election.

It follows that the situation feared by the majority would arise only if the State refused to hold an election in the first place, on the ground that no candidate could meet the impossible qualification. But Congress unquestionably has the power to override such a refusal. Under the plain terms of § 4, Congress can make a regulation providing for the State to hold a congressional election at a particular time and place, and in a particular manner.[22]

3

In discussing the ratification period, the majority stresses two principal data. One of these pieces of evidence is no evidence at all—literally. The majority devotes considerable space to the fact that the recorded ratification debates do not contain any affirmative statement that the States can supplement the constitutional qualifications. See *ante*, at 812–815. For the majority, this void is "compelling" evidence that "unquestionably reflects the Framers' common understanding that States lacked that power." *Ante*, at 812, 814. The majority reasons that delegates at several of the ratifying conventions attacked the Constitution for failing to require Members of Congress to rotate out of office.[23] If

---

[22] Even if there is anything left of the majority's argument on this point, it would still have no bearing on whether the Framers intended to preclude *the people* of each State from supplementing the constitutional qualifications. Just as the Framers had no fear that the people of a State would destroy congressional elections by entirely disenfranchising themselves, see The Federalist No. 52, at 326, so the Framers surely had no fear that the people of the States would destroy congressional elections by entirely disqualifying all candidates.

[23] As the majority notes, see *ante*, at 837, and 812, n. 22, the Philadelphia Convention had dropped without discussion a portion of the original Randolph Resolutions calling for Members of the House of Representatives

supporters of ratification had believed that the individual States could supplement the constitutional qualifications, the majority argues, they would have blunted these attacks by pointing out that rotation requirements could still be added State by State. See *ante*, at 814.

But the majority's argument cuts both ways. The recorded ratification debates also contain no affirmative statement that the States *cannot* supplement the constitutional qualifications. While ratification was being debated, the existing rule in America was that the States could prescribe eligibility requirements for their delegates to Congress, see n. 3, *supra*, even though the Articles of Confederation gave Congress itself no power to impose such qualifications. If

---

"to be incapable of re-election for the space of [blank space] after the expiration of their term of service." 1 Farrand 20. This provision, which at a minimum would have barred all Members of the House from serving consecutive terms, was abandoned without objection when the Convention voted to require House Members to stand for election every three years. See *id.*, at 214–217; see also *id.*, at 362 (opting for 2-year terms instead). Subsequently, indeed, some members of the Convention appeared to be unaware that a rotation requirement had ever been proposed. See 2 *id.*, at 120 (remarks of Gouverneur Morris).

The majority properly does not cite the omission of this nationwide rotation requirement as evidence that the Framers meant to preclude individual States from adopting rotation requirements of their own. Just as individual States could extend the vote to women before the adoption of the Nineteenth Amendment, could prohibit poll taxes before the adoption of the Twenty-fourth Amendment, and could lower the voting age before the adoption of the Twenty-sixth Amendment, so the Framers' decision not to impose a nationwide limit on congressional terms did not itself bar States from adopting limits of their own. See, *e. g.*, Ga. Const. of 1877, § 2–602 (adopted Aug. 3, 1943) (reducing voting age to 18 nearly three decades before the Twenty-sixth Amendment was proposed); *Harman* v. *Forssenius*, 380 U. S. 528, 539 (1965) (noting that by the time the Twenty-fourth Amendment was proposed, "only five States retained the poll tax as a voting requirement"); Congressional Research Service, The Constitution of the United States of America: Analysis and Interpretation 1571 (1973) (reporting that 11 States had adopted women's suffrage by the time the Nineteenth Amendment was proposed). Cf. *ante*, at 837, and n. 50.

the Federal Constitution had been understood to deprive the States of this significant power, one might well have expected its opponents to seize on this point in arguing against ratification.

The fact is that arguments based on the absence of recorded debate at the ratification conventions are suspect, because the surviving records of those debates are fragmentary. We have no records at all of the debates in several of the conventions, 3 Documentary History of the Ratification of the Constitution 7 (M. Jensen ed. 1978), and only spotty records from most of the others, see *ibid.;* 1 *id.,* at 34–35; 4 Elliot 342; Hutson, The Creation of the Constitution: The Integrity of the Documentary Record, 65 Texas L. Rev. 1, 21–23 (1986).

If one concedes that the absence of relevant records from the ratification debates is not strong evidence for either side, then the majority's only significant piece of evidence from the ratification period is The Federalist No. 52. Contrary to the majority's assertion, however, this essay simply does not talk about "the lack of state control over the qualifications of the elected," whether "explicitly" or otherwise. See *ante,* at 806.

It is true that The Federalist No. 52 contrasts the Constitution's treatment of the qualifications of voters in elections for the House of Representatives with its treatment of the qualifications of the Representatives themselves. As Madison noted, the Framers did not specify any uniform qualifications for the franchise in the Constitution; instead, they simply incorporated each State's rules about eligibility to vote in elections for the most numerous branch of the state legislature. By contrast, Madison continued, the Framers chose to impose some particular qualifications that all Members of the House had to satisfy. But while Madison did say that the qualifications of the elected were "more susceptible of uniformity" than the qualifications of electors, The Federalist No. 52, at 326, he did not say that the Constitution

prescribes anything but uniform minimum qualifications for congressmen. That, after all, is more than it does for congressional electors.

Nor do I see any reason to infer from The Federalist No. 52 that the Framers intended to deprive the States of the power to add to these minimum qualifications. Madison did note that the existing state constitutions defined the qualifications of "the elected"—a phrase that the essay used to refer to Members of Congress—"less carefully and properly" than they defined the qualifications of voters. But Madison could not possibly have been rebuking the States for setting unduly high qualifications for their representatives in Congress, because they actually had established only the sketchiest of qualifications. At the time that Madison wrote, the various state constitutions generally provided for the state legislature to appoint the State's delegates to the Federal Congress.[24] Four State Constitutions had added a term-limits provision that tracked the one in the Articles of Confederation,[25] and some of the Constitutions also specified that people who held certain salaried offices under the United States were ineligible to represent the State in Congress.[26] But only two State Constitutions had prescribed any other

---

[24] See Del. Const. of 1776, Art. 11, in 1 Thorpe 564; Md. Const. of 1776, Form of Government, Art. XXVII, in 3 Thorpe 1695; Mass. Const. of 1780, Pt. 2, Ch. IV, in 3 Thorpe 1906; N. H. Const. of 1784, Pt. II, in 4 Thorpe 2467; N. Y. Const. of 1777, Art. XXX, in 5 Thorpe 2634–2635; N. C. Const. of 1776, Form of Government, Art. XXXVII, in 5 Thorpe 2793; Pa. Const. of 1776, Frame of Government, § 11, in 5 Thorpe 3085; S. C. Const. of 1778, Art. XXII, in 6 Thorpe 3253; Va. Const. of 1776, in 7 Thorpe 3817.

[25] Md. Const. of 1776, Form of Government, Art. XXVII, in 3 Thorpe 1695; N. H. Const. of 1784, Pt. II, in 4 Thorpe 2467; N. C. Const. of 1776, Art. XXXVII, in 5 Thorpe 2793; Pa. Const. of 1776, Frame of Government, § 11, in 5 Thorpe 3085.

[26] Md. Const. of 1776, Form of Government, Art. XXVII, in 3 Thorpe 1695; N. H. Const. of 1784, Pt. II, in 4 Thorpe 2467; Pa. Const. of 1776, Frame of Government, § 11, in 5 Thorpe 3085.

qualifications for delegates to Congress.[27] In this context, when Madison wrote that the state constitutions defined the qualifications of Members of Congress "less carefully and properly" than they defined the qualifications of voters, he could only have meant that the existing state qualifications did not do enough to safeguard Congress' competence: The state constitutions had not adopted the age, citizenship, and inhabitancy requirements that the Framers considered essential. Madison's comments readily explain why the Framers did not merely incorporate the state qualifications for Congress. But they do not imply that the Framers intended to withdraw from the States the power to supplement the list of qualifications contained in the Federal Constitution.[28]

Though The Federalist No. 52 did not address this question, one might wonder why the Qualifications Clauses did not simply incorporate the existing qualifications for members of the state legislatures (as opposed to delegates to Congress). Again, however, the Framers' failure to do so cannot be taken as an implicit criticism of the States for setting unduly high entrance barriers. To the contrary, the age and citizenship qualifications set out in the Federal Constitution are considerably higher than the corresponding qualifications contained in the state constitutions that were then in force. At the time, no state constitution required members of the lower house of the state legislature to be more than 21 years old, and only two required members of the upper house to be 30. See N. H. Const. of 1784, Pt. II, in 4 Thorpe 2460; S. C. Const. of 1778, Art. XII, in 6 Thorpe 3250. Many

---

[27] See Md. Const. of 1776, Art. XXVII, in 3 Thorpe 1695; N. H. Const. of 1784, Pt. II, in 4 Thorpe 2467.

[28] The majority suggests that I have overlooked Madison's observation that subject to the "reasonable limitations" spelled out in the House Qualifications Clause, the Constitution left the House's door "open to merit of every description." See *ante*, at 807–808, n. 18; see also *ante*, at 808 (quoting a similar passage from The Federalist No. 57). As discussed above, however, such statements do not advance the majority's case. See *supra*, at 880–881.

States, moreover, permitted naturalized aliens to take seats in the state legislature within one or two years of becoming citizens. See Kettner, Development of American Citizenship, at 214–219.

The majority responds that at the time of the framing, most States imposed property qualifications on members of the state legislature. See *ante,* at 807–808, n. 18. But the fact that the Framers did not believe that a uniform minimum property requirement was necessary to protect the competence of Congress surely need not mean that the Framers intended to preclude States from setting their own property qualifications.

In fact, the constitutional text supports the contrary inference. As the majority observes, see *ibid.,* and *ante,* at 825, n. 35, at the time of the framing some States also imposed religious qualifications on state legislators. The Framers evidently did not want States to impose such qualifications on federal legislators, for the Constitution specifically provides that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." Art. VI, cl. 3. Both the context[29] and the plain language of the Clause show that it bars the States as well as the Federal Government from imposing religious disqualifications on federal offices. But the only reason for extending the Clause to the States would be to protect Senators and Representatives from state-imposed religious qualifications; I know of no one else who holds a "public Trust under the United States" yet who might be subject to state disqualifications. If the *expressio unius* maxim cuts in any direction in this case, then, it undermines the majority's position: The Framers' prohibition on state-imposed religious disqual-

---

[29] The immediately preceding portion of the Clause requires not only "[t]he Senators and Representatives before mentioned" but also "the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States," to take an "Oath or Affirmation" to support the Constitution. Art. VI, cl. 3.

ifications for Members of Congress suggests that other types of state-imposed disqualifications are permissible. See Rotunda, Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution, 73 Ore. L. Rev. 561, 574 (1994).

4

More than a century ago, this Court was asked to invalidate a Michigan election law because it called for Presidential electors to be elected on a district-by-district basis rather than being chosen by "the State" as a whole. See Art. II, § 1, cl. 2. Conceding that the Constitution might be ambiguous on this score, the Court asserted that "where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction[s] are entitled to the greatest weight." *McPherson* v. *Blacker*, 146 U. S., at 27. The Court then described the district-based selection processes used in 2 of the 10 States that participated in the first Presidential election in 1788, 3 of the 15 States that participated in 1792, and 5 of the 16 States that participated in 1796. *Id.*, at 29–31. Though acknowledging that in subsequent years "most of the States adopted the general ticket system," *id.*, at 32, the Court nonetheless found this history "decisive" proof of the constitutionality of the district method, *id.*, at 36. Thus, the Court resolved its doubts in favor of the state law, "the contemporaneous practical exposition of the Constitution being too strong and obstinate to be shaken . . . ." *Id.*, at 27.

Here, too, state practice immediately after the ratification of the Constitution refutes the majority's suggestion that the Qualifications Clauses were commonly understood as being exclusive. Five States supplemented the constitutional disqualifications in their very first election laws, and the surviving records suggest that the legislatures of these States considered and rejected the interpretation of the Constitution that the majority adopts today.

As the majority concedes, the first Virginia election law erected a property qualification for Virginia's contingent in the Federal House of Representatives. See Virginia Election Law (Nov. 20, 1788), in 2 Documentary History of the First Federal Elections, 1788–1790, pp. 293, 294 (G. DenBoer ed. 1984) (hereinafter First Federal Elections) (restricting possible candidates to "freeholder[s]"). What is more, while the Constitution merely requires representatives to be inhabitants of their State, the legislatures of five of the seven States that divided themselves into districts for House elections [30] added that representatives also had to be inhabitants of the district that elected them. Three of these States adopted durational residency requirements too, insisting that representatives have resided within their districts for at least a year (or, in one case, three years) before being elected.[31]

---

[30] Despite the majority's emphasis on the Framers' supposed desire for uniformity in congressional elections, even the majority does not dispute that the Framers wanted to let States decide for themselves whether to use district elections in selecting Members of the House of Representatives. The Framers fully expected that in some States each Member of the House would be chosen by the people of the whole State, while in other States each Member would be directly accountable only to the people of a single district. See, e. g., 14 Papers of Thomas Jefferson 3 (J. Boyd ed. 1958) (letter from Madison to Jefferson, Oct. 8, 1788).

[31] See Georgia Election Law (Jan. 23, 1789) (restricting representatives from each district to "resident[s] of three years standing in the district"), in 2 First Federal Elections 456, 457; Maryland Election Law (Dec. 22, 1788) (simple district residency requirement), in 2 First Federal Elections 136, 138; Massachusetts Election Resolutions (Nov. 20, 1788) (same), in 1 First Federal Elections 508, 509 (M. Jensen & R. Becker eds. 1976); North Carolina Election Law (Dec. 16, 1789) (requiring the person elected from each district to have been "a Resident or Inhabitant of that Division for which he is elected, during the Space or Term of one Year before, and at the Time of Election"), in 4 First Federal Elections 347; Virginia Election Law (Nov. 20, 1788) (requiring each candidate to have been "a bona fide resident for twelve months within such District"), in 2 First Federal Elections 293, 294. Upon being admitted to the Union in 1796, Tennessee also required its Members in the Federal House of Representatives to have

In an attempt to neutralize the significance of the district residency requirements, respondent Hill asserts that "there is no evidence that any state legislature focused, when it created these requirements, on the fact that it was adding to the constitutional qualifications." Brief for Respondents Bobbie E. Hill et al. 20. But this claim is simply false.

In Massachusetts, for instance, the legislature charged a committee with drafting a report on election methods. The fourth article of the resulting report called for the State to be divided into eight districts that would each elect one representative, but did not require that the representatives be residents of the districts that elected them. Joint Committee Report (Nov. 4, 1788), in 1 First Federal Elections 481. When the members of the State House of Representatives discussed this report, those who proposed adding a district residency requirement were met with the claim that the Federal Constitution barred the legislature from specifying additional qualifications. See Massachusetts Centinel (Nov. 8, 1788) (reporting proceedings), in 1 First Federal Elections 489. After "considerable debate," the House approved the committee's version of the fourth article by a vote of 89 to 72. *Ibid.* But the State Senate approved a district residency amendment, 1 First Federal Elections 502, and the House then voted to retain it, *id.*, at 504.

Although we have no record of the legislative debates over Virginia's election law, a letter written by one of the members of the House of Delegates during the relevant period indicates that in that State, too, the legislature considered the possible constitutional objection to additional disqualifications. In that letter, Edward Carrington (an opponent of the district residency requirement) expressed his view that the requirement "may exceed the powers of the Assembly,"

been Tennessee residents for three years and district residents for one year before their election. Act of Apr. 20, 1796, ch. 10, in Laws of the State of Tennessee 81 (1803).

but acknowledged that there was "no prospect of its being struck out" because Federalists as well as Anti-Federalists at least professed to "think it right." 2 *id.*, at 367 (letter from Carrington to Madison, Nov. 9–10, 1788). Carrington was correct about the views of his colleagues: By a vote of 80 to 32, the House of Delegates rejected a motion to delete the added qualifications, while a similar motion in the State Senate lost by a vote of 12 to 3. *Id.*, at 287, 293.[32]

The surviving records from Maryland and Georgia are less informative, but they, too, show that the legislatures of those States gave special attention to the district residency requirements that they enacted.[33] Out of the five original

---

[32] After the Virginia Legislature had enacted this bill, some of James Madison's friends suggested that he might find it harder to win election in his own district than in certain other areas of the State. They believed that if Madison won the popular vote in one of those other districts, the House of Representatives could seat him on the theory that States cannot add to the constitutional qualifications. See 11 Papers of James Madison 378–379 (R. Rutland & C. Hobson eds. 1977) (letter from Carrington to Madison, Dec. 2, 1788). Other advisers, however, warned that the people of Virginia might not share this understanding of the Constitution. As Alexander White wrote in a letter to Madison:

"Some Gentlemen suppose you may be elected in other Districts, and that Congress would disregard the Act which requires Residence in a particular District. I will not undertake to decide that question, but this I know, such a determination would afford much ground of clamour, and enable the opposers of the Government to inflame the Minds of the People beyond anything which has yet happened." *Id.*, at 380 (Dec. 4, 1788).

Madison himself apparently never endorsed the idea that he should test the district residency requirement. Instead, he ran from his own district (where he overcame a stiff challenge from another future President, James Monroe).

[33] The records show that Maryland's House of Delegates put the district residency requirement to a separate vote and approved it by a margin of 41 to 24. 2 First Federal Elections 129–130 (summarizing proceedings from Dec. 3, 1788). A subsequent effort to jettison the requirement lost by a vote of 39 to 28. *Id.*, at 132–133 (summarizing proceedings from Dec. 10, 1788). Language in Maryland's second election law confirms that

States that adopted district residency requirements, in fact, only in North Carolina were the records so poor that it is impossible to draw any inferences about whether the legislature gave careful attention to the implications of the requirement.[34]

---

the state legislature knew that it was supplementing the Qualifications Clauses. The Act of December 10, 1790, stipulated that each candidate must "b[e] a resident of his district at the time of the election, and hav[e] resided therein twelve calendar months immediately before, and [be] otherways qualified according to the constitution of the United States." 1790 Laws of Maryland, ch. XVI, art. VIII.

In Georgia, too, the State House of Assembly called special attention to the district residency requirement. Shortly before Georgia held its first federal elections, the House adopted a resolution to stress that if the top votegetter in any district had not been "an actual resident of three years standing" in that district, then "such person shall not be considered as eligible nor shall he be commissioned." 2 First Federal Elections 459 (resolution of Feb. 4, 1789).

[34] Even the experience in New York and South Carolina—the only States that opted for district elections without requiring district residency—does not support the majority's position. While the records from South Carolina are sketchy, those from New York affirmatively undermine the majority's suggestion that the Qualifications Clauses were commonly understood to be exclusive. When the topic was first broached in the State Assembly, the assemblymen defeated a district residency proposal amid comments that "to add any other qualification [to those listed in the Constitution] would be unconstitutional." 3 First Federal Elections 232 (Dec. 18, 1788). But the State Senate took a different view, adding a district residency requirement when it considered the election bill. Id., at 320. The Assembly then approved the requirement by a vote of 36 to 12, id., at 325–326 (Jan. 19, 1789), but reconsidered the requirement the following day (apparently with more assemblymen in attendance). After a sophisticated debate on the constitutional question, with some assemblymen arguing that the district residency requirement was unconstitutional and others responding that the Constitution merely erected minimum qualifications, the Assembly divided evenly over the requirement: 28 voted in favor of it and 28 voted against it. Id., at 328–335 (Jan. 20, 1789). The chairman broke the tie with a vote against the requirement. Id., at 335. Still, there clearly was no consensus in the New York Assembly. What is more, some of the votes against the district residency requirement may well have been cast by assemblymen who simply opposed the requirement

The majority asserts that "state practice with respect to residency requirements does not necessarily indicate that States believed that they had a broad power to add restrictions," because the States "may simply have viewed district residency requirements as the necessary analog to state residency requirements." *Ante,* at 827, n. 41. This argument fails even on its own terms. If the States had considered district residency requirements necessary for the success of a district election system, but had agreed with the majority that the Constitution prohibited them from supplementing the constitutional list of qualifications, then they simply would have rejected the district system and used statewide elections. After all, the majority deems district residency requirements just as unconstitutional as other added qualifications. See *ante,* at 799.

The majority's argument also fails to account for the durational element of the residency requirements adopted in Georgia, North Carolina, and Virginia (and soon thereafter in Tennessee). These States obliged Congressmen not only to be district residents when elected but also to have been district residents for at least a year before then. See n. 31, *supra.*

Finally, the majority's argument cannot explain the election schemes of Maryland and Georgia. Though these States did divide themselves into congressional districts, they allowed every voter to vote for one candidate from each

on policy grounds, as an undue restriction on the people's ability to elect nonresidents if they wanted to do so. In any event, the New York Senate obviously considered the requirement constitutional.

There is evidence that some members of the Pennsylvania Legislature considered the Qualifications Clauses to be exclusive. See 1 *id.,* at 282–288. Of course, they also believed that § 2 of Article I—which calls for Members of the Federal House of Representatives to be "chosen . . . by the People of the several States"—forbade Pennsylvania to elect its representatives by districts. See *id.,* at 283. The legislatures of the five States that adopted district residency requirements, who had the Pennsylvania example before them, disagreed with the Pennsylvania legislators.

district. See Georgia Election Law (Jan. 23, 1789), in 2 First Federal Elections 456, 457; Maryland Election Law (Dec. 22, 1788), in 2 First Federal Elections 136, 138. In other words, Maryland and Georgia imposed district residency requirements despite permitting every voter in the State to vote for every representative from the State. Neither of these States could possibly have seen district residency requirements as the "necessary analog" to anything; they imposed these requirements solely for their own sake.

The majority nonetheless suggests that the initial election laws adopted by the States actually support its position because the States did not enact very many disqualifications. See *ante*, at 826–827, n. 41. In this context, the majority alludes to the fact that no State imposed a religious qualification on federal legislators, even though New Hampshire continued to require state legislators to be Protestants and North Carolina imposed a similar requirement on people holding places of trust in the State's "civil department." See *ante*, at 826–827, n. 41, and 825, n. 35. But the majority concedes that "Article VI of the Federal Constitution . . . prohibited States from imposing similar qualifications on federal legislators." *Ante*, at 825, n. 35. As discussed above, the constitutional treatment of religious qualifications tends to undermine rather than support the majority's case. See *supra*, at 903–904.

The majority also points out that no State required its own federal representatives to rotate out of office after serving one or more terms. *Ante*, at 826. At the time of the framing, however, such requirements were increasingly disfavored on policy grounds. The advantages of incumbency were substantially fewer then than now, and turnover in office was naturally quite high. The perceived advantages of term limits were therefore smaller than they are today. But the perceived disadvantages were just as great: Term limits prevented the States or the people of the States from keeping good legislators in office, even if they wanted to do so.

See G. Wood, Creation of the American Republic, 1776–1787, p. 439 (1969).

It is true that under the Articles of Confederation, four States had imposed term limits on their delegates to Congress. See *ante*, at 826. But three of these provisions added nothing to the limits in the Articles themselves, see Md. Const. of 1776, Form of Government, Art. XXVII (echoing Article of Confederation V), in 3 Thorpe 1695; N. H. Const. of 1784, Pt. II (same), in 4 Thorpe 2467; N. C. Const. of 1776, Art. XXXVII (similar), in 5 Thorpe 2793, and the other one contained only a minor variation on the provision in the Articles, see Pa. Const. of 1776, Frame of Government, § 11, in 5 Thorpe 3085. Indeed, though the majority says that "many States imposed term limits on state officers," *ante*, at 825–826, it appears that at the time of the framing only Pennsylvania imposed any restriction on the reelection of members of the state legislature, and Pennsylvania deleted this restriction when it adopted a new Constitution in 1790. Compare Pa. Const. of 1776, Frame of Government, § 8, in 5 Thorpe 3084, with Pa. Const. of 1790, in 5 Thorpe 3092–3103; cf. Va. Const. of 1776, Form of Government (perhaps imposing term limits on members of the upper house of the state legislature), in 7 Thorpe 3816. It seems likely, then, that the failure of any State to impose term limits on its senators and representatives simply reflected policy-based decisions against such restrictions.

The majority counters that the delegates at three state ratifying conventions—in Virginia, New York, and North Carolina—"proposed amendments that would have required rotation." *Ante*, at 813; cf. *ante*, at 826, and n. 40. But the amendments proposed by both the North Carolina Convention and the Virginia Convention would have imposed term limits only on the President, not on Members of Congress. See 4 Elliot 245 (North Carolina) ("[N]o person shall be capable of being President of the United States for more than eight years in any term of fifteen years"); 3 *id.*, at 660

(Virginia) (similar). If the majority is correct that these conventions also "voiced support for term limits for Members of Congress," see *ante,* at 826,[35] then the evidence from these conventions supports my position rather than the majority's: the conventions deemed it necessary for the Constitution itself to impose term limits on the President (because no State could do that on its own), but they did not think it necessary for the Constitution to impose term limits on Members of Congress. This understanding at the Virginia and North Carolina conventions meshes with the election laws adopted by both States, which reflected the view that States could supplement the Qualifications Clauses. See *supra,* at 905, and n. 31, 909.[36]

---

[35] The majority correctly notes that each convention, in addition to proposing a list of specific "Amendments to the Constitution," proposed a "Declaration of Rights" to be appended to the Constitution. In both States, this "Declaration" contained the general exhortation that members of both the Legislative and Executive Branches "should, at fixed periods, be reduced to a private station, return into the mass of the people, and the vacancies be supplied by certain and regular elections." 4 Elliot 243; 3 *id.,* at 657–658. But both Declarations went on to state that at these elections, the previous occupants of the office in question should "be eligible or ineligible [for reelection], as the rules of the constitution of government and the laws shall direct." 4 *id.,* at 243; 3 *id.,* at 658. Accordingly, it is hard to describe either Declaration as a "proposed . . . constitutional amendment supporting term limits for Members of Congress." See *ante,* at 826, n. 40.

[36] As for New York, the State's ratifying convention did propose amending the Federal Constitution to provide "[t]hat no person be eligible as a senator for more than six years in any term of twelve years." 1 Elliot 329–330. The majority finds it significant that when this suggestion fell on deaf ears, New Yorkers did not amend their State Constitution to impose this restriction on their state legislature's appointment authority. Before the Seventeenth Amendment was adopted, however, the Federal Constitution vested the choice of Senators in the state legislatures rather than the people. See Art. I, § 3, cl. 1. At least without a delegation of this authority from the legislature, cf. *supra,* at 878–882, and n. 16, the people of New York may well have thought that they could no more amend

If the majority can draw no support from state treatment of religious qualifications and rotation requirements, we are left only with state treatment of property qualifications. It is true that nine of the State Constitutions in effect at the time of the framing required members of the lower house of the state legislature to possess some property, see *ante*, at 823–824, n. 33, and that four of these Constitutions were revised shortly after the framing but continued to impose such requirements, see *ante*, at 824–825, and n. 35. Only one State, by contrast, established a property qualification for the Federal House of Representatives. But the fact that more States did not adopt congressional property qualifications does not mean that the Qualifications Clauses were commonly understood to be exclusive; there are a host of other explanations for the relative liberality of state election laws.[37] And whatever the explanation, the fact remains that

the State Constitution to narrow the legislature's choices for Senator than they could amend the State Constitution to take the appointment of Senators entirely away from the legislature. It obviously would not follow that they doubted their ability to amend the State Constitution to impose constraints on their own choice of Representatives. The ratifying convention's proposal thus sheds absolutely no light on whether New Yorkers considered the Qualifications Clauses to be exclusive.

[37] Property qualifications may simply have seemed unnecessary. For instance, it surely was far more likely that a pauper would secure one of the 202 seats in the South Carolina House of Representatives than that he would secure one of South Carolina's five seats in the United States House of Representatives. Compare S. C. Const. of 1778, Art. XIII, in 6 Thorpe 3251, with U. S. Const., Art. I, § 2, cl. 3; cf. S. C. Const. of 1790, Art. I, § 3 (providing for a 122-seat State House of Representatives), in 6 Thorpe 3258. It may be significant, then, that the one State that saw fit to enact a congressional property qualification was also the State that had the largest congressional delegation. See U. S. Const., Art. I, § 2, cl. 3 (allocating 10 seats to Virginia). In addition, people of the day expected that "[t]he representatives of each State [in the federal House] . . . will probably in all cases have been members . . . of the State legislature." The Federalist No. 56, at 348 (Madison); see also n. 17, *supra* (quoting article by John Stevens, Jr.). Because most States had property re-

five of the election laws enacted immediately after ratification of the Constitution imposed additional qualifications that would clearly be unconstitutional under today's holding. This history of state practice—which is every bit as strong as the history we deemed "decisive" in *McPherson* v. *Blacker*, 146 U. S., at 36—refutes the majority's position that the Qualifications Clauses were generally understood to include an unstated exclusivity provision.

### 5

The same is true of the final category of historical evidence discussed by the majority: controversies in the House and the Senate over seating candidates who were duly elected but who arguably failed to satisfy qualifications imposed by state law.

---

quirements for their state legislators, there may have been little perceived need for a separate property qualification for their Members of Congress.

Even States that wanted to create such a qualification, and that considered it within their constitutional authority to do so, might have been deterred by the possibility that the Federal House of Representatives would take a different view. As I have shown, there certainly was no general understanding that the Qualifications Clauses included an unstated exclusivity provision. But people of the day did consider this to be "one of the doubtful questions on which honest men may differ with the purest motives." 14 Writings of Thomas Jefferson, at 83 (letter to Joseph C. Cabell, Jan. 31, 1814); see n. 14, *supra*. If some States feared that the "honest men" in the House might throw out the results of an election because of a qualifications law, they might well have thought that any policy benefits of such laws were outweighed by the risk that they would temporarily be deprived of representation in Congress. Alternatively, they may simply have wanted to stay away from difficult constitutional questions. Cf. *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). Thus, despite concluding that the States do enjoy the power to prescribe qualifications, Thomas Jefferson questioned whether the advantages of added qualifications were sufficient to justify enacting a law whose constitutionality could be disputed. See 14 Writings of Thomas Jefferson, at 84.

As the majority concedes, "'congressional practice has been erratic'" and is of limited relevance anyway. *Ante,* at 819 (quoting *Powell* v. *McCormack,* 395 U. S., at 545). Actions taken by a single House of Congress in 1887 or in 1964 shed little light on the original understanding of the Constitution. Presumably for that reason, the majority puts its chief emphasis on the 1807 debate in the House of Representatives about whether to seat Maryland's William McCreery. See *ante,* at 816–818. I agree with the majority that this debate might lend some support to the majority's position if it had transpired as reported in *Powell* v. *McCormack.* See *ante,* at 816–817. But the Court's discussion—both in *Powell* and today—is misleading.

A Maryland statute dating from 1802 had created a district entitled to send two representatives to the House, one of whom had to be a resident of Baltimore County and the other of whom had to be a resident of Baltimore City. McCreery was elected to the Ninth Congress as a resident of Baltimore City. After his reelection to the Tenth Congress, however, his qualifications were challenged on the ground that because he divided his time between his summer estate in Baltimore County and his residence in Washington, D. C., he was no longer a resident of Baltimore City at all.

As the majority notes, a report of the House Committee of Elections recommended that McCreery be seated on the ground that state legislatures have no authority to add to the qualifications set forth in the Constitution. See 17 Annals of Cong. 871 (1807); *ante,* at 816–817. But the committee's submission of this initial report sparked a heated debate that spanned four days, with many speeches on both sides of the issue. See 17 Annals of Cong. 871–919, 927–947 (reporting proceedings from Nov. 12, 13, 16, and 18, 1807). Finally, a large majority of the House voted to recommit the report to the Committee of Elections. *Id.,* at 950 (Nov. 19, 1807). The committee thereupon deleted all references to the

constitutional issue and issued a revised report that focused entirely on the factual question whether McCreery satisfied the state residency requirement. *Id.,* at 1059–1061 (Dec. 7, 1807). After receiving the new report, the House seated McCreery with a resolution simply saying: "*Resolved,* That William McCreery is entitled to his seat in this House." *Id.,* at 1237 (Dec. 24, 1807). By overwhelming majorities, the House rejected both a proposal to specify that McCreery possessed "the qualifications required by the law of Maryland," *ibid.,* and a proposal to declare only that he was "duly qualified, agreeably to the constitution of the United States," *id.,* at 1231. Far from supporting the majority's position, the McCreery episode merely demonstrates that the 10th House of Representatives was deeply divided over whether state legislatures may add to the qualifications set forth in the Constitution.[38]

The majority needs more than that. The prohibition that today's majority enforces is found nowhere in the text of the Qualifications Clauses. In the absence of evidence that the Clauses nonetheless were generally understood at the time of the framing to imply such a prohibition, we may not use the Clauses to invalidate the decisions of a State or its people.

### III

It is radical enough for the majority to hold that the Constitution implicitly precludes the people of the States from prescribing any eligibility requirements for the congres-

---

[38] Though obliquely acknowledging this fact, the majority thinks it relevant that some subsequent commentators have mistakenly accepted the gloss put on the McCreery case by two editors in 1834. See *ante,* at 817–818 (citing treatises, each of which relies upon Cases of Contested Elections in Congress (M. Clarke & D. Hall eds. 1834)). But surely we need not accept an inaccurate view of history merely because it has appeared in print. The majority also cites Thomas Jefferson's hazy recollection of the McCreery case, see *ante,* at 817, without acknowledging Jefferson's conclusion that the States were free to supplement the Qualifications Clauses. See *supra,* at 873–874.

sional candidates who seek their votes. This holding, after all, does not stop with negating the term limits that many States have seen fit to impose on their Senators and Representatives.[39] Today's decision also means that no State may disqualify congressional candidates whom a court has found to be mentally incompetent, see, *e. g.*, Fla. Stat. §§ 97.041(2), 99.021(1)(a) (1991), who are currently in prison, see, *e. g.*, Ill. Comp. Stat. Ann., ch. 10, §§ 5/3–5, 5/7–10, 5/10–5 (1993 and West Supp. 1995), or who have past vote-fraud convictions, see, *e. g.*, Ga. Code Ann. §§ 21-2-2(25), 21-2-8 (1993 and Supp. 1994). Likewise, after today's decision, the people of each State must leave open the possibility that they will trust someone with their vote in Congress even though they do not trust him with *a* vote in the election for Congress. See, *e. g.*, R. I. Gen. Laws § 17-14-1.2 (1988) (restricting candidacy to people "qualified to vote").

In order to invalidate § 3 of Amendment 73, however, the majority must go further. The bulk of the majority's analysis—like Part II of my dissent—addresses the issues that would be raised if Arkansas had prescribed "genuine, unadulterated, undiluted term limits." See Rotunda, 73 Ore. L. Rev., at 570. But as the parties have agreed, Amendment 73 does not actually create this kind of disqualification. See

---

[39] Going into the November 1994 elections, eight States had adopted "pure" term limits of one sort or another. See Colo. Const., Art. XVIII, § 9a; Mich. Const., Art. II, § 10; Mo. Const., Art. III, § 45(a); Mont. Const., Art. IV, § 8; Ohio Const., Art. V, § 8; Ore. Const., Art. II, § 20; S. D. Const., Art. III, § 32; Utah Code Ann. § 20A-10-301. Eight other States had enacted "ballot access" provisions triggered by long-term incumbency or multiple prior terms in Congress. See Ariz. Const., Art. VII, § 18; Ark. Const., Amdt. 73, § 3; Calif. Elec. Code Ann. § 25003 (West Supp. 1994); Fla. Const., Art. VI, §§ 4(b)(5), (6); N. D. Cent. Code § 16.1–01–13.1 (Supp. 1993); Okla. Const., Art. II, § 12A; Wash. Rev. Code §§ 29.68.015, 29.68.016 (1994); Wyo. Stat. § 22–5–104 (Supp. 1994). In the 1994 elections, six more States—Alaska, Idaho, Maine, Massachusetts, Nebraska, and Nevada—enacted term-limit or ballot-access measures, bringing to 22 the total number of States with such provisions. See Pear, The 1994 Elections, N. Y. Times, Nov. 10, 1994, p. B7, col. 4. In 21 of these States, the measures have been enacted by direct vote of the people.

Tr. of Oral Arg. 53–54; cf. *ante*, at 828. It does not say that covered candidates may not serve any more terms in Congress if reelected, and it does not indirectly achieve the same result by barring those candidates from seeking reelection. It says only that if they are to win reelection, they must do so by write-in votes.

One might think that this is a distinction without a difference. As the majority notes, "[t]he uncontested data submitted to the Arkansas Supreme Court" show that write-in candidates have won only six congressional elections in this century. *Ante*, at 830, n. 43. But while the data's accuracy is indeed "uncontested," petitioners filed an equally uncontested affidavit challenging the data's relevance. As political science professor James S. Fay swore to the Arkansas Supreme Court, "[m]ost write-in candidacies in the past have been waged by fringe candidates, with little public support and extremely low name identification." App. 201. To the best of Professor Fay's knowledge, in modern times only two incumbent Congressmen have ever sought reelection as write-in candidates. One of them was Dale Alford of Arkansas, who had first entered the House of Representatives by winning 51% of the vote as a write-in candidate in 1958; Alford then waged a write-in campaign for reelection in 1960, winning a landslide 83% of the vote against an opponent who enjoyed a place on the ballot. *Id.*, at 201–202. The other incumbent write-in candidate was Philip J. Philbin of Massachusetts, who—despite losing his party primary and thus his spot on the ballot—won 27% of the vote in his unsuccessful write-in candidacy. See *id.*, at 203. According to Professor Fay, these results—coupled with other examples of successful write-in campaigns, such as Ross Perot's victory in North Dakota's 1992 Democratic Presidential primary—"demonstrate that when a write-in candidate is well-known and well-funded, it is quite possible for him or her to win an election." *Ibid.*

The majority responds that whether "the Arkansas amendment has the likely effect of creating a qualification" is "simply irrelevant to our holding today." *Ante,* at 836. But the majority—which, after all, bases its holding on the asserted exclusivity of the Qualifications Clauses—never adequately explains how it can take this position and still reach its conclusion.

One possible explanation for why the actual effect of the Arkansas amendment might be irrelevant is that the Arkansas Supreme Court has already issued a binding determination of fact on this point. Thus, the majority notes that "the state court" has advised us that "there is nothing more than a faint glimmer of possibility that the excluded candidate will win." *Ante,* at 830. But the majority is referring to a mere plurality opinion, signed by only three of the seven justices who decided the case below. One of the two justices who concurred in the plurality's holding that Amendment 73 violates the Qualifications Clauses did write that "as a practical matter, the amendment would place term limits on service in the Congress," but he immediately followed this comment with the concession that write-in candidacies are not entirely hopeless; his point was simply that "as a practical matter, write-in candidates are at a distinct disadvantage." 316 Ark., at 276; 872 S. W. 2d, at 364 (Dudley, J., concurring in part and dissenting in part). As a result, the majority may rely upon the state court only for the proposition that Amendment 73 makes the specified candidates "distinct[ly]" worse off than they would be in its absence— an unassailable proposition that petitioners have conceded.

In the current posture of these cases, indeed, it would have been extremely irregular for the Arkansas Supreme Court to have gone any further. Disputed questions of fact, in Arkansas as elsewhere, generally are resolved at trial rather than on appeal from the entry of summary judgment. See

Ark. Rule Civ. Proc. 56.[40] Accordingly, the majority explicitly disclaims any reliance on the state court's purported finding about the effect of Amendment 73. See *ante*, at 830, n. 44.

Instead, the majority emphasizes another purported conclusion of the Arkansas Supreme Court. As the majority notes, the plurality below asserted that "[t]he intent" of Amendment 73 was "to disqualify congressional incumbents from further service." 316 Ark., at 266, 872 S. W. 2d, at 357. According to the majority, "[w]e must, of course, accept the state court's view of the purpose of its own law: We are thus authoritatively informed that the sole purpose of §3 of Amendment 73 was to attempt to achieve a result that is forbidden by the Federal Constitution." *Ante*, at 829.

I am not sure why the intent behind a law should affect our analysis under the Qualifications Clauses. If a law does not in fact add to the constitutional qualifications, the mistaken expectations of the people who enacted it would not seem to affect whether it violates the alleged exclusivity of those Clauses. But in any event, the majority is wrong about what "the state court" has told us. Even the plurality

---

[40] Even if one were inclined to believe that the Arkansas Supreme Court had departed from the usual practice and had purported to make a binding determination on a disputed issue of fact, we would not be foreclosed from examining the basis for that determination. To be sure, on direct review of a state court's judgment, we will not "conduct a more searching review of findings made in state trial court than we conduct with respect to federal district court findings." *Hernandez* v. *New York*, 500 U. S. 352, 369 (1991) (plurality opinion). But that is only to say that we will review state-court findings under the "clear error" standard. *Ibid.*; accord, *id.*, at 372 (O'CONNOR, J., concurring in judgment); cf. *id.*, at 379 (STEVENS, J., dissenting) (identifying no standard of review, but arguing that the state court's decision should be reversed because its underlying factual findings were erroneous). In certain areas, indeed, this Court apparently gives quite little deference to the initial factfinder, but rather "exercise[s] its own independent judgment" about the factual conclusions that should be drawn from the record. See *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 501, and n. 17 (1984) (STEVENS, J.).

below did not flatly assert that the desire to "disqualify" congressional incumbents was the *sole* purpose behind § 3 of Amendment 73. More important, neither of the justices who concurred in the plurality's holding said anything at all about the intent behind Amendment 73. As a result, we cannot attribute any findings on this issue to the Arkansas Supreme Court.

The majority suggests that this does not matter, because Amendment 73 itself says that it has the purpose of "evading the requirements of the Qualifications Clauses." See *ante*, at 831 (referring to the "avowed purpose" of Amendment 73). The majority bases this assertion on the amendment's preamble, which speaks of "limit[ing] the terms of elected officials." See *ante*, at 830. But this statement may be referring only to §§ 1 and 2 of Amendment 73, which impose true term limits on state officeholders. Even if the statement refers to § 3 as well, it may simply reflect the limiting effects that the drafters of the preamble expected to flow from what they perceived as the restoration of electoral competition to congressional races. See *infra*, at 924. In any event, inquiries into legislative intent are even more difficult than usual when the legislative body whose unified intent must be determined consists of 825,162 Arkansas voters.

The majority nonetheless thinks it clear that the goal of § 3 is "to prevent the election of incumbents." See *ante*, at 830, 836. In reaching this conclusion at the summary-judgment stage, however, the majority has given short shrift to petitioners' contrary claim. Petitioners do not deny that § 3 of Amendment 73 intentionally handicaps a class of candidates, in the sense that it decreases their pre-existing electoral chances. But petitioners do deny that § 3 is intended to (or will in fact) "prevent" the covered candidates from winning reelection, or "disqualify" them from further service. One of petitioners' central arguments is that congressionally conferred advantages have artificially inflated the pre-existing electoral chances of the covered candidates, and

that Amendment 73 is merely designed to level the playing field on which challengers compete with them.

To understand this argument requires some background. Current federal law (enacted, of course, by congressional incumbents) confers numerous advantages on incumbents, and these advantages are widely thought to make it "significantly more difficult" for challengers to defeat them. Cf. *ante,* at 831. For instance, federal law gives incumbents enormous advantages in building name recognition and good will in their home districts. See, *e. g.,* 39 U. S. C. § 3210 (permitting Members of Congress to send "franked" mail free of charge); 2 U. S. C. §§ 61–1, 72a, 332 (permitting Members to have sizable taxpayer-funded staffs); 2 U. S. C. § 123b (establishing the House Recording Studio and the Senate Recording and Photographic Studios).[41] At the same time that incumbent Members of Congress enjoy these in-kind benefits, Congress imposes spending and contribution limits in congressional campaigns that "can prevent challengers from spending more . . . to overcome their disadvantage in name recognition." App. to Brief for State of Washington as *Amicus Curiae* A–4 (statement of former 10-term Representative William E. Frenzel, referring to 2 U. S. C. § 441a). Many observers believe that the campaign-finance laws also give incumbents an "enormous fund-raising edge" over their challengers by giving a large financing role to entities with incentives to curry favor with incumbents. Wertheimer & Manes, Campaign Finance Reform: A Key to Restoring the Health of Our Democracy, 94 Colum. L. Rev. 1126, 1133 (1994). In

---

[41] Former Representative William E. Frenzel describes the House Recording Studio as a sophisticated operation used "to prepare tapes of speeches and messages to voters." Frenzel explains: "Taxpayers pay for the facilities, the personnel that run them, the production costs, and the costs of distributing, by mail or otherwise, the tapes that members supply (from their taxpayer-funded expense accounts). These messages are widely disseminated by broadcasters, who can use them to fill air time at no cost to themselves." App. to Brief for State of Washington as *Amicus Curiae* A–5 to A–6.

addition, the internal rules of Congress put a substantial premium on seniority, with the result that each Member's already plentiful opportunities to distribute benefits to his constituents increase with the length of his tenure. In this manner, Congress effectively "fines" the electorate for voting against incumbents. Hills, 53 U. Pitt. L. Rev., at 144–145.

Cynics see no accident in any of this. As former Representative Frenzel puts it: "The practice . . . is for incumbents to devise institutional structures and systems that favor incumbents." App. to Brief for State of Washington as *Amicus Curiae* A–3. In fact, despite his service from 1971 to 1989 on the House Administration Committee (which has jurisdiction over election laws), Representative Frenzel can identify no instance in which Congress "changed election laws in such a way as to lessen the chances of re-election for incumbents, or to improve the election opportunities for challengers." *Ibid.*

At the same time that incumbents enjoy the electoral advantages that they have conferred upon themselves, they also enjoy astonishingly high reelection rates. As Lloyd Cutler reported in 1989, "over the past thirty years a weighted average of ninety percent of all House and Senate incumbents of both parties who ran for reelection were reelected, even at times when their own party lost control of the Presidency itself." Cutler, Now is the Time for All Good Men . . . , 30 Wm. & Mary L. Rev. 387, 395; see also Kristol, Term Limitations: Breaking Up the Iron Triangle, 16 Harv. J. L. & Pub. Policy 95, 97, and n. 11 (1993) (reporting that in the 100th Congress, as many Representatives died as were defeated at the polls). Even in the November 1994 elections, which are widely considered to have effected the most sweeping change in Congress in recent memory, 90% of the incumbents who sought reelection to the House were successful, and nearly half of the losers were completing only their first terms. Reply Brief for Petitioners U. S. Term Limits, Inc., et al. 4, n. 5. Only 2 of the 26 Senate incumbents seeking reelection were defeated, see *ibid.,* and one of

them had been elected for the first time in a special election only a few years earlier.

The voters of Arkansas evidently believe that incumbents would not enjoy such overwhelming success if electoral contests were truly fair—that is, if the government did not put its thumb on either side of the scale. The majority offers no reason to question the accuracy of this belief. Given this context, petitioners portray § 3 of Amendment 73 as an effort at the state level to offset the electoral advantages that congressional incumbents have conferred upon themselves at the federal level.

To be sure, the offset is only rough and approximate; no one knows exactly how large an electoral benefit comes with having been a long-term Member of Congress, and no one knows exactly how large an electoral disadvantage comes from forcing a well-funded candidate with high name recognition to run a write-in campaign. But the majority does not base its holding on the premise that Arkansas has struck the wrong balance. Instead, the majority holds that the Qualifications Clauses preclude Arkansas from trying to strike any balance at all; the majority simply says that "an amendment with the avowed purpose and obvious effect of evading the requirements of the Qualifications Clauses by handicapping a class of candidates cannot stand." *Ante,* at 831. Thus, the majority apparently would reach the same result even if one could demonstrate at trial that the electoral advantage conferred by Amendment 73 upon challengers precisely counterbalances the electoral advantages conferred by federal law upon long-term Members of Congress.

For me, this suggests only two possibilities. Either the majority's holding is wrong and Amendment 73 does not violate the Qualifications Clauses, or (assuming the accuracy of petitioners' factual claims) the electoral system that exists without Amendment 73 is no less unconstitutional than the electoral system that exists with Amendment 73.

I do not mean to suggest that States have unbridled power to handicap particular classes of candidates, even when those candidates enjoy federally conferred advantages that may threaten to skew the electoral process. But laws that allegedly have the purpose and effect of handicapping a particular class of candidates traditionally are reviewed under the First and Fourteenth Amendments rather than the Qualifications Clauses. Compare *Storer* v. *Brown,* 415 U. S., at 728–736 (undertaking a lengthy First and Fourteenth Amendment analysis of a California rule that denied ballot access to any independent candidate for Congress who had not severed his ties to a political party at least one year prior to the immediately preceding primary election, or 17 months before the general election), with *id.,* at 746, n. 16 (dismissing as "wholly without merit" the notion that this rule might violate the Qualifications Clauses). Term-limit measures have tended to survive such review without difficulty. See, *e. g., Moore* v. *McCartney,* 425 U. S. 946 (1976) (dismissing an appeal from *State ex rel. Maloney* v. *McCartney,* 159 W. Va. 513, 223 S. E. 2d 607, on the ground that limits on the terms of state officeholders do not even raise a substantial federal question under the First and Fourteenth Amendments).

To analyze such laws under the Qualifications Clauses may open up whole new vistas for courts. If it is true that "the current congressional campaign finance system . . . has created an electoral system so stacked against challengers that in many elections voters have no real choices," Wertheimer & Manes, 94 Colum. L. Rev., at 1133, are the Federal Election Campaign Act Amendments of 1974 unconstitutional under (of all things) the Qualifications Clauses? Cf. *Buckley* v. *Valeo,* 424 U. S. 1 (1976) (upholding the current system against First Amendment challenge). If it can be shown that nonminorities are at a significant disadvantage when they seek election in districts dominated by minority voters, would the intentional creation of "majority-minority

districts" violate the Qualifications Clauses even if it were to survive scrutiny under the Fourteenth Amendment? Cf. *Shaw* v. *Reno*, 509 U. S. 630, 649 (1993) ("[W]e express no view as to whether [the intentional creation of such districts] always gives rise to an equal protection claim"); *id.*, at 677 (STEVENS, J., dissenting) (arguing that States may draw district lines for the "sole purpose" of helping blacks or members of certain other groups win election to Congress). More generally, if "[d]istrict lines are rarely neutral phenomena" and if "districting inevitably has and is intended to have substantial political consequences," *Gaffney* v. *Cummings*, 412 U. S. 735, 753 (1973), will plausible Qualifications Clause challenges greet virtually every redistricting decision? Cf. *id.*, at 754 (noting our general refusal to use the Equal Protection Clause to "attemp[t] the impossible task of extirpating politics from what are the essentially political processes of the sovereign States"); see also *Burns* v. *Richardson*, 384 U. S. 73, 89, n. 16 (1966) (finding nothing invidious in the practice of drawing district lines in a way that helps current incumbents by avoiding contests between them).

The majority's opinion may not go so far, although it does not itself suggest any principled stopping point. No matter how narrowly construed, however, today's decision reads the Qualifications Clauses to impose substantial implicit prohibitions on the States and the people of the States. I would not draw such an expansive negative inference from the fact that the Constitution requires Members of Congress to be a certain age, to be inhabitants of the States that they represent, and to have been United States citizens for a specified period. Rather, I would read the Qualifications Clauses to do no more than what they say. I respectfully dissent.